IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADA ANGLEMEYER, <u>et al.</u>, | : | CIVIL ACTION |
| Plaintiffs | : : : | |
| v. | : : | |
| CRAIG AMMONS, <u>et al.</u>, | : : : | |
| Defendants | : | No. 19-3714 |

**DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT -
<u>STATEMENT OF UNDISPUTED FACTS</u>**

**THE PROPERTY AND RESIDENTS**

1.  This case pertains to a search warrant executed 340 Allentown Road, Bangor Township, PA on February 23, 2018.

2.  340 Allentown Road, Bangor Township, PA ("the property") is owned by Ada and Richard Anglemeyer. Ada Anglemeyer Dep. at 13:20-14:15.

3.  The property is approximately 60 acres overall and incudes a large residence and numerous other structures. Dep. of Ada Anglemeyer at 30:4-31:6, 43:1-20; Dep. of Jeffrey Anglemeyer at 37:23-38:1; Exh. 13: Photo-Overhead (Dep. Exh. D-1).

4.  As of February 2018, the following individuals were living in the residence on the property (Plaintiffs in bold; ages at that time in parentheses):

    a.  **Ada Anglemeyer (76)**

    b.  **Richard Anglemeyer (77)**

    c.  Mark Anglemeyer (52, Ada and Richard's son)

    d.  **Jeffrey Anglemeyer** (55, Ada and Richard's son)

  e. Renae Kluska (45, Ada and Richard's daughter)

  f. **Joseph Kluska** (44, Renae's husband)

  g. Kierra Kluska (17, Renae and Joseph Kluska's daughter)

  h. Tyeler Trinkley (20, Renae Kluska's son)

Ada Anglemeyer Dep. at 8:13-13:10, 53:4-11; Exhibit 16: Intelligence Brief, pp. 2-9.

## SERT ASSISTANCE REQUEST

5. On February 8, 2018, Detective Michael Enstrom the Northampton County Drug Task Force ("NCDTF") contacted the Pennsylvania State Police's ("PSP") Special Emergency Task Force ("SERT") regarding the property. Rowlands Dep. at 7:8-12, 28:1-9; Exhibit 15: Warrant Service Plan (Dep. Exh. Rowlands-1), pp. 1, 9.

6. SERT is a PSP unit trained to deal with high-risk, volatile situations. Est. of Smith v. Marasco, 430 F.3d 140, 145 (3d Cir. 2005)

7. Detective Enstrom spoke with Sergeant Mark Rowlands and asked for SERT's assistance in serving a search warrant Detective Enstrom intended to obtain for 340 Allentown Road, Bangor Township, PA. Rowlands Dep. at 7:7-12, 28:1-13; Exhibit 15: Warrant Service Plan, pp. 1, 9.

8. Detective Enstrom relayed to Sergeant Rowlands that the warrant is based on multiple controlled buys of crystal methamphetamine from one of the residents, Mark Anglemeyer, and that the search would include a detached garage or trailer where the purchases were made, as well as the residential structure where Mark Anglemeyer lived. Rowlands Dep. at 7:7-12, 29:7-12; Warrant Service Plan, pp. 1, 9.

9. Based on the information relayed by Detective Enstrom, the situation qualified for SERT involvement. Rowlands Dep. at 7:13-24, 37:2-15; Exhibit 15: Warrant Service Plan, p. 1.

10.     Between February 8, 2018 and February 23, 2018 Sergeant Rowlands obtained additional information from Detective Enstrom and the NCDTF about the property and the residents. Rowlands Dep. at 35:16-36:5, 44:4-14, 53:14-54:1.

11.     Between February 8, 2018 and February 23, 2018 Sergeant Rowlands and other staff assigned to SERT independently obtained information on the eight adults and one teenager believed to live at the property, including reviewing criminal histories, firearm registration records, and social media accounts.  Rowlands Dep. at 41:10-42:5; 44:4-14.

12.      NCDTF obtained the search warrant on February 22, 2018; it allowed for the search of the residence, trailer and garage, and "All persons located on the premises described herein." Exhibit 12: Search Warrant.

