**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3   ADA ANGLEMEYER, et al)
 4                        )
 5      - vs -           ) No. 19-3714
 6                        )
 7   NORTHAMPTON COUNTY,  )
 8   et al               )
 9
10
11          Videotaped Video Teleconference
12   Deposition of CLINTON C. PAINTER, held on August
13   27, 2020, at 12:29 p.m., before Dolores M. Horne,
14   Professional Reporter and Notary Public, in and
15   for the Commonwealth of Pennsylvania.
16
17
18          ESQUIRE DEPOSITION SOLUTIONS
19          1835 Market Street, Suite 555
20          Philadelphia, Pennsylvania  19103
21               215-988-9191
22
23
24
```

**Page 2**

```
 1   APPEARANCES:
 2
 3          THE ZEIGER FIRM
 4          BY:  BRIAN ZEIGER, ESQUIRE
 5          1500 John F. Kennedy Boulevard
 6          Suite 620A
 7          Philadelphia, Pennsylvania  19103
 8          (215) 546-0340
 9          Attorneys for the Plaintiffs
10
11
12
13          PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
14          BY:  KEVIN BRADFORD, ESQUIRE
15          1600 Arch Street
16          Suite 300
17          Philadelphia, Pennsylvania  19103
18          (215) 560-1031
19          kbradford@attorneygeneral.gov
20          Attorneys for the Defendants
21
22   ALSO PRESENT:
23          JASON PELOTTE
24
```

**Page 3**