13.     No one from SERT was involved in the process of obtaining the search warrant or the underlying investigation that led to the search warrant. Exhibit 12: Search Warrant.

## SERT BRIEFING AND APPROACH TO PROPERTY

14.     On or about February 21, 2018 various SERT members were notified that they were to report to the PSP's Belfast Barracks at 4:00 a.m. the following morning for a briefing on the operation. Dep. Exh. Rowlands-1, p. 5, 9.

15.     Approximately 50 SERT members were activated for the operation, including the 19 defendants.  Rowlands Dep. at 38:17-40:10; Exhibit 15: Service Warrant Plan, pp. 2-3.

16.     At the briefing the SERT members were provided with an intelligence brief prepared by Corporal Arthur Johnson.  Rowlands Dep. at 62:22-63:24; Exhibit 16: Intelligence Brief (Dep. Exh. Rowlands-2).

17.     At the briefing Mark Rowlands and other SERT leaders gave a verbal presentation, which was video recorded and included a recital of the entire Intelligence Brief and photographs.

Rowlands Dep. at 61:11-21, 62:22-63:24; Videos MVI_2287 through MVI_2293; (Intelligence Brief recited in MVI_2287.)

18. Through either the intelligence brief and/or verbal briefing the SERT members in attendance were provided with the following information:

   a. SERT was there to execute a high risk search warrant for the NCDTF based on multiple methamphetamine sales by Mark Anglemeyer that occurred on a detached garage on the property. Video "MVI_2286"

   b. Mark Anglemeyer, along with seven other adults and one 17-year old were believed to live in the residence at the property. Video "MVI_2286"

   c. The search warrant included the residence, garage, and a trailer. Video "MVI_2286"

   d. There were numerous guns inside the residence. Video "MVI_2286"

   e. The residents are "not law enforcement friendly." Video "MVI_2286"

   f. Records of gun purchases showed that several residents had purchased handguns. Video "MVI_2287"; Intelligence Brief, pp. 2-10.

   g. The weapons include an AR-15. Video "MVI_2286"

   h. There are videos on Facebook of some of the residents firing an AR-15 and a 50 caliber rifle on the property. Video "MVI_2288" at 3:50.

   i. The residents openly carry guns on their person while on the property. Video "MVI_2286", MVI_2288 at 3:40.

   j. Expect to be met with some resistance. Video "MVI_2286"

   k. Mark Anglemeyer and had a lengthy criminal record, including charges of drug sales, assault and resisting arrest and had been involved in an incident where he led police

on a dangerous vehicle pursuit. Video "MVI_2287"; Exhibit 16: Intelligence Brief, p.2.

l. Mark's brother, Jeffrey Anglemeyer, also had an extensive record including drug sales firearms violations, assault, resisting arrest and strangulation. Video "MVI_2287"; Exhibit 16: Intelligence Brief, p. 3.

m. Mark's sister Renae had a past simple assault charge. Video "MVI_2287"; Exhibit 16: Intelligence Brief, p. 6.

n. Joseph Kluska, Renae's husband, had a past simple assault charge. Video "MVI_2287"; Exhibit 16: Intelligence Brief p. 7.

o. Richard Anglemeyer (identified as "Father"), Ada Anglemeyer (identified as "Mother"), Kierra Kluska, Tyeler Trinkley, and Ricky Anglemeyer (Jeffrey's then 22-year old adult son) were also expected to be at the property and had no criminal histories. Video "MVI_2287"; Exhibit 16: Intelligence Brief pp. 4, 5, 8-10.

p. It was unknown if any of the other residents played any role in the drug sales occurring at the property. Video "MVI_2287"; Exhibit 16: Intelligence Brief pp. 3-10.

q. A description and photos of the property. Video "MVI_2288"

r. A description and photos of the exterior of the structures to be entered. Video "MVI_2288"

s. The confidential informant reported that the property has "an extensive surveillance system." Video "MVI_2288" at 3:55.

t. The residence is a "split-level" style house.

    u. The interior of the residence "a puzzle" with "a lot of additions." Video "MVI_2290" at 1:20.

    v. There is no good description of the interior available. Video "MVI_2290" at 4:05.

    w. The anticipated location of a "pool room" and a "game room." Video "MVI_2290" at 4:10.