```
 1                I N D E X
 2   WITNESS    EXAMINATION          PAGE
 3   CLINTON C. PAINTER
 4
 5          By:  Mr. Zeiger     5, 83
 6          By:  Mr. Bradford   73, 87
 7
 8          E X H I B I T S
 9   NO.        DESCRIPTION        PAGE
10   Painter 1    Callout Report       25
11   Painter 2    Concise History      60
12   Painter 3    Investigation Report 60
13   Painter 4    Intelligence Report  77
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1          DEPOSITION SUPPORT INDEX
 2
 3   Direction to Witness Not to Answer
 4   Page    Line   Page    Line   Page    Line
 5
 6
 7
 8   Request for Production of Documents
 9   Page    Line   Page    Line   Page    Line
10
11
12
13   Stipulations
14   Page    Line   Page    Line   Page    Line
15
16
17
18
19   Question Marked
20   Page    Line   Page    Line   Page    Line
21
22
23
24
```

SUMMARY
JUDGMENT
EXHIBIT
6



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
5–8

Page 5

1        THE VIDEO TECHNICIAN:  We are now
2  on the record.  The time is now 12:29 p.m. on
3  August 27, 2020.  This begins the video conference
4  deposition of Clinton C. Painter taken in the
5  matter of Ada Anglemeyer, et al, versus
6  Northampton County, et al, filed in the US
7  District Court, Eastern District of Pennsylvania,
8  Civil Action No. 19-3714.  My name is George
9  Ellis.  I'm the remote videographer today.  The
10  court reporter is Dolores Horne.  We are
11  representing Esquire Deposition Solutions.
12        Counsel, will you please state
13  your name and who you represent after which the
14  court reporter will swear in the witness.
15        MR. ZEIGER:  Brian Zeiger for the
16  plaintiffs.
17        MR. BRADFORD:  Kevin Bradford for
18  all of the defendants currently in the case.
19        CLINTON C. PAINTER, after having
20  been first duly sworn, was examined and testified
21  as follows:
22        * * *
23        EXAMINATION
24        * * *

Page 6

1  BY MR. ZEIGER:
2  Q.     Good morning, Trooper.
3  A.     Good morning.
4  Q.     Trooper, do you recall February 23,
5  2018?
6  A.     Yes.
7  Q.     And were you employed as a Pennsylvania
8  State Trooper on that day?
9  A.     Yes, I was.
10  Q.     And do you remember being at a briefing
11  session at approximately 04:00 hours on that
12  day?
13  A.     Yes.
14  Q.     And was that at the Belfast State
15  Trooper barracks in Pennsylvania?
16  A.     Yes.
17  Q.     And after that briefing were you part of
18  a SERT team at approximately 6:00 a.m. in the
19  morning?
20  A.     Yes, I am part of the team.
21  Q.     At approximately 6:00 a.m. did you --
22  did you go to a property as part of that SERT
23  team?
24  A.     Yes.

Page 7

1  Q.     And at 4:00 a.m. were you briefed on the
2  operation or what would happen at 6:00 a.m.?
3  A.     Yes.
4  Q.     And did your tour of duty then take you
5  to 340 Old Allentown Road at Bushkill Township,
6  Northampton, Pennsylvania?
7  A.     Yes, I believe that was the address.
8  Q.     And in that tour you were as part of a
9  SERT team?
10  A.     Yes, I was.
11  Q.     And that was to execute a warrant on
12  that property?
13  A.     Yes.
14  Q.     And did you use force once you entered
15  the property?
16  A.     Yes.
17  Q.     And was the person you used the force
18  against male or female?
19  A.     Female.
20  Q.     And do you know that person's name?
21  A.     I learned it after the fact.
22  Q.     What is her name?
23  A.     I believe Ada.
24  Q.     Okay.  And her last name is Anglemeyer;

Page 8

1  is that right?
2  A.     Yes.
3  Q.     Okay.  And do you know if based on the
4  force you used if Ada Anglemeyer was injured?
5  A.     Yes.
6  Q.     Is that a yes, that you know she was
7  injured or, yes, that she was, in fact, injured or
8  both?
9        MR. BRADFORD:  Objection to the
10  form.  You can answer.
11        THE WITNESS:  Yes, I knew she was
12  injured.
13  BY MR. ZEIGER:
14  Q.     And if you know, was she injured as a
15  result of the force that you used?
16  A.     I believe so.  I can't say for certain
17  because there was also related that she had a
18  previous back surgery or injury.
19  Q.     I get that --
20  A.     So I don't know.
21  Q.     Sir, please finish your answer.  It's
22  very hard with this audio.  It is not my intention
23  to cut you off in any way.  I apologize at the
24  outset for that.



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
9–12

Page 9

1   A.      Okay.

2   Q.      Please finish answering the question?

3   A.      Yes, I believe I injured her, yes.

4   Q.      Okay.  And do you accept responsibility

5   then for causing that injury?

6           MR. BRADFORD:  Objection to the

7   form.  Go ahead and answer that, I guess.

8           THE WITNESS:  Can you repeat the

9   answer -- I mean the question, please?

10  BY MR. ZEIGER:

11  Q.      Do you accept responsibility for causing

12  her injury?

13          MR. BRADFORD:  I object.  You can

14  answer.

15          THE WITNESS:  Yes.

16  BY MR. ZEIGER:

17  Q.      Have you apologized to her?

18          MR. BRADFORD:  Objection.

19          THE WITNESS:  No.

20  BY MR. ZEIGER:

21  Q.      Would you like to apologize to her right

22  now on the record?

23          MR. BRADFORD:  No.  Don't answer

24  that question.  That's an improper question.  Go

Page 10

1   ahead, Brian.  Move on.

2           MR. ZEIGER:  Well, I mean, it's

3   the same thing we had in the last deposition.  If

4   it's a car accident, you're allowed to say it's my

5   fault.  I'm sorry you're hurt.  If that's the case

6   and he accepts responsibility, which I think --

7           MR. BRADFORD:  Wait --

8           MR. ZEIGER:  He's allowed to say

9   I hurt you, I'm sorry.  He can say it.  What is

10  the basis of the objection?

11          MR. BRADFORD:  It's an improper

12  question --

13          MR. ZEIGER:  It's not --

14          MR. BRADFORD:  I'm instructing

15  him not to answer that.  You can go ahead and file

16  a motion with the judge saying, you know, you want

17  him to answer that question.

18          MR. ZEIGER:  Okay.  If he wants

19  to say he's sorry, he has an opportunity, though.

20          MR. BRADFORD:  Yeah, well, this

21  isn't the context for that, anyway.  Go ahead.

22  BY MR. ZEIGER:

23  Q.      Trooper, did you have an opportunity to

24  fill out any paperwork in regard to this case?

Page 11

1   A.      Yes.

2   Q.      I'm going to pull up a document on my

3   screen here, and then I'm going to attempt to

4   share it with you.  I'm going to zoom in for you.

5   Can you see that?

6   A.      Yes, I can.

7   Q.      Can you tell me what this document is?

8   A.      That's one of my callout reports that I

9   completed for this call for that warrant detail.

10  Q.      Okay.  And is that your name where it

11  says name?

12  A.      Yes.

13  Q.      And it says date of activation, 2-23-18.

14  Was that the date of the incident?

15  A.      To the best of my knowledge.

16  Q.      And it says date of report, 2-27-18?

17  A.      Yes.

18  Q.      Is that the day that you wrote the

19  report?

20  A.      Yes, it is.

21  Q.      Okay.  And I'm not asking you a question

22  now.  I don't want you to tell me any

23  communication you had with your attorney.  Okay.

24  I'm just asking you in a more general sense.  Did

Page 12

1   you review this document today before your

2   deposition?

3   A.      Not today, yesterday.

4   Q.      Okay.  And did you note any mistakes

5   or omissions on the document in your review?

6   A.      No.

7   Q.      And who is the typist?

8   A.      I typed it.

9   Q.      And did any supervisor review it?

10  A.      I submitted it to our coordinator and

11  then it gets reviewed and filed.

12  Q.      Were any changes made to the document

13  from when you originally typed it and submitted it

14  until it was accepted?

15  A.      Not to my knowledge.

16  Q.      Okay.  So, to the best of your

17  knowledge, the document that you reviewed

18  yesterday in preparation for today's dep is the

19  same document that you originally typed and

20  submitted?

21  A.      Yes.

22  Q.      Okay.  Very good.  I'm going to go down

23  here.  First it says straight time hours used,

24  eight hours and overtime hours used nine hours.

CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
13–16

Page 13

1   It means you used 17 hours on this job?
2   A.      Yes.
3   Q.      I'm scrolling.  Let's -- let's go
4   through this document here.  It says on February
5   21st of 2018 at approximately 19:30 hours I was
6   requested to assist the East Team on a warrant
7   service at the above location.  So what -- that
8   means that's the day that you were notified you
9   were going to be on this SERT team to execute this
10  warrant?
11  A.      Yes.
12  Q.      And then on 2-23-18 at 04:00 hours you
13  responded to assembly point and received a
14  briefing regarding the warrant service.  That
15  means you met up with all the other troopers and
16  you were told by a supervisor of what this was
17  about; is that correct?
18  A.      Yes.
19  Q.      And the briefing revealed the following
20  regarding this warrant service.  There was an
21  ongoing investigation in the distribution of
22  methamphetamine, three structures.  Main residence
23  is a large structure containing multiple
24  occupants, adults.  The majority of adult

Page 14

1   occupants have been seen, known to open carry
2   firearms throughout the residence.  Multiple
3   firearms known to be inside of the residence and
4   the owner, occupants are known to be anti police
5   from previous encounters with local police.  Is
6   that what you wrote?
7   A.      Yes.
8   Q.      Okay.  Were you made aware of who the
9   target of the methamphetamine investigation was?
10  A.      That was during the briefing, yes.
11  Q.      Who was that?
12  A.      I don't know.  I don't have his name off
13  the top of my head but it -- I believe it was a
14  son that lived there.
15  Q.      If I said the name Mark Anglemeyer,
16  would that refresh your recollection?
17  A.      I know that the last name was
18  Anglemeyer.  I don't know the first name.
19  Q.      Were you given any information on where
20  -- let's back up for a minute.  Were you made
21  aware that this parcel of land had -- had multiple
22  properties on it?
23  A.      Yes.
24  Q.      And were you made aware of where the

Page 15

1   methamphetamine operation was going on on this
2   parcel of land?
3   A.      Yes.  I believe it was through the
4   garage.
5   Q.      Okay.  And the garage is the name of one
6   of the three structures, correct?
7   A.      Yes.
8   Q.      The garage is not the main residence,
9   correct?
10  A.      Correct.
11  Q.      And you had no information that there
12  was any methamphetamine activity going on in the
13  main residence, correct?
14  A.      Correct.
15  Q.      Now, you mentioned something about
16  having a firearm here, right, people had
17  firearms?
18  A.      Yes.
19  Q.      You're not -- you didn't write here that
20  anyone had an illegal firearm; did you?
21  A.      No.
22  Q.      There's nothing illegal per se about
23  having a firearm in your own home; is there?
24  A.      No.

Page 16

1   Q.      Were you aware of -- that some of the
2   people had a valid Pennsylvania license to carry
3   concealed?
4   A.      Yes.