19. Each of the SERT members were given specific tasks. The 19 defendants were tasked with entering and securing the residence, with some members to enter through an exterior door on the upper level and others simultaneously entering through a French door on the lower level. Rowlands Dep. at 45:21-46:19.

20. Each side of a residence had been designated with a number; the lower level entrance, was designated the "4-side" with the point of entrance being a French door; the upper level entrance was designated the "1 side" with the point of entry being a solid door. Rowlands Dep. at 45:21-46:19; Pelotte Dep. at 26:9-21; Ada Anglemeyer Dep. at 33:3-23; Exhibit 13: Photo-Overhead (Dep. Exh. D-1); Exhibit 14: Photo-French doors (Dep. Exh. D-2).

21. The 19 defendants were *not* provided with the layout of the interior of the residence or the expected location of each of the individuals expected to be there.

22. After the verbal briefing, the SERT members assigned to enter the residence put on their uniforms and equipment and, in the parking lot, conducted at least three rehearsals of the entry into the residence. Videos "MVI_2296", "MVI_2297", "MVI_2298"

23. The SERT members all wore olive-colored helmets and the same camouflage uniform. Rowlands Dep. at 10:6-15. 33:19-34:5; Videos "MVI_2296", "MVI_2297", "MVI_2298."

24. The SERT members then proceeded to the residence in several marked vehicles. Painter Dep. at 42:10-43:7.

25.     As they neared the location, SERT members conducting surveillance at the property observed a black Chevrolet Suburban leaving the property; this information was shared with the other SERT members and the Suburban passed them in the opposite direction.  Painter Dep. at 43:14-44:1; Chulock Callout Report, p. 1; Exhibit 17: Command Post Log.

26.     The SERT members arrived at approximately 6:05 a.m.  It was still dark out.  Exhibit 17: Command Post Log, 6:05 entry; Exhibit 15: Warrant Service Plan, p.1; Pelotte Dep. at 6:20-23.

27.

28.     As the SERT members approached the lower level entrance, Pelotte observed an adult male he believed to be Richard Anglemeyer looking out a window by the entrance.  Exhibit 17: Command Post Log; Pelotte Dep. at 18:21-20:4; Richard Anglemeyer at 25:18-23.

29.     Pelotte informed the other SERT members over the radio that they had been compromised.  Pelotte Dep. at 20:21-21:10.

30.     Both entrances were then forcibly entered.

## LOWER LEVEL (4-SIDE) ENTRY

**Vincente Lopez**

31.     Lopez was part of the team that entered the lower level.  Exhibit 25: Lopez Callout Report; Exhibit 15: Warrant Service Plan, p.6.

32.     Lopez was armed with a Halligan bar (a crowbar) and a handgun. Exhibit 25: Lopez Callout Report; Exhibit 15: Warrant Service Plan.

33.     After entering Lopez had physical contact with one person - a white male in the living room who he applied flex cuffs to. Exhibit 25: Lopez Callout Report.

**Kevin Ward**

34. Ward was part of the team that entered the lower level. Exhibit 29: Ward Callout Report; Exhibit 15: Warrant Service Plan, p.6.

35. Ward was armed with a Ram (door breaching device), Ninja Rocks (glass breaking device) and a handgun. Exhibit 29: Ward Callout Report; Exhibit 15: Warrant Service Plan, p.6.

36. After entering Ward had no physical contact with any of the residents. Exhibit 29: Ward Callout Report.

**Clinton Painter**

37. Painter was part of the team that entered the lower level. Painter Dep. at 17:17-19.

38. Painter was carrying a hand gun in one hand and a shield on his opposite arm. The shield had a viewing port and headlights on the front. Painter Dep. at 17:19-21, 29:10-16.

39. Painter, along with other Troopers, were giving commands to the residents to show their hands and get to the ground. Painter Dep. at 22:2-11.

40. Painter was holding the shield over his face, looking through the port shield and using the headlights; the lighting was dim inside. Painter Dep. at 29:6-9, 30:14.

41. Upon entry Painter observed an adult male who retreated to a doorway further in the residence. Painter Dep. at 22:14-23.