5   Q.      And you're aware as a state trooper that
6   you can't get a conceal carry permit if you have a
7   criminal history, correct?
8   A.      Correct.
9   Q.      And, so, you weren't aware -- and you
10  also have to give your name and information when
11  you purchase a firearm, correct?
12  A.      Yes.
13  Q.      So, you were not aware when you went in
14  there of any illegal firearms, right, that wasn't
15  part of your mission; was it?
16  A.      No.
17  Q.      If you were told that there were people
18  in there that had a valid license to carry and
19  that had validly registered the firearms, then
20  that's no crime, right?
21  A.      Correct.
22  Q.      And based on reason and logic, you could
23  then conclude that they were not criminals because
24  they would not have been able to have a license to



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
17–20

Page 17
1  carry, correct?
2           MR. BRADFORD:  Objection to form.
3           THE WITNESS:  Correct.
4  BY MR. ZEIGER:
5  Q.      Okay.  So, let's move on.  You were
6  assigned to the East Tac van.  What does that
7  mean?
8  A.      It's one of the vehicles that we use to
9  drive there.
10  Q.      Who else was in your van?
11  A.      It's listed on the worksheet who was in
12  the van.
13  Q.      So you don't remember?
14  A.      Not off the top of my head, no.
15  Q.      Where were you seated in the van?
16  A.      In the back of it.
17  Q.      Next it says, my assignment was point
18  ground level making entry into, quote, four, quote
19  side entrance of the residence.  I was equipped
20  with a shield and a Glock 21.  What does four
21  mean?
22  A.      That's how you number the residences,
23  the sides of the houses.  So if you stare at it
24  straight on, that would be the one side working --

Page 18
1  working around clockwise, two, three, four side.
2  Q.      And it says shield, can you describe the
3  shield?
4  A.      It's a ballistic level three shield.
5  Q.      Can you describe what it looked like?
6  A.      It's rectangular in shape.  It has a
7  window port with two glass lights in front of it.
8  I don't know if they're glass.  But it has two --
9  two flashlights available on the front of it.
10  Q.      Are the flashlights covered with
11  anything?
12  A.      I think, yeah, there's like a metal
13  guard around them.
14  Q.      Is it like a gate?
15  A.      Yes, I guess you could say that.
16  Q.      What material is it made of?
17  A.      The what?
18  Q.      The gate.
19  A.      I don't know.
20  Q.      Do you think it's metal or plastic --
21  A.      I think it's metal, sort of protects it
22  for -- metal or aluminum so it doesn't -- the
23  glass or flashlights, so it don't get broken.
24  Q.      And do -- does that part -- is that part

Page 19
1  flush with the shield or does it stick out from
2  the shield?
3  A.      It protrudes a little bit.
4  Q.      And then you say 2 inches?
5  A.      Approximately, yes.
6  Q.      And then there's that glass part.
7  That's there so you can see through the shield,
8  correct?
9  A.      Correct.
10  Q.      Because the rest of the shield is black,
11  right?
12  A.      Yes.
13  Q.      And that little window, does that
14  protrude out of the shield or is that flush as
15  well?
16  A.      It protrudes out a little bit, not as
17  much as the flashlight, though.
18  Q.      Say an inch?
19  A.      Yes.
20  Q.      And the piece that protrudes, is that
21  plastic or metal?
22  A.      That's -- that's plastic.
23  Q.      Okay.  Moving on.  Upon entry into the
24  primary entry point, I proceeded into the dining

Page 20
1  room.  Upon entry I observed two open doorways
2  into the adjacent room.  So, the entry point was
3  that the kitchen?
4  A.  I don't know.
5  Q.      You don't remember or you don't know?
6  A.  I don't remember what it was.  I think
7  -- I remember seeing like a table there, so that's
8  why I think I called it the dining room.
9  Q.      Okay.  So, the -- so the dining room,
10  was that the first room you went in?
11  A.  Yes.
12  Q.      The next sentence says upon entry I
13  observed two open doorways into an adjacent room.
14  Does that -- that means there's two other rooms
15  connected to that dining room?
16  A.  Yes.
17  Q.      Were you part of something called a
18  train?
19  A.      That's a terminology.
20  Q.      Were you part of that?
21  A.      Yes.
22  Q.      Who else was in your train?
23  A.      I don't know off the top of my head.
24  Q.      Okay.  The next sentence, while clearing



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
21–24

Page 21

1  I observed one WNM enter the doorway to the right.
2  Okay.  So what -- what does that mean while
3  clearing?
4  A.        As I was going, I observed one -- one
5  person standing in the doorway to the right.
6  Q.        I know.  What does the word clearing
7  mean?  What does that mean?
8  A.        Clearing -- clearing the rooms looking
9  for people.
10  Q.        Okay.  What does WNM mean?
11  A.        White non Hispanic male.
12  Q.        And how old was that person?
13  A.        I don't know.
14  Q.        Did he look like a senior citizen, a
15  teenager, middle aged person?
16  A.        Adult male --
17  Q.        I didn't understand your answer.  I'm
18  sorry.  I just can't hear you.
19  A.        I know.  Sorry.  Another phone call came
20  through.  It was an adult male.
21  Q.        Did it not look like a senior citizen?
22  A.        No.  I couldn't tell.
23  Q.        No or you couldn't tell?  It's kind of a
24  different answer.

Page 22

1  A.        I could not tell.
2  Q.        Okay.  The next line says, the male was
3  given verbal commands being state police search
4  warrant.  Did you give the commands or did
5  somebody else?
6  A.        I do.  We all give commands but I was
7  giving commands.
8  Q.        The next sentence, the male was also
9  given multiple commands to get on the ground and
10  show us his hands.  Who gave the commands?
11  A.        I did initially at first.  And then I
12  broke to my next primary sector within the
13  house.
14  Q.        The next sentence says, the male refused
15  all commands, stood there for a short period of
16  time and then retreated into the adjacent room out
17  of sight.  What -- what room did he go in?
18  A.        The room he was standing in when he was
19  in the doorway.
20  Q.        Do you know what was in that room?
21  A.        No.
22  Q.        Did you follow him?
23  A.        No.
24  Q.        Did you see another trooper follow

Page 23

1  him?
2  A.        No.
3  Q.        The next sentence says, I proceeded to
4  the left half of the room and cleared to the open
5  doorway to the left.  Is that the opposite
6  direction from where -- where that male was going
7  or the same direction as to where that male was
8  going?
9  A.        The same direction.
10  Q.        I observed the male through the doorway
11  deep into the room.  Same guy?
12  A.        Yes.
13  Q.        And he stayed in that other room?
14  A.        Yes.
15  Q.        Did you see any weapons or firearms on
16  his person?
17  A.        No.
18  Q.        Did you see any weapons or firearms
19  anywhere near him in either of the two rooms?
20  A.        No.
21  Q.        Were you given a picture of Mark
22  Anglemeyer before you went into the house?
23  A.        Yes.
24  Q.        And that's the person that was the

Page 24

1  subject of the methamphetamine operation in the
2  garage, correct?
3  A.        For Mark, yes.
4  Q.        Right.  And the person that you saw in
5  this first room and then the second room, that was
6  not Mark, correct?
7  A.        Yes, correct.
8  Q.        And the person you saw had not been
9  identified by you or any other trooper as being a
10  dangerous person, correct?
11  A.        I didn't know who it was.
12  Q.        Well, you knew it wasn't Mark, right?
13  A.        Correct.
14  Q.        And Mark was the only person identified
15  in your briefing as being a dangerous person,
16  right?
17            MR. BRADFORD:  Objection to form.
18            THE WITNESS:  Correct.
19  BY MR. ZEIGER:
20  Q.        I'm sorry.  Your answer was correct;
21  yes?
22  A.        Yes.
23  Q.        Okay.  More commands were given, which
24  he refused all.  The next sentence, as I was



Page 25

1 proceeding into the room another a WNM appeared in
2 the doorway with no shirt on. That male, was he a
3 senior citizen?
4 A.   No -- I don't know what he was.
5        MR. ZEIGER: Pardon me. I have to
6 take this.
7        THE VIDEO TECHNICIAN: Off the
8 record. The time is 12:51.
9        (Whereupon a break was taken.)
10       THE VIDEO TECHNICIAN: We are
11 back on the record. The time is 12:55.
12 BY MR. ZEIGER:
13 Q.   Trooper, so sorry about that. Let me
14 share my screen again. Just for the record, I'm
15 going to have this document marked as Painter 1.
16 Okay. As -- as I was proceeding into the room,
17 another WNM appeared in the doorway with no shirt
18 on. And I asked you if that person was a senior
19 citizen.
20 A.   I couldn't tell.
21 Q.   Okay. Could you tell at all how old the
22 person was?
23 A.   No.
24 Q.   Did the person seem confused or

Page 26

1 disoriented?
2 A.   No. I think he was following commands.
3 He was -- he was crawling out on the floor and
4 then that was really my little interaction with
5 him and another member dealt with him.
6 Q.   The next sentence says, that said male
7 had to be pushed to the ground in the doorway due
8 to his close proximity and also refusing commands
9 to show us his hands and to get on the ground.
10 Who pushed him to the ground?
11 A.   I did. He was coming out partially and
12 he was in close proximity and I just pushed him
13 down.
14 Q.   And what did you push him with?
15 A.   My shield.
16 Q.   And what part of your shield touched
17 what part of his body?
18 A.   I believe it was the lower half of my
19 shield because he was -- like he came out of
20 nowhere.
21 Q.   And what -- what part of his body did it
22 touch?
23 A.   I think his backside.
24 Q.   And at that point are you able to tell

Page 27

1 approximately how old the male is?
2 A.   No. I'm at -- like that wasn't my point
3 of responsibility where it was. So I'm kind of
4 looking further ahead when that happened.
5 Q.   Did you later learn that person's
6 name?
7 A.   No.
8 Q.   Entry was made into the room. The first
9 WNM that was observed standing in the center of
10 the room. Verbal commands were given to him,
11 which he refused all commands and became verbally
12 aggressive by yelling. I held on the said male
13 giving him verbal commands to get on the ground.
14 What does I held on the said male mean?
15 Pardon me, Trooper. I'm so sorry. What does that
16 mean?
17 A.   I held, which means I stayed in the same
18 location I was at, not moving and gave him verbal
19 commands.
20 Q.   The WNM continued to resist and refused
21 all commands. The said WNM was then pinned
22 against the wall -- pardon me again.
23       THE VIDEO TECHNICIAN: Off the
24 record.

Page 28

1       (Whereupon a break was taken.)
2       THE VIDEO TECHNICIAN: Back on
3 the record.
4 BY MR. ZEIGER:
5 Q.   The said WNM was then pinned against the
6 wall with a shield by another member to contain or
7 limit his movement and to detain, control him.
8 Who was that other member?
9 A.   I believe that was Corporal McGarvey.
10 Q.   I then proceeded to clear through the