42. Painter did not know who the adult male was, although he did not believe it to be Mark Anglemeyer. Painter Dep. at 24:4-13.

43. As Painter approached that area, he encountered a second adult male, who was not wearing a shirt. Painter Dep. at 24:23-25:2.

44. The second adult male surprised Painter, who he then pushed to the ground applying his shield to the man's backside. Painter Dep. at 26:6-27:1.

45. Painter did not know who the second adult was. Painter Dep. at 25:2-3, 26:24-27:7.

46. Painter then proceeded into the room where first adult male was now located. Painter Dep. at 27:8-19.

47. That person was yelling and did not respond to commands to get to the ground. Painter 27:8-19.

48. Another trooper carrying a shield pinned that person to the wall. Painter 27:8-9.

49. Painter then proceeded further into the residence, where Painter encountered a female at or near a doorway. 29:10-16.

50. Although he did not know the identity or approximate age of the female at the time of this encounter, Painter later learned it was Ada Anglemeyer. Painter Dep. at 29:13-30: 17.

51. As Painter approached Ada Anglemeyer, he instructed her to show her hands and get on the ground. Painter Dep. at 29:20-23.

52. Painter saw a doorway to a room behind Ada Anglemeyer and was uncertain as to whom or what was in it. Painter Dep. at 37:3-13.

53. Ada Anglemeyer had just awoken by a noise and was standing outside her bedroom. Ada Anglemeyer Dep. at 66:7-13

54. Ada Anglemeyer was unaware that police were in the house and did not hear any commands. Ada Anglemeyer Dep. at 67:1-8

55. As Painter continued to approach, Ada Anglemeyer, who did not see him, did not react. Painter Dep. at 31:10-16; Ada Anglemeyer Dep. at 67:16-68:6.

56. Painter then pushed her with his shield; Ada Anglemeyer was facing the shield and the contact caused her to fall backwards. Painter Dep. at 35:3-36:24.

57. Painter then continued into the room that was behind Ada Anglemeyer. Painter Dep. at 37:1-21

58. Another SERT member stayed with Ada Anglemeyer. Painter Dep. at 38:10-16.

59. Painter thereafter participated in clearing the rest of the residence, including four additional rooms and an indoor pool area. He encountered no additional residents. Painter Dep. at 38:17-39:14.

**Mark Benson**

60. Benson was part of the team that entered the lower level. Exhibit 21: Benson Callout Report; Exhibit 15: Warrant Service Plan, p.6.

61. Benson was armed with a rifle and a handgun. Exhibit 21: Benson Callout Report; Exhibit 15: Warrant Service Plan, p.6.

62. Upon entry Benson encountered a white male who did not comply with commands to get to the ground and Benson assisted with securing the male. Exhibit 21: Benson Callout Report.

63. Benson remained with the male and did have physical contact with any of the other residents. Exhibit 21: Benson Callout Report.

**Robert McGarvey**

64. McGarvey was part of the team that entered the lower level. McGarvey Dep. at 31:19-32:2.

65. McGarvey was carrying a hand gun in one hand and a shield on his opposite arm. McGarvey Dep. at 22:14-23:18.

66. McGarvey, along with other Troopers, were giving commands to the residents to show their hands and get to the ground. McGarvey Dep. at 33:10-13.

67. Upon entry McGarvey observed an adult male who retreated to a doorway further in the residence. McGarvey Dep. at 32:3-6.

68. McGarvey did not know who the adult male was and could not estimate his age. McGarvey Dep. at 32:7-9.

69. McGarvey followed the adult male, who continued to disregard commands. McGarvey Dep. at 36:19-37:18.

70. McGarvey eventually got close enough to the adult male that he was able to use his shield to force him to the ground. McGarvey Dep. at 37:9-10, 39:4-41:12.

71. Another SERT member then secured the white male with flex cuffs. McGarvey Dep. at 41:13-19.

72. McGarvey thereafter participated in clearing the rest of the residence, including a room with a pool. He encountered no additional residents. McGarvey Dep. at 43:19-44:19.