11 rest of the residence and came to a hallway. At
12 the end of the hallway I observed it went to an
13 open bedroom. As I proceeded through the hallway,
14 verbal commands were being given indicating state
15 police search warrant. Now, Trooper, throughout
16 that time did you observe any illegality?
17 A.   Any what?
18 Q.   Anything illegal?
19 A.   No. It's not my job to search for stuff
20 that is illegal.
21 Q.   I understand. But you're a member of
22 law enforcement. Did you see any narcotics
23 anywhere?
24 A.   No.



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
29–32

Page 29

1 Q.     Did you see anyone with a firearm?
2 A.     No.
3 Q.     Did you see any firearms or ammunition
4 or any other thing related to firearms as you were
5 walking through the house?
6 A.     No. It was darker.
7 Q.     What was the last --
8 A.     It was dark. The lighting was dim. It
9 was dark.
10 Q.     I understand. As I was proceeding
11 through the hallway, verbal commands were being
12 given indicating state police search warrant.
13 As I proceeded down the hallway, I observed a WNF
14 enter the doorway hallway. What does WNF stand
15 for?
16 A.     White non Hispanic female.
17 Q.     And later did you learn the identity of
18 that WNF?
19 A.     Yes. That's Ada.
20 Q.     Okay. I gave the female verbal commands
21 indicating state police search warrant. Get on
22 the ground. Do you -- did she comply?
23 A.     No.
24 Q.     Can you estimate about how old she is?

Page 30

1 A.     I couldn't.
2 Q.     Would you say she's a senior citizen?
3 A.     At the time I couldn't -- I couldn't
4 tell. It was -- it was dark out. I was using my
5 shield lights. And throughout the whole process
6 of all this, like it's easy to break down here,
7 but all this is going on in a matter of like less
8 than a minute. The whole house was cleared in
9 probably less than a minute. So it's -- it's easy
10 to break down and question did I see anything --
11 for people -- and for bad people. I cleared
12 through. And when I got to her, I -- I couldn't
13 tell how old she was. The whole hallway was dark.
14 I'm looking through a shield port and both of my
15 hands were -- were occupied.
16 Q.     So, you couldn't tell how old she was?
17 A.     No.
18 Q.     I gave the female verbal commands,
19 indicated state police search warrant, get on the
20 ground. The female was yelling at my direction.
21 However, it was unknown what was being said. So,
22 today thinking back, more time has passed, do you
23 have any idea what she was saying?
24 A.     No. I would have put it in there. I

Page 31

1 have -- I don't know if it was -- I don't want to
2 say it was an aggressive manner, because that's --
3 that's not what it was, that I -- I picked up as.
4 I didn't know if it was in a passive manner. I
5 didn't know. I knew she was yelling something.
6 Q.     Based on your experience, did she seem
7 to be confused?
8 A.     I didn't -- that didn't cross my mind.
9 I couldn't tell.
10 Q.     I slowed my approach towards her telling
11 her to get on the ground, show her hands. The
12 white non Hispanic female did not follow any of
13 the verbal commands and did not make any type of
14 action or movement to show me her hands or to
15 comply in any manner. So she just stood there?
16 A.     Yes.
17 Q.     Did you see her with a firearm?
18 A.     No.
19 Q.     Did she aggress towards you?
20 A.     No.
21 Q.     Did she try to push you or anything of
22 that nature?
23 A.     No, no.
24 Q.     Did she try to run?

Page 32

1 A.     No.
2 Q.     This was very -- a very short amount of
3 time, right, that this all took place, probably
4 less than ten seconds?
5 A.     Correct.
6 Q.     And you did not observe her do anything
7 illegal, correct?
8 A.     Correct.
9 Q.     And she was the only person standing
10 there, correct?
11 A.     That I could see, correct.
12 Q.     And she was not the subject of any kind
13 of investigation of which you were there for,
14 correct?
15 A.     She wasn't identified -- I didn't know
16 who she was.
17 Q.     You didn't see her try to flee or run
18 away from you; did you?
19 A.     No.
20 Q.     You weren't thinking she was going to be
21 arrested for anything; did you?
22 A.     I didn't know who she was or what part
23 of the investigation she was -- she was involved
24 in.



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
33–36

Page 33

1   Q.      So, at that time the answer is no?
2   A.      She was an actor within the residence
3   that we were asked to search.
4   Q.      I understand.  But at that time you had
5   no knowledge that she was about to be arrested for
6   anything, right?
7   A.      I -- yes, correct, I didn't know she was
8   going to be arrested or if she was part of it or
9   not.
10  Q.      Let's -- let's just go down the list.
11  She wasn't Mark Anglemeyer, obviously, because
12  she's female, right?
13  A.      Right.
14  Q.      And in your briefing session there was
15  no information about someone named Ada Anglemeyer
16  that was going to be suspected or arrested of any
17  crime, correct?
18  A.      Correct.
19  Q.      And in your interaction with her, you
20  didn't observe her violate any laws of the
21  Commonwealth of Pennsylvania; did you?
22  A.      No.
23  Q.      So, to your knowledge, in your mind at
24  that time she was not about to be under arrest for

Page 34

1   anything; was she?
2   A.      My -- that's difficult to answer because
3   I'm asked to serve these high risk propensity of
4   violence search warrants on people and people that
5   are within the houses.  My job isn't to do the
6   investigation and it's not to followup on
7   investigations, to search after and to do charges
8   after.  It's to secure the residence of people and
9   potentially bad people that could be in it.  So
10  I -- I can't answer that question myself because
11  I've done no type of investigations into the
12  residence or -- or what was even going to be found
13  or anything within the house.
14  Q.      I understand.  But my job, what I do for
15  work is -- requires me to show different like
16  factors that go into law enforcement members when
17  they're doing their job.  Okay.  So, one of the
18  factors that I'm discussing with you right now is
19  whether the suspect was about to be arrested for
20  something.
21  A.      Okay.  At that point in time I had no
22  probable cause to arrest her for nothing, just
23  based on me.
24  Q.      That's all I was getting at.  And she

Page 35

1   was not trying to resist you actively; was she?
2   A.      Actively no -- actively I don't know.
3   Q.      Let's go back to the document.  I
4   continued towards her in slow manner to close
5   proximity and pushed her with my shield to clear
6   the doorway of the room due to the rest of the
7   residence not being secured.  So, when you pushed
8   her with your -- with your shield, what part of
9   the shield touched what part of her body?
10  A.      I cannot answer that question because I
11  don't have -- I intended it to be a chest level
12  just to push her back into the room.  What was
13  actually struck or impacted, I don't know.
14  Q.      Now, let me ask this whole question
15  before you answer.  So, when you pushed her with
16  the shield, did you hold the shield towards your
17  body and then push into her or were you standing
18  upright and pushed the shield out a popping motion
19  away from your body to hit her with the shield?
20  A.      She was in close proximity to the shield
21  and I pushed outwards with my arm.
22  Q.      So, more of like that popping answer, so
23  the shield moved away from your body but your body
24  stood still as you pushed her with the shield?

Page 36

1   A.      I wouldn't call it popping.  The
2   shield -- the shield was touching her and I just
3   pushed it outwards.
4   Q.      Okay.  But your body stayed still except
5   for your arms?
6   A.      No.  I was walking forward.
7   Q.      Okay.  So, were your elbows locked when
8   you pushed her with the shield?
9   A.      Initially.
10  Q.      And then as you pushed her, your elbows
11  unlocked?
12  A.      My left elbow.
13  Q.      Okay.  From the said push she fell
14  backwards into the room.  Did you see her hit the
15  ground?
16  A.      Yes.
17  Q.      And what part of her body touched what
18  part of the -- did she fall onto the floor?
19  A.      Yes.  That's all I could answer.  She
20  fell backwards onto the floor.
21  Q.      Did you see what part of her body hit
22  the floor?
23  A.      I don't know if it was her back or her
24  buttocks or she just went -- she fell backwards.



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
37—40

Page 37

1  Q.      I continued into the room and cleared
2  it.  What -- what does that mean?
3  A.      So, to back up.  The reason for the push
4  was for her standing in the doorway and I was -- I
5  was limited of what I could do in that area in
6  terms of complete clearing the rest of the
7  residents in the house.  So I pushed her into the
8  room in -- in order to clear the bedroom and the
9  rest of the house for other actors.  So you asked
10 me what -- what clearing means, which means
11 clearing the corners, clearing around the bed and
12 moving on to the next doorways or any other places
13 where people could be.
14 Q.      You said you cleared that room, so there
15 was nothing -- nothing else going on in that room?
16 A.      So, I cleared the room, which means a
17 room entry of how we do it.  I broke right,
18 cleared the right corner and the far adjacent
19 corner while other members come in and -- and
20 held on her and finished the other clearing of
21 the other side of the room.
22 Q.      Did you find anything else in -- anyone
23 else in the room, any other human beings?
24 A.      No.

Page 38

1  Q.      Did you find anything of interest in the
2  room related to your investigation or your
3  execution of the warrant in the room?
4  A.      I was searching for people.
5  Q.      Understood.  But, I mean, you're a
6  member of law enforcement.  I understand what your
7  mission was.  But you didn't observe in plain view
8  any kind of methamphetamine operation?
9  A.      No.
10 Q.      The female was secured and covered by
11 another member.  What does that mean?
12 A.      Another member stayed with her while we
13 finished clearing the rest of the house.
14 Q.      Was she handcuffed or zip tied?
15 A.      I don't believe so.  I don't know.  I
16 don't think she was.
17 Q.      I proceeded and cleared the rest of the
18 residence, which was approximately four other
19 rooms and the indoor pool area.  Did you come in
20 contact with -- with anyone else in those four
21 rooms or the -- in the pool area?
22 A.      No.
23 Q.      Once the primary clearance of the
24 residence was conducted and secondary search were

Page 39

1  conducted, it deemed the residence to be secured.
2  What does that mean, secondary search?
3  A.      That's more of a -- like as I explained
4  earlier, like how -- like the movement and the
5  speed of how some of these go, the first initial
6  primary is more of a faster pace.  The secondary
7  is more of a -- like hiding places or anywhere
8  people could hide or anything like that.  So it's
9  kind of more of a detailed search looking for
10 people that could be hiding or whatnot.
11 Q.      Did your secondary --
12 A.      I'm sorry.
13 Q.      Did your secondary search reveal