73. McGarvey does not recall seeing the adult male again and is unaware of him suffering any injuries as a result of McGarvey forcing him to the ground. McGarvey Dep. at 42:1-15.

**Lance Schimp**

74. Schimp was part of the team that entered the lower level. Exhibit 28: Schimp Callout Report; Exhibit 15: Warrant Service Plan, p.6.

75. Schimp was armed with a rifle and a handgun. Exhibit 28: Schimp Callout Report; Exhibit 15: Warrant Service Plan, p.6.

76. Schimp had no physical contact with any of the residents. Exhibit 28: Schimp Callout Report.

**Brian King**

77. King was part of the team that entered the lower level. King Dep. at 16:4-12.

78. King was carrying either a beanbag or taser or both. King Dep. at 14:4-12.

79. Upon entry King was applied flex cuffs to a middle-aged male on the lower level. King Dep. 17:10-18:19.

80. King had no physical contact with any of the other residents. King Dep. at 14:13-20.

**Jason Pelotte**

81. Pelotte was part of the team that entered the lower level. Pelotte Dep. at 8:1-2, 10:7-8, 27:19-21.

82. Upon entry Pelotte saw the male he believed to be "the father" or Richard Anglemeyer. Pelotte Dep. at 23:9-22.

83. Pelotte observed Richard Anglemeyer disobey commands to show his hands and lie down; he instead retreated further in the house. Pelotte Dep. at 23:9-22.

84. Pelotte also at some point observed an adult female he later learned to be Ada Anglemeyer, as well as and a younger adult male he is unable to identify. Pelotte Dep. at 23:24-25:2.

85. Pelotte did not personally make physical contact with Richard Anglemeyer, Ada Anglemeyer, or the younger adult described in the previous paragraph. Pelotte Dep. at 23:24-25:2.

86. Pelotte then opened a door to a small room that contained a small statured older male in a bed. Pelotte Dep. at 8:1-12, 25:12-18.

87. Pelotte asked this male to get up, the adult male complied, and Pelotte escorted him to the living room where he had him lay down on the floor on his stomach. Pelotte Dep. at 8:1-12, 25:17-26:3.

88. Pelotte then passed custody of the adult the male off to another SERT member and continued in clearing the residence.  Pelotte Dep. at 9:20-21.

89. Pelotte did not personally place flex cuffs on the small statured male and does not know if anyone else did.  Pelotte Dep. at 9:22-10:5.

90. Pelotte did not recognize from the briefing the small statured male he interacted with, but did not believe it to be Richard Anglemeyer, who observed lying on the ground in the same area near Trooper King.  Pelotte Dep. at 14:3-20.

91. Pelotte thereafter participated in clearing the rest of the residence, including a room with a pool.  He encountered no additional residents.  Pelotte Dep. at 26:6-27:8.

## UPPER LEVEL (1-SIDE) ENTRY

**Matthew Wysocky**

92. Wysocky was part of the team that entered the 1-side on the upper level of the residence. Wysocky Dep. at 28:20-23.

93. Upon entering through the door, Wysocky entered a bedroom and encountered an adult male and an adult female.  Wysocky Dep. at 29:8-13.

94. The male was in a bed; Wysocky did not know who he was at that time.  Wysocky Dep. at 38:13-19.

95. Based on other deposition testimony, the male is believed to be Joseph Kluska and the woman Renae Kluska.  Joseph Kluska Dep. at 42:14-43:13.

96. On the headboard of the bed was a loaded handgun.  Wysocky Dep. at 33:9-14.

97. Wysocky went towards Kluska and pulled his arms behind his back and handcuffed him behind back using flex cuffs; Joseph Kluska was face down on the bed.  Wysocky Dep. at 31:1-32:19.

98. Wysocky then moved Joseph Kluska from the bed to the floor so that he could pat him down for weapons. Wysocky Dep. at 33:2-8; 36:12-14.

99. Wysocky testified that he moved Joseph Kluska by grabbing him in the upper arm area. Wysocky Dep. at 34:11-35:16.

100. Kluska testified that Wysocky moved him by grabbing his wrist area and/or the flex cuffs, picking him up and dropping him to the floor. Joseph Kluska Dep. at 52:3-18.