14 anything in this case?
15 A.      No.
16 Q.      I then went back to the WNF and she was
17 complaining of back pain.  So, is that the same
18 person, Ada Anglemeyer?
19 A.      Yes.
20 Q.      And was she seated, standing, on the
21 ground?  Where -- where was she when you went back
22 to her?
23 A.      She was in -- at the same location on
24 the floor.

Page 40

1  Q.      Was she sitting up or just laying on the
2  ground?
3  A.      I don't know.  Like I don't remember.
4  Q.      The female was yelling out loud that she
5  just had back surgery.  Did she say anything else?
6  A.      Not that I recall.
7  Q.      Medics were contacted for the female at
8  the -- as the residence was deemed secure.  The
9  medics treated the female, and she was later
10 transported to the hospital.  Did you go with her
11 to the hospital?
12 A.      No.
13 Q.      Did any troopers go with her to the
14 hospital?
15 A.      I don't know.
16 Q.      Was she ever charged with any crimes
17 related to this incident?
18 A.      I don't know.
19 Q.      Did you ever recommend any charges be
20 brought against her to any other members of law
21 enforcement in this matter?
22 A.      No.
23 Q.      Did you ever speak with the supervisor
24 about charging her with anything?



Page 41

1  A.    No.
2  Q.    Sitting here today, do you believe she
3  should have been charged with anything?
4  A.    No.
5  Q.    Next I did not observe anything within
6  the residence of evidentiary value.  Does that
7  mean you didn't find any evidence of any kind of
8  methamphetamine operation?
9  A.    That was in plain view of just what I --
10 what I saw or encountered.
11 Q.    Okay.  So, in other words, that sentence
12 is just about any kind of illegality, it's not
13 about methamphetamine, correct?
14 A.    Correct.
15 Q.    I was released from the scene by the
16 command post Topcom.  What does that mean?
17 A.    After we serve the warrant, once it's
18 turned over to investigators and they don't need
19 anything else from us, we leave.  We debrief it
20 and we get released.
21 Q.    Okay.
22 A.    The command post would be our
23 coordinator.  The Topcom would be whatever station
24 or state police, whoever was designated.  I don't

Page 42

1  know who it was at the time but it's documented on
2  the reports.
3  Q.    Okay.  Next it says, post activation
4  inventory completed.  Weapon and equipment
5  maintenance completed.  What does that mean?
6  A.    Just basic inventory and make sure we
7  had everything we came there with and everything
8  was just taken care of.  That's like an
9  administrative thing we do.
10 Q.    Okay.  I assisted with transporting the
11 Bearcat to and from the assembly point with
12 Trooper Walters and Corporal and Trooper Bigelow.
13 What is a Bearcat?
14 A.    That's our armored vehicle that is
15 utilized for -- for these warrants.
16 Q.    Where was the Bearcat?
17 A.    Before I transported it or -- or at the
18 house?
19 Q.    Let's start -- let's start at 6:00 a.m.
20 or just before 6:00 a.m. when you arrive at the
21 property, how -- how does the Bear -- does the
22 Bearcat get to the property?
23 A.    One of the negotiators drives it.
24 That's administrative -- we transport it

Page 43

1  administratively to -- to the briefing.
2  Q.    But it had -- it arrived at the property
3  at some point in time, correct?
4  A.    Yes.  It's -- it's on the assignment
5  of -- on the documents, whoever was assigned to
6  drive it.  I don't know who drove it to the
7  property.
8  Q.    And was it used on -- on this day at all
9  for any purpose?
10 A.    I believe so, yes.
11 Q.    What was it -- what was it used for, if
12 you know?
13 A.    I don't know.
14 Q.    I'm going to un-share this.  There's a
15 word that was used in a previous deposition called
16 compromise.  And I believe it's used meaning like
17 the people you're serving the warrant on may know
18 that you're coming, like the element of surprise
19 is gone.
20 A.    Correct.
21 Q.    Are you aware with this warrant, was
22 this scene compromised before you entered?
23 A.    There was intel path from pre-deployment
24 that it could have been due to a vehicle leaving

Page 44

1  and seeing us drive by.
2  Q.    Do you have any firsthand knowledge
3  yourself of a compromise of the scene?
4  A.    That's all I know of it because I sit in
5  the back of the van --
6  Q.    I get that.  But my question is much
7  more simplistic, I think, than perhaps what you
8  think it means.  I mean like when you -- when
9  you're in the van, do you see out the window
10 anything that looks like a compromise to you?
11 A.    No, I didn't see anything.
12 Q.    When you get to the scene and you get
13 out of the van, do you observe anything with your
14 own eyes that looks like there's a compromise to
15 you?
16 A.    No.
17 Q.    So, you didn't have any firsthand
18 knowledge of any kind of compromise, right?
19 A.    No.  It's not my position, though, as
20 well.  But firsthand knowledge, no.
21 Q.    I understand.  I think that you think I
22 mean it in like a technical way, compromise.  I
23 just mean it in a very human way.  Like did --
24 whether it's your position or not, did you observe



Page 45

1 anyone like run in the house and close the door
2 behind them when they saw you? You didn't see
3 anything like that; did you?
4 A.    No.
5 Q.    All right. I'm going to go to another
6 document -- well, actually I'm not for a second.
7 So, Trooper, how many years have you been a
8 trooper?
9 A.    A little over eight years.
10 Q.    And before that did you have any jobs in
11 the military, security or law enforcement?
12 A.    I was local law enforcement and I was in
13 the military before that.
14 Q.    What local law enforcement were you part
15 of?
16 A.    Washington Township.
17 Q.    What county?
18 A.    Westmoreland County.
19 Q.    And is that the only law enforcement job
20 you had?
21 A.    No. I had a few other part-time police
22 jobs before I got with the state.
23 Q.    Okay. And in the military, what branch
24 of the military were you in?

Page 46

1 A.    The Marine Corps.
2 Q.    Thank you for your service. Were you
3 involved in any police work or security in the --
4 in the Marines?
5 A.    No.
6 Q.    In any time before you were a state
7 trooper, are you aware, either in the military or
8 in any of the law enforcement jobs you had of any
9 complaints against you for excessive force?
10 A.    No.
11 Q.    Okay. Now, as a state trooper, are you
12 aware of the process of when a complaint is made
13 against you for excessive force?
14 A.    Yes.
15 Q.    What is the process, if you know?
16 A.    What is that?
17 Q.    What is the procedure?
18 A.    I guess any private citizen could file a
19 complaint through whatever resources there are. I
20 don't know the whole procedure for that. But in
21 our internal system of how we handle it, it's
22 handled through the Bureau of Professional
23 Responsibilities and IAD, internal investigation
24 division.

Page 47

1 Q.    Do you have any duty to report on
2 another trooper if you see another trooper do
3 something wrong?
4 A.    Yes.
5 Q.    What is that duty?
6 A.    If it's a violation of what, of use of
7 force?
8 Q.    Pardon me for one second. I'm sorry.
9 Can we take a very brief recess.
10         THE VIDEO TECHNICIAN: Off the
11 record, 1:22.
12         (Whereupon a break was taken.)
13         THE VIDEO TECHNICIAN: Back on
14 the record. The time is 1:27.
15 BY MR. ZEIGER:
16 Q.    So, Trooper, do you have a duty to
17 report other troopers if you see that they're --
18 they've done something wrong, like, for example,
19 steal a pack of gum?
20 A.    Yes.
21 Q.    And what would you do if that
22 occurred?
23 A.    We report it to the supervisor.
24 Q.    Is there a system called the blue box

Page 48

1 or blue something, Blue Team?
2 A.    Yes, Blue Team, yes.
3 Q.    And do you have any duty to log in and
4 file anything on that?
5 A.    If the supervisory - it's a supervisory
6 thing. So the supervisor would then do the Blue
7 Team.
8 Q.    Do you have any duty to self report like
9 on yourself?
10 A.    Like make a Blue Team on myself?
11 Q.    Like if you got a DUI?
12 A.    Oh, yes.
13 Q.    And what would be the procedure for
14 that?
15 A.    Any type of criminal charges, even a
16 speeding ticket or a summary or anything like
17 that.
18 Q.    No. I got it. What is the procedure?
19 What would you do? Like you log into the system,
20 you tell a supervisor, like what is the process?
21 A.    You tell -- you tell the supervisor.
22 Q.    Okay.
23 A.    And he'll make that Blue Team entry.
24 Q.    And what about the use of force; do you



Page 49

1  have a duty to self report the use of force?
2  A.     Well, that's part of -- like you went
3  over the report.  If I think you're going the
4  direction I think you are, when I was released
5  from the Topcom and command post, that's when it
6  was reported that she received injuries, and
7  that's when the Blue Team was done.  So he -- he
8  was made aware.
9  Q.     So, you -- you self reported to your
10 commanding officer in this case?
11 A.     I made a report that the use of force
12 was used and that she was injured.  And he knew
13 that there's an injury had happened.  So we
14 debrief it.  And I report my use of force whenever
15 there's a use of force incident, when there's an
16 injury sustained or believed to be sustained, a
17 Blue Team entry is completed for an internal
18 investigation.
19 Q.     And can you -- can you distinguish
20 between that sort of self reporting and when a
21 citizen complains about you using too much
22 force?
23 A.     All I know is there's two different
24 types of Blue Teams.  There's a noncompliant and a

Page 50

1  use of force with injury.  I know that there's
2  two.
3  Q.     Okay.  And, so, do you know in your
4  career as a state trooper has there ever been a
5  citizen's complaint about you using too much
6  force?
7  A.     No.
8  Q.     And do you know as a trooper how many
9  times you've self reported?
10 A.     I don't know how many but there has been
11 times.
12 Q.     Okay.  I'm going to share another
13 document with you now.  Can you see that, Trooper?
14 A.     Yes.
15 Q.     And it says concise officer history,
16 Corporal Clinton C. Painter.  Is that you?
17 A.     That's me, yes.
18 Q.     Have you ever seen this document
19 before?
20 A.     No, not this one.
21 Q.     Okay.  I'm going report to you that I
22 requested this in -- I requested a history for you
23 in a written paper discovery request and that your
24 attorney supplied me with this document.  Okay?

Page 51

1  A.     Yes.
2  Q.     And this is a listing of --
3  chronological listing of times where --
4         MR. BRADFORD:  AED events if you
5  want to kind of just give it a label.
6         MR. ZEIGER:  I think that's fair,
7  IAD events.
8  BY MR. ZEIGER:
9  Q.     This is a listing of IAD events.
10 Okay?
11 A.     I'm aware of them, yes.
12 Q.     I'm going to scroll down to the last
13 page.  Do you see where it says incident type?
14 A.     Yes.
15 Q.     And then it says received.  Do you see
16 that?
17 A.     Yes.
18 Q.     And below that it says complaint and the
19 number six.  Do you see that?
20 A.     Yes.
21 Q.     Do you know what any of those six were
22 about or all six of those, do you know what
23 they're about?
24 A.     Off the top of my head, no.  I know

Page 52

1  there's a couple of miscellaneous property