101. No weapons were found on Kluska's person. Wysocky Dep. at 33:2-8.

102. Wysocky then moved Joseph Kluska from the floor to a nearby chair. Wysocky Dep. at 35:20-36:2.

103. Wysocky testified that he moved him by assisting him to his feet and leading him to the chair. Wysocky Dep. at 36:5-18.

104. Kluska testified that Wysocky moved him by grabbing the flex cuffs attached to Kluska's wrists and lifting him up. Joseph Kluska Dep. at 52:21-53:5.

105. Kluska immediately had pain in his shoulders, which he attributes to Wysocky moving him from the bed to the floor and then the floor to the chair. Joseph Kluska Dep. at 48:23-49:7, 52:21-24, 54:12-18.

106. Joseph Kluska and Renae Kluska remained in the room for approximately 15 minutes until they were escorted to a living room downstairs where the other residents of the house were located. Joseph Kluska Dep. at 57:11-15, 60:16-61:4.

**Peter Del Gaizo**

107. Del Gaizo was part of the team that entered the front door which was on the upper level of the residence. Del Gaizo Dep. at 24:8-18.

108. Upon entering through the door, Del Gaizo, along with Trooper Wysocky, entered a bedroom and encountered an adult male and an adult female. Del Gaizo Dep. at 19:3-13.

109. Del Gaizo was unaware as to whom the individuals were at the time, but now understands the male to be Joseph Kluska and the female to be Renae Kluska. Del Gaizo Dep. at 19:3-13.

110. Del Gaizo gave verbal commands to Renae, who complied and was flex cuffed by Del Gaizo without incident. Del Gaizo Dep. at 20:7-21:2.

111. Del Gaizo did not have any physical contact with Joseph Kluska, who was flex cuffed by Trooper Wysocky. Del Gaizo Dep. at 21:15-18; Joseph Kluska Dep at 50:22-51:1.

**Nathan Aukamp**

112. Aukamp was part of the team that entered the upper level. Exhibit 20: Aukamp Callout Report; Exhibit 15: Warrant Service Plan, p.6.

113. Aukamp was armed with a handgun and a shield. Exhibit 20: Aukamp Callout Report; Exhibit 15: Warrant Service Plan, p.6.

114. Aukamp's only physical contact with any residents was with an adult male in an upper level bedroom. Exhibit 20: Aukamp Callout Report.

**Terrance Merante**

115. Merante was part of the team that entered the upper level. Exhibit 26: Merante Callout Report; Exhibit 15: Warrant Service Plan, p.6.

116. Merante was armed with a rifle. Exhibit 26: Merante Callout Report; Exhibit 15: Warrant Service Plan, p.6.

117. Merante's only physical contact with any residents was with an adult male in an upper level bedroom, who appeared to be Mark Anglemeyer. Exhibit 26: Merante Callout Report.

**Daniel Wilk**

118. Wilk was part of the team that entered the upper level. Exhibit 30: Wilk Callout Report; Exhibit 15: Warrant Service Plan, p.6.

119. Wilk was armed with a handgun and a shield. Exhibit 30: Wilk Callout Report; Exhibit 15: Warrant Service Plan, p.6.

120. Wilk's only physical contact with any residents was with a juvenile male and female in an upper level bedroom who were flex cuffed without incident. Exhibit 30: Wilk Callout Report.

**David Brodeur**

121. Brodeur was part of the team that entered the upper level. Exhibit 22: Brodeur Callout Report; Exhibit 15: Warrant Service Plan, p.6.

122. Brodeur was armed with a shotgun. Exhibit 22: Brodeur Callout Report; Exhibit 15: Warrant Service Plan, p.6.

123. Brodeur's only physical contact with any residents was with a juvenile male and female in an upper level bedroom, who were flex cuffed without incident. Exhibit 22: Brodeur Callout Report.

**Craig Ammons**

124. Ammons was part of the team that entered the upper level. Exhibit 18: Ammons Callout Report; Exhibit 15: Warrant Service Plan, p.6.

125. Ammons was armed with a handgun and a shield. Exhibit 18: Ammons Callout Report; Exhibit 15: Warrant Service Plan, p.6.