2  complaints and stuff like that.
3  Q.     Okay.  None of them involved force, as
4  far as you know?
5  A.     Off the top of my head, correct.
6  Q.     Firearm discharge, there's a one?
7  A.     Yes.
8  Q.     Do you know what that is about?
9  A.     Yes.
10 Q.     What is it about?
11 A.     I was involved in a shooting, December
12 of 2017.
13 Q.     Okay.  Next it says, supervisory
14 resolution, one.  Do you know -- do you know what
15 that was?
16 A.     Yes.  I believe that was -- I think that
17 was one of -- one of the first ones that were
18 received.
19 Q.     Do you know what it was about?
20 A.     I think race or something like that.
21 Q.     Say again?
22 A.     Something about race.
23 Q.     I can't understand the word.  Can you
24 spell the word?



Page 53

1  A.   Like race.
2  Q.   Can you spell it?
3  A.   Like I profiled someone --
4  Q.   Like racial profiling?
5  A.   Yes.
6  Q.   I see.  Moving on, use of force, it says
7  12.  Your testimony today is there's 12 times that
8  you've self reported the type of force that you
9  used?
10        MR. BRADFORD:  Objection to form.
11  BY MR. ZEIGER:
12  Q.   If you understand you can answer, if not
13  I'm happy to rephrase it.
14  A.   That's what it says.
15  Q.   Okay.  I'm going to ask another question
16  then.  Do you agree it says on here use of force,
17  12, correct?
18  A.   Yes.
19  Q.   I asked you previously if you're aware
20  that any civilian has ever complained about you
21  for use of force and your answer was never, none;
22  is that correct?
23  A.   That I was made aware of.
24  Q.   I see.  And I asked you also previously

Page 54

1  if you self reported about using force on other
2  times other than this case and you said yes.  Do
3  you remember that?
4  A.   Yes.
5  Q.   And I asked you how many and you said I
6  think you used the word several.  Do you remember
7  that?
8  A.   Yes.
9  Q.   Okay.  This says 12.  So, does 12 seem
10  like the amount of times you would have self
11  reported?
12  A.   I believe so.
13  Q.   Because you're not aware of any use of
14  force complaints against you by civilians,
15  correct?
16  A.   Correct.  I had --
17  Q.   Please finish your answer.
18  A.   I'm sorry.  I've had the interviews, but
19  I -- I don't know if it was regarding a complaint
20  or self report or both.  A lot of times I don't
21  know how I got them.  But, yes, I've had IAD
22  interviews with -- regarding the use of force.
23  Q.   Are you aware of any of the IAD
24  interviews being founded against?

Page 55

1  A.   No, none.
2  Q.   Are you aware of any of the IAD
3  investigations or any of these 12 complaints being
4  in regard to you using your shield as a weapon
5  other than in this case?
6  A.   Yes.
7  Q.   How many?
8  A.   I don't know.  Six, that's a guess.
9  Q.   I'm going to ask your attorney to
10  provide me in discovery investigation files for
11  those six times.
12  A.   Okay.
13  Q.   Sorry.
14  A.   I don't know if it's six.  That was a
15  guess.  But if they're there, if you need them.
16        MR. BRADFORD:  How about this,
17  Brian, whichever ones involve the use of a shield,
18  whatever that number is.
19        MR. ZEIGER:  That's fair.
20        MR. BRADFORD:  I'll see what is
21  available and see how hard that is to search for
22  and we'll come up with some sort of solution to
23  that.
24        MR. ZEIGER:  I agree.

Page 56

1  BY MR. ZEIGER:
2  Q.   Trooper, do you know on any of these 12,
3  were any of them founded against you?
4  A.   No.
5  Q.   Have you ever been sued before?
6  A.   I believe -- I don't know the answer to
7  that question.  I've received litigation holds for
8  things that I was involved in but not directly.
9  But the best of my knowledge, no, nothing like
10  this.
11        MR. BRADFORD:  Well, litigation
12  hold doesn't mean you're necessarily being sued.
13  It just means you might have information that
14  might be relevant to the lawsuit.
15        THE WITNESS:  Okay.  Well, no
16  then.
17  BY MR. ZEIGER:
18  Q.   Do you know what a litigation hold meant
19  to you before your lawyer just made that
20  statement?
21  A.   No, because different cases and
22  different instances I get them in email and I
23  comply with them the best I can with what I have
24  to offer.  Other than that, no.



CLINTON PAINTER
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
57–60

Page 57

1  Q.     They ask you questions in an email or
2  ask you for documents?
3  A.     No, just advising that there's a
4  litigation and to -- to keep your documents.
5  Q.     And have you had any training regarding
6  the shield?
7  A.     Yes.
8  Q.     Can you describe that training?
9  A.     It was through our special emergency
10  response team, CPB portion, covert and through our
11  basic class --
12  Q.     Does any involve using the training --
13  using the shield as an object of force?
14  A.     Yes.
15  Q.     And which training is that?
16  A.     It was through the training.
17  Q.     I'm sorry. I thought you just mentioned
18  three separate trainings for the shield. Which of
19  the three --
20  A.     Our special emergency response team CPB
21  course.
22  Q.     Is it your testimony today that you're
23  authorized to use the shield as a weapon?
24          MR. BRADFORD: Objection to form.

Page 58

1          THE WITNESS: Not as a weapon.
2  BY MR. ZEIGER:
3  Q.     Okay. Is it your testimony today you're
4  authorized to use the shield as an object of
5  force?
6  A.     Yes.
7  Q.     And can you describe briefly what you're
8  allowed to do with the shield as it relates to
9  force?
10  A.     To push and to pin people with it.
11  Q.     Are you allowed to lift people up with
12  it?
13  A.     I don't know how you would do that.
14  Q.     Nor I.
15  A.     What do you mean?
16  Q.     Are you -- are you able to push someone
17  into a wall with it and then lift them up with
18  their feet off the ground with the shield --
19  A.     No. I don't know what you're asking.
20  Can I lift somebody with a shield --
21  Q.     I don't want to interrupt you at all.
22  I'm sorry, Trooper.
23  A.     I'm trying to answer your question but I
24  don't know if that's even physically possible.

Page 59

1  It's heavy enough as it is. How am I going to
2  lift somebody up with it.
3  Q.     Well, how tall are you?
4  A.     I'm 5, 7.
5  Q.     How much do you weigh?
6  A.     190 pounds.
7  Q.     So, if there was a wall there and you
8  hit -- and you pinned someone to the wall with a
9  shield, would you be able to sort of lean down and
10  into them and then lift up with the shield to get
11  their feet off the ground; is that a
12  possibility?
13  A.     I don't believe so.
14  Q.     Have you ever done that before?
15  A.     No.
16  Q.     And you didn't do that to Ada Anglemeyer
17  in this case; did you?
18  A.     No.
19  Q.     And in this case when your shield made
20  contact with Ada Anglemeyer, did she hit any
21  walls?
22  A.     No.
23  Q.     She just fell straight down?
24  A.     Yeah, backwards.

Page 60

1  Q.     Understood. I'm going to share this
2  document now. Then I'm going to share another
3  document. Can you see that?
4  A.     Yes. I'm going to scroll down.
5  Q.     So, the previous document that I used,
6  that was your concise history. I'd like to have
7  that marked as Painter 2. And this document, I'd
8  like to have marked as Painter 3. I'm starting on
9  a page that has been previously Bates stamped by
10  your attorney as PSP 64. Okay. I'm saying that
11  just for the court reporter.
12          So, on PSP 64 that is here with us --
13  pardon me for one second. This is your name,
14  correct?
15  A.     Yes.
16  Q.     And this is the date of the report,
17  correct?
18  A.     Yes.
19  Q.     Okay. You participated in this
20  investigation?
21  A.     Yes.
22  Q.     Was there anyone present at the time
23  when you were interviewed during this
24  investigation that was not a member of the



Page 61

1  Pennsylvania State Police?
2  A.     I'm trying to think back, not that I
3  know of.
4  Q.     Is there any kind of independent
5  organization or civilian who had anything to do
6  with any kind of -- this investigation?
7  A.     No.
8  Q.     And in -- in this investigation, did you
9  have an opportunity to review this report before
10 your deposition today?
11 A.     No, I've never seen this.
12 Q.     Okay.  And were you ever give this to
13 read at any time after the investigation took
14 place?
15 A.     I never seen this.
16 Q.     No problem.  I'm going to scroll through
17 this document, okay, and stop on various different
18 pages.  Okay.  I'm here now on what has been
19 previously marked as PSP 83.  This says page 20 of
20 31 and it says transcript.  Are you aware that
21 your interview was being recorded?
22 A.     Yes.
23 Q.     And have you seen the transcript before?
24 A.     Yes.

Page 62

1  Q.     And did you review this transcript
2  before your deposition today?
3  A.     Yes.
4  Q.     And did you tell anybody that there were
5  any mistakes or omissions in the transcript?
6  A.     No.
7  Q.     Do you suspect that whomever typed this
8  up missed anything?
9  A.     No.
10 Q.     I'm going to keep scrolling.  Is it your
11 understanding that this transcript is complete,
12 meaning nothing is missing from it, it went from
13 beginning to end of your interview; is that right?
14 A.     Yes.
15 Q.     And the people that interviewed you,
16 they all worked for the Pennsylvania State Police,
17 correct?
18 A.     Yes.
19 Q.     There's no independent body or agency or
20 civilians that were part of the interview process,
21 correct?
22 A.     Correct.
23 Q.     Okay.  Now, during the incident when the
24 SERT team went into the -- the home and you were

Page 63

1  part of the SERT team and you went in, was any of
2  that videoed, to your knowledge?
3  A.     No.
4  Q.     Did -- did you have a body cam on?
5  A.     No.
6  Q.     I'm only looking for an answer from you,
7  Corporal Painter.  Do you know why you don't have
8  a video -- a body cam on?
9  A.     Do I know why I don't?
10 Q.     That's the question, correct.
11 A.     No, I don't.
12 Q.     Have you ever requested to any
13 supervisor that you would like to have a body cam
14 on?
15 A.     No.
16 Q.     Have you ever written a note or an email
17 or a text message to any supervisor to say I would
18 like a body cam?
19 A.     No.
20 Q.     I'm going to unshare this document.
21 As far as you know, in this operation was anything
22 recovered related to any kind of methamphetamine
23 operation?
24 A.     I don't know nothing about the

Page 64

1  investigation and what it -- what it revealed.
2  Q.     But, again, my questions are like with
3  your own eyes, right.  So, like when you're there,
4  do you see anything related to any kind of
5  methamphetamine operation at all during the entire
6  time you were at the property?
7  A.     No.
8  Q.     And other than Mark Anglemeyer, did you
9  observe anyone else being arrested?
10 A.     No.
11     MR. BRADFORD:  Object to form.
12 BY MR. ZEIGER:
13 Q.     Okay.  And other than Mark Anglemeyer,
14 did you personally observe anyone else commit any
15 crimes against the Commonwealth of Pennsylvania?
16 A.     No.
17 Q.     Okay.  Are you aware from your briefing
18 that there's any information that there was any
19 methamphetamine operation going on in any building
20 other than the building called the garage?
21 A.     Not to my knowledge.
22 Q.     Okay.  The gentleman who was in the room
23 that -- that sort of walked away from you when you
24 first entered the property -- just go all the way



Page 65

1  back to the beginning of the story, okay.  You
2  enter the property.  There's a gentleman that goes
3  from that room to the adjoining room when he sees
4  you guys.  Do you remember that?
5  A.    Yes.
6  Q.    Did you ever learn that gentleman's
7  name?
8  A.    I believe I -- I don't know his name but
9  it was the older gentleman, correct?
10  Q.    I'm asking you.
11  A.    I don't know his name, no.
12  Q.    Did he look like a senior citizen to
13  you?
14  A.    No.  But he was an older gentleman.
15  I -- I saw him for a split second.  We made eye
16  contact and he was older, but I can't tell you --
17  this is what -- what I'm trying to explain to you
18  earlier of the speed and the progressions of this,
19  I -- I don't -- I don't know.
20  Q.    Okay.  Was there any African American
21  troopers that were part of the SERT team that
22  entered the house that day, if you recall?
23  A.    I don't know what his assignment was but
24  that there are.

Page 66

1  Q.    Was there one or more than one?  Let's
2  start there.
3  A.    In the house?
4  Q.    Yes.
5  A.    I don't know what his assignment was.
6  Q.    Okay.
7  A.    But there are African American --
8  Q.    I know that but --
9  A.    -- SERT members.
10  Q.    When you guys left the briefing area and
11  you traveled to the house, do you know how many
12  African American troopers there were involved in
13  the entire party that day?
14  A.    No, I don't.
15  Q.    Okay.  If I said that there was a
16  trooper named Brian King that was part of the SERT
17  team that entered the house, would that refresh
18  your recollection?
19  A.    Well, I know he's on the team, but I
20  don't know if he's part of the entry team or not.
21  I don't know what his assignment was.
22  Q.    Did you have any interaction with
23  Corporal Brian King inside the property on that
24  day?

Page 67

1  A.    Not that I recall.
2  Q.    And did you hear Corporal King instruct
3  any other troopers, give them any commands or
4  anything like that on that day?
5  A.    Not that I recall.
6  Q.    And physically would you describe
7  Corporal King as a very large man?
8  A.    Yes.
9  Q.    All right.  I have one more group of
10  questions.  So, other than the allegation of the
11  methamphetamine operation when you were debriefed,
12  you were not aware of any other allegations of any
13  other crimes, correct?
14  A.    Debriefed when?
15  Q.    I'm sorry.  The -- the briefing, like at
16  4:00 a.m, other than the methamphetamine
17  operation, no one told you about any other
18  suspected crimes, correct?
19  A.    Yeah, to my knowledge, yes.
20  Q.    Okay.  And when you entered the home, no
21  one pointed a gun or a weapon at you or anything
22  of that nature?
23  A.    Correct.
24  Q.    Correct, meaning no one did that to

Page 68

1  you?
2  A.    No one did that to me.
3  Q.    And when you were dealing with Ada
4  Anglemeyer, she was not actively resisting; was
5  she?
6  A.    Not actively, correct.
7  Q.    Right, because she wasn't under arrest
8  for anything, so you can't resist an arrest if
9  there's no underlying arrest, correct?
10      MR. BRADFORD:  Objection to form.
11      THE WITNESS:  She was passively
12  resistant.
13  BY MR. ZEIGER:
14  Q.    I understand that.  I totally get that,
15  Trooper.  But what I mean is she wasn't a suspect
16  for like disorderly conduct or something and was
17  like resisting being arrested for some other
18  charge, right?
19  A.    Right.
20  Q.    Okay.  Her passive resistance was in
21  regard to your execution of the warrant, right?
22  A.    Yes.
23  Q.    I'm asking a totally different question.
24  In other words, you weren't saying to her, Ada,

Page 69

1  you're under arrest for X and then she started
2  resisting being arrested for that, right?
3  A.    Right.
4  Q.    She didn't try to run away from you; did
5  she?
6  A.    No.
7  Q.    She didn't try to escape the house,
8  correct?
9  A.    Correct.
10  Q.    Okay. You had no knowledge before you
11  went in the house that a woman named Ada
12  Anglemeyer was violent or dangerous; did you?
13  A.    I did have knowledge of that.
14  Q.    That Ada Anglemeyer was violent or
15  dangerous?
16  A.    Yes. During the briefing it was briefed
17  that she was -- one of the township police had
18  been there and she open carries through the house,
19  she's verbally aggressive towards -- towards them
20  to a point where they don't even go. That was
21  within the briefing.
22  Q.    They -- they don't even go for what? I
23  didn't understand. Can you explain?
24  A.    It's in the video of -- during the intel

Page 70

1  report that past experiences with then, Ada has
2  been seen to open carry throughout the house and
3  is verbally anti -- anti police, aggressive
4  towards them.
5  Q.    And then -- and then you said and they
6  won't even go, that's what you said?
7  A.    Yes, that at -- at times -- it was
8  passed to me at times that they -- like they don't
9  have a solo officer responding at that house due
10  to, I guess, the -- I don't know what the word
11  they say -- to put it as, but whatever township or
12  police department is out there, they don't go to
13  that residence due to how unruly these people
14  are.
15  Q.    I'm -- so, if someone called and said we
16  have a domestic, they just wouldn't show up?
17  A.    No. They'll get multiple officers.
18  Q.    I see. And --
19  A.    A solo or single officer response, they
20  don't do.
21  Q.    Open carrying of a firearm on your
22  person is not illegal in the United States
23  anywhere; is it?
24  A.    No.

Page 71

1  Q.    And what was the next thing you said,
2  she was anti police or she would say something
3  anti police, what was the next thing you said?
4  A.    I guess -- I guess during the briefing
5  that she was -- she was verbally aggressive.
6  Q.    Right. It's not verbally -- it's not
7  illegal to be verbally aggressive towards police
8  in the United States, correct?
9  A.    Correct.
10  Q.    But as long as a citizen doesn't
11  threaten you personally, they can basically say
12  whatever they want to you other than a threat to
13  you, correct?
14        MR. BRADFORD: Objection to form.
15        THE WITNESS: Correct.
16  BY MR. ZEIGER:
17  Q.    Okay. If you have another answer or
18  something -- your lawyer objected. Do you
19  understand the question I asked you?
20        MR. BRADFORD: He answered it.
21  It's fine.
22        MR. ZEIGER: I'll move on.
23        MR. BRADFORD: It's on the
24  record.

Page 72

1  BY MR. ZEIGER:
2  Q.    And when you entered the house, she and
3  the other two persons were the only people that
4  you encountered?
5  A.    Well, there's that one other guy that
6  briefly -- that was briefly there.
7  Q.    So three total?
8  A.    Uh-huh.
9  Q.    Yes?
10  A.    Yes.
11  Q.    And at the time that you were dealing
12  with her with your shield, she was the only
13  civilian in your surrounding, correct?
14  A.    Correct.
15  Q.    She was not arrested or charged with
16  anything, correct?
17  A.    Correct.
18  Q.    Okay. And just so we're clear, whatever
19  this injury is to her back or reinjury to her
20  back, you do accept responsibility for causing
21  that incident?
22        MR. BRADFORD: Objection to form.
23  Her alleged injury or -- I'm just objecting to
24  form. Go ahead.



Page 73

1  BY MR. ZEIGER:
2  Q.     You can answer.
3  A.     Can you repeat the question, please?
4  Q.     If she was injured as a result of this
5  or reinjured her back, an injury to her back as a
6  result of your interaction with her that day, you
7  accept responsibility for that injury?
8          MR. BRADFORD:  Objection to form.
9          THE WITNESS:  Yes.
10         MR. ZEIGER:  I have nothing
11 further.
12 BY MR. BRADFORD:
13 Q.     I have a few questions.  You said you --
14 Trooper Painter, you said you encountered three
15 people when you entered the house?
16 A.     Yes.
17 Q.     At least you personally.  What was the
18 level of cooperation that you received from these
19 individuals?
20 A.     There was no -- no cooperation
21 whatsoever.
22 Q.     Was this -- was this unusual to you in
23 your experience?
24 A.     Yes.

Page 74

1  Q.     Is it concerning to you?
2  A.     It is concerning.
3  Q.     Do you know why they were not
4  cooperating?
5          MR. ZEIGER:  Objection.  Calls
6  for speculation.  You can answer.
7          THE WITNESS:  I mean, I have -- I
8  have no idea why they were acting that way.
9  BY MR. BRADFORD:
10 Q.     Did you know these individuals, any of
11 these three individuals that you encountered to be
12 unarmed, such as not having, you know, like a gun
13 in their pocket or in -- behind their back or
14 tucked in their waistband?
15 A.     Did I know that?
16 Q.     Did you know of them to be unarmed?
17 A.     No.
18 Q.     Did you know the layout of the house
19 when you were -- before you entered it?
20 A.     No.
21 Q.     When you encountered Ada Anglemeyer,
22 who -- who you later determined to be Ada
23 Anglemeyer, was there a room behind her that she
24 was blocking access to?

Page 75

1  A.     Yes.
2  Q.     Did you know if anyone was in that room
3  behind her?
4  A.     I did not know.
5  Q.     Did you know if anyone in that room --
6  there was someone in that room who was armed?
7  A.     I did not know.
8  Q.     Were you -- were you made aware
9  beforehand during the briefing that there were
10 firearms all over the house?
11 A.     Yes.
12 Q.     And there was at least one, maybe more
13 people who had criminal records in that house?
14 A.     Yes.
15 Q.     And could someone who doesn't actually
16 own a firearm pick up a firearm and use it?
17 A.     Yes.
18 Q.     You're aware that the briefing or at
19 least the majority of it was videotaped?
20 A.     The briefing, yes.
21 Q.     Yes, at 04:00 hours?
22 A.     Yes.
23 Q.     And those videos have been provided to
24 plaintiff's counsel.  Were you present for that --

Page 76

1  all of those -- have you seen those videos?
2  A.     I saw them and I was present during
3  them, yes.
4  Q.     Okay.  That was my question.  So, is it
5  fair that's the best record of what was actually
6  presented to you by SERT leadership?
7  A.     Yes.
8  Q.     Did you decide what information was
9  presented to you?
10 A.     I'm sorry?
11 Q.     Hold on one second.
12         (Discussion off the record.)
13         (Jason Pelotte is now present.)
14 BY MR. BRADFORD:
15 Q.     So I think I asked you, did you control
16 what information was presented to you during that
17 briefing?
18 A.     No.
19 Q.     Did you assume that if it was being
20 presented to you that it was important and
21 relevant?
22 A.     Yes.
23 Q.     Were you given an intelligence brief, a
24 document?



Page 77

1  A.    Yes.

2  Q.    I'm going to share my screen we. Can

3  get this marked as -- what are we up to, Brian?

4          MR. ZEIGER: I think No. 4 would

5  be the next one.

6          MR. BRADFORD: No, 4, so this will

7  be Painter 4.

8  BY MR. BRADFORD:

9  Q.    Is that up on your screen?

10  A.    Yes, it is.

11  Q.    You can see that. Okay. And it's an 11

12  page document. So I'm not going to show you the

13  whole thing here. But does this appear to be the

14  intelligence brief from -- from the day in

15  question?

16  A.    Yes, it does.

17  Q.    February 23, 2018 search warrant service

18  at 340 Old Allentown Road, Bushkill Township

19  Northampton County, right?

20  A.    Correct.

21  Q.    And included in here -- I'm going to

22  read from the first page at 0322 on the Bates

23  stamp. CI related that there are rifles all over

24  the house. Then local PD reported that rifle was

Page 78

1  observed behind the front door when they were at

2  the home for a call a few years ago. That

3  information -- you had that information -- first

4  of all, did I read that correctly?

5  A.    Yes, you did.

6  Q.    So you had that information available?

7  A.    Yes.

8  Q.    And you're aware that Mark Anglemeyer

9  had several -- had a pretty extensive criminal

10  history?

11  A.    Yes.

12  Q.    And he lived in -- it was your

13  understanding that he was in that house?

14  A.    Yes.

15  Q.    And you didn't know exactly what part of

16  the house he was in?

17  A.    No, I did not.

18  Q.    You didn't even know the layout of the

19  house?

20  A.    Correct.

21  Q.    And he has a criminal history of drug

22  possession, DWI charges, recklessly endangering,

23  simple assault, escape, fleeing, alluding,

24  resisting arrest, harassment and disorderly

Page 79

1  conduct. In 2009 he got into an argument with a

2  district judge during a prelim. He ran out of the

3  court and drove off with the police chasing him.

4  When Anglemeyer stopped at a stop sign, the

5  officers got out of their car and reached into his

6  truck to get him to stop. Anglemeyer hit the gas

7  nearly pinning one officer between the two cars.

8  He fled to his residence and was taken into

9  custody. Was that -- was that information that

10  was shared with you during the briefing?

11  A.    It was.

12  Q.    And I'm reading from, just for the

13  record, Bates 0323, the second page. And we'll

14  move on to Jeffrey Anglemeyer, who is a plaintiff

15  in this lawsuit. We'll move onto, it's the third

16  page, Bates stamped 324. It says, according to

17  investigators, Jeffrey has been staying at this

18  residence since recently being -- being bailed out

19  of jail on domestic abuse charge. Jeffrey's

20  criminal history is out of PA, New Jersey and

21  Florida, consists of firearms not to be carried,

22  theft, criminal mischief, obstructing justice,

23  numerous drug possession, PWI, simple assault,

24  harassment, disorderly conduct, terroristic

Page 80

1  threats, strangulation and resisting arrest. Was

2  that information you were aware of before you

3  entered the residence that day?

4  A.    It was.

5  Q.    And a gun query was completed for

6  Jeffrey, which indicated that he purchased a 22

7  caliber Smith and Wesson handgun and a 357 Smith

8  and Wesson handgun, both in 1985. He does not

9  have a permit to carry. You were aware of that --

10  that information?

11  A.    I was.

12  Q.    And it says for Ada, that she is a

13  coowner of the residence and it is unknown if Ada

14  has a part in the drug sales. Did you -- did you

15  have that information?

16  A.    Yes, I did.

17  Q.    And it indicates that she purchased a 25

18  caliber handgun in 1979. She does have an active

19  concealed carry permit in Northampton County. You

20  had that information?

21  A.    I did.

22  Q.    And going back to Richard Anglemeyer.

23  It indicates, it is not known if Richard has a

24  part in the drug sales. Is that information you



CLINTON PAINTER                                     August 27, 2020
ANGLEMEYER vs NORTHAMPTON COUNTY                    81–84

Page 81

1  had?
2  A.      Yes.
3  Q.      And it indicated that that information
4  also included that he purchased a 9 millimeter
5  Glock handgun in 1989.  He does not possess a
6  permit to carry.  Is that information you had?
7  A.      Yes.
8  Q.      And onto page six of this document,
9  Bates 0327.  This is information related to Renee
10  Kluska.  It says Renee's criminal history consists
11  of a 1996 simple assault arrest in Pennsylvania
12  and it indicates that she has an active conceal
13  carry permit in Northampton County.  Is that
14  information you had?
15  A.      Yes.
16  Q.      And it also says it is not known if she
17  has a part in the drug sales, correct?
18  A.      Correct.
19  Q.      Moving on to the seventh page of this
20  document, page 3 -- 0328 on the Bates, this
21  pertains to Joseph Kluska.  It indicates it is not
22  known if he has a part in the drug sales and that
23  he has a criminal history in Pennsylvania
24  consisting of DUI, simple assault and disorderly

Page 82

1  conduct.  A gun query was negative.  He does not
2  possess a concealed carry permit.  Is that
3  information you had available before you entered
4  the residence that day?
5  A.      Yes.
6  Q.      On page nine, which is Bates 0330.
7  What -- what -- what is depicted on the bottom
8  photograph there?
9  A.      Someone shooting a rifle into, it looks
10  like a lake or a body of water.
11  Q.      And did you have -- was information
12  presented at the briefing that there were AR15s
13  in -- at this residence?
14  A.      Yes.
15  Q.      What is depicted on -- on page 11?  It's
16  Bates 0332?  What is depicted at the top of this
17  page here, the first photograph?
18  A.      It's a large caliber rifle.  It looks
19  like 50 cal.  It's scoped.
20  Q.      And it indicates this is from Renee
21  Kluska's Facebook page?
22  A.      Yes.
23  Q.      And this was, again, information you had
24  at -- at the time you entered the residence that

Page 83

1  day?
2  A.      Yes.
3  Q.      You were asked earlier by counsel if
4  Mark Anglemeyer was the only person considered
5  dangerous to you.  Do you remember being asked
6  that?
7  A.      Yes.
8  Q.      Do you want to stand by that answer or
9  do you want to revise that at all based on that
10  information I just, you know, refreshed your
11  recollection with?
12  A.      Yes, based on -- on the briefing he was
13  not.
14  Q.      Is it fair to say that all of these
15  people were a concern given that -- given that the
16  information you had regarding their criminal
17  histories and the guns, whether they were there
18  legally or not?
19  A.      Yes.
20          MR. BRADFORD:  I'm done.  I don't
21  know you if have any followup on that.
22          MR. ZEIGER:  I do.
23  BY MR. ZEIGER:
24  Q.      So, just to be clear, you -- you went

Page 84

1  into the house at 6:00 a.m, right?
2  A.      Yes.
3  Q.      And it was February and so it was still
4  dark outside at 6:00 a.m. when you entered the
5  house, right?
6  A.      Correct.
7  Q.      And you do that because you hope that
8  some people are still asleep when you go in the
9  house, right?
10  A.      I don't know the reason why they do
11  that.
12  Q.      What do you think the reason is?
13  A.      I -- I can't answer for the way -- for
14  what time they do the warrants.
15  Q.      Okay.  When you went in the house, was
16  anyone still asleep, if you know?
17  A.      No, it didn't appear.
18  Q.      Did you later learn that there were
19  people that were still asleep when you went into
20  the house?
21  A.      Not on the lower level floor.
22  Q.      Did you learn anyone on any other level
23  floor was still asleep when you went in the
24  house?



Page 85

1  A.      I know they dealt with some people in
2  bedrooms.  I don't know if they were sleeping or
3  not.
4  Q.      Okay.  As far as cooperation with you
5  when you entered the house to execute a warrant,
6  is there -- I mean, do you know of a requirement
7  that anyone cooperate with the police, right, in
8  our community?  That's not a requirement or a law;
9  is it?
10        MR. BRADFORD:  Objection to form.
11 You can answer.
12        THE WITNESS:  No, it's not a
13 requirement.
14 BY MR. ZEIGER:
15 Q.      And -- and it's not illegal not to
16 cooperate with police; is it?
17        MR. BRADFORD:  Objection to form.
18        THE WITNESS:  No.
19 BY MR. ZEIGER:
20 Q.      Okay.  And no one was arrested in this
21 case for anything in connection with not
22 cooperating with police; were they?
23 A.      To the best of my knowledge.
24 Q.      Okay.  So, to the best of your

Page 86

1  knowledge, no one was arrested for anything in
2  regard to not cooperating with the police in this
3  case, correct?
4  A.      Correct.
5  Q.      Okay.  When you went into the house, you
6  did not encounter anyone who was armed; did you?
7  A.      No.
8  Q.      You did not observe any firearms; did
9  you?
10 A.      No.
11 Q.      On those reports that your lawyer just
12 showed you for the debriefing, there was a line he
13 kept repeating, he said not known if involved in
14 drug sales.  Do you remember he read that about
15 six times?
16 A.      Yes.
17 Q.      That means there was no knowledge that
18 those people were involved in any drug sales,
19 correct?
20        MR. BRADFORD:  Objection.  You
21 can answer.
22        THE WITNESS: It says not known by
23 the investigators.  That's what was provided to
24 us.

Page 87

1  BY MR. ZEIGER:
2  Q.      So that means when you were briefed, you
3  were not given any information that any of those
4  people were involved in drug sales, correct?
5  A.      Correct.
6  Q.      Okay.  You did not observe any AR15s;
7  did you?
8  A.      No.
9        MR. ZEIGER:  I have nothing
10 further.  Please be safe.
11 BY MR. BRADFORD:
12 Q.      Trooper, just a couple of followups.  Do
13 you know if anyone was arrested that day one way
14 or another?
15 A.      I really don't recall.
16 Q.      Do you know if there was multiple
17 arrests of -- whether there was arrests of several
18 residents that day?
19 A.      My involvement is -- is the security of
20 the house and people.  We load up and we leave.
21 And I -- I haven't heard anything else on it.
22 So I don't know who was arrested, what was found
23 or anything.
24 Q.      And when you encountered these three

Page 88

1  individuals that you personally encountered, did
2  you know one way or another if they were armed or
3  had access to a handgun within arm's reach?
4  A.      During the briefing from what the CI
5  said, yes, there -- close proximity access to
6  firearms.
7        MR. BRADFORD:  I have nothing
8  further.
9        MR. ZEIGER:  I have nothing
10 further, either.  Please be safe, Trooper.  Thank
11 you very much.
12        THE VIDEO TECHNICIAN:  Counsel,
13 same orders?
14        MR. ZEIGER:  Yes.
15        MR. BRADFORD:  Yes.
16        THE VIDEO TECHNICIAN:  We are now
17 going off the record on August 27, 2020 at 2:15
18 p.m.
19        (Witness excused.)
20        (Deposition concluded at 2:15
21 p.m.)
22
23
24



```
                                              Page 89
 1            C E R T I F I C A T E

 2

 3            I hereby certify that the witness

 4   was duly sworn by me and that the deposition is a

 5   true record of the testimony given by the witness.

 6

 7

 8

 9            _____

10            Dolores M. Horne

11            Dated:  September 3, 2020

12

13

14

15   (The foregoing certification of this transcript

16   does not apply to any reproduction of the same by

17   any means, unless under the direct control and/or

18   supervision of the certifying shorthand reporter.)

19

20

21

22

23

24
```