126. Ammons' only physical contact was with an adult male in an upper level bedroom. Exhibit 18: Ammons Callout Report.

**Michael Lang**

127.     Lang was part of the team that entered the upper level. Exhibit 24: Lang Callout Report; Exhibit 15: Warrant Service Plan, p.6.

128.     Lang was armed with a rifle and a handgun. Exhibit 24: Lang Callout Report; Exhibit 15: Warrant Service Plan, p.6.

129.     Lang's only physical contact was with an adult male in an upper level bedroom. Exhibit 24: Lang Callout Report.

**John Chulock**

130.     Chulock was part of the team that entered the upper level. Exhibit 23: Chulock Callout Report; Exhibit 15: Warrant Service Plan, p.6.

131.     Chulock was armed with a rifle. Exhibit 23: Chulock Callout Report; Exhibit 15: Warrant Service Plan, p.6.

132.     Chulock's only physical contact was with a female on the upper level. Exhibit 23: Chulock Callout Report.

**Brian Atkinson**

133.     Atkinson was part of the team that entered the upper level. Exhibit 19: Atkinson Callout Report; Exhibit 15: Warrant Service Plan, p.6.

134.     Atkinson was armed with a shotgun loaded with bean bags and a handgun. Exhibit 19: Atkinson Callout Report; Exhibit 15: Warrant Service Plan, p.6.

135.     Atkinson's only physical contact was with a female on the upper level. Exhibit 19: Atkinson Callout Report.

**Matthew Pierotti**

136.   Pierotti entered the residence (it is unknown through which entrance). Exhibit 27: Pierotti Callout Report; Exhibit 15: Warrant Service Plan, p.6.

137.   Schimp was armed with a rifle and a handgun. Exhibit 27: Schimp Callout Report; Exhibit 15: Warrant Service Plan, p.6.

138.   Schimp had no physical contact with any of the residents. Exhibit 27: Schimp Callout Report.

## CONCLUSION OF SERT INVOLVEMENT

139.   Ada Anglemeyer complained of injuries after falling to the ground.

140.   SERT had brought along medics to the operation; they were promptly summoned to assess Ada Anglemeyer. Rowlands Dep. at 10:1-5, 39:7-9; Pelotte Dep. at 29:6-15.

141.   Following the assessment, Ada Anglemeyer was transported via ambulance to a local hospital. Pelotte Dep. at 29:6-15. Command Post Log.

142.   Meanwhile the other residents were eventually gathered in the same room.

143.   At approximately 6:13, the scene was deemed secured and turned over to NCDTF and SERT members departed the scene. Exhibit 15: Warrant Service Plan, p.1; Exhibit 17: Command Post Log.

144.   The NCDTF thereafter conducted a thorough search, took photographs, and inventoried the items collected and issued criminal charges.

## ALLEGED INJURIES TO PLAINTIFFS

145.   Ada Anglemeyer alleges that as a result of being struck with Trooper Painter's shield she suffered a fracture of L2 vertebra in back, two front teeth broken, and an elbow injury that required surgery. Second Amended Complaint ¶ 19(a).

146.    Joseph Kluska alleges he suffered injuries as a result of Trooper Wysocky moving him from the bed to the floor and then the chair.  Due to lingering pain he sought medical attention several weeks later; he was eventually diagnosed with a left rotator cuff tear that required surgery and an injury to his right rotator cuff.  Second Amended Complaint ¶ 19(b); Joseph Kluska Dep. at 73:1-20.

147.    Richard Anglemeyer alleges that an unidentified SERT member grabbed him by the neck, and struck him with something that caused him to lose consciousness.  He alleges injures to his right knee and temple area. He sought medical attention for these injuries after the SERT members had departed. Second Amended Complaint ¶ 19(c); Richard Anglemeyer Dep. at 49:4-49:15.

148.    Jeffrey Anglemeyer alleges that an unidentified SERT member stomped on the back of his neck and then slapped him several times in the head.  He alleges this caused headaches and pain to his shoulder and neck.  He sought medical attention two days later.  Second Amended Complaint ¶ 19(d). Jeffrey Anglemeyer Dep. at 85:2-86:6

#    #    #