**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                     - - -
        ADA ANGLEMEYER, et al.    : CIVIL ACTION
 4                                :
             v.                   :
 5                                :
        NORTHAMPTON COUNTY        : NO. 19-3714
 6
 7                     - - -
 8              October 1, 2020
 9                     - - -
10              Videotape deposition of TROOPER
11   MATTHEW WYSOCKY, taken pursuant to notice, was
12   held at remotely, commencing at 11:15 a.m., on
13   the above date, before Torre Lynn Adams, a Court
14   Reporter and Notary Public in the Commonwealth
15   of Pennsylvania.
16                     - - -
17
18
19
            ESQUIRE DEPOSITION SOLUTIONS
20                 Suite 2600
               1835 Market Street
21        Philadelphia, Pennsylvania 19103
                (215) 988-9191
22
23
24
```

**Page 2**

```
 1   APPEARANCES:
 2
 3       LEVIN & ZEIGER
         BY:  BRIAN ZEIGER, ESQUIRE
 4       Two Penn Center
         1500 John F. Kennedy Boulevard
 5       Suite 620
         Philadelphia, Pennsylvania 19102
 6       (267) 328-5506
         zeiger@levinzeiger.com
 7       Representing the Plaintiffs
 8
 9
         OFFICE OF ATTORNEY GENERAL
10       BY:  KEVIN R. BRADFORD, ESQUIRE
         21 South 12th Street
11       2nd Floor
         Philadelphia, Pennsylvania 19103
12       (215) 560-2262
         Representing the Defendants
13
```

**Page 3**

```
 1                     - - -
 2                   I N D E X
 3                     - - -
 4
 5   Testimony of:  TROOPER MATTHEW WYSOCKY
 6        By Mr. Zeiger              6, 67, 70
 7        By Mr. Bradford            62, 69
 8                     - - -
 9                 E X H I B I T S
10                     - - -
11   NO.       DESCRIPTION              PAGE
12        (None)
```

**Page 4**

```
 1                     - - -
 2           DEPOSITION SUPPORT INDEX
 3                     - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line   Page Line      Page Line
 7   None
 8
 9
10   Request for Production of Documents
11   Page Line   Page Line      Page Line
12   None
13
14
15   Stipulations
16   Page Line   Page Line      Page Line
17   None
18
19
20   Question Marked
21   Page Line   Page Line      Page Line
22   None
```

SUMMARY JUDGMENT EXHIBIT 7



Page 5
1      - - -
2      VIDEO TECHNICIAN: Good morning,
3  everyone. We are now on the video record. The
4  time is 11:15 a.m. on October 1st, 2020. This
5  begins the videotape deposition of Trooper
6  Wysocky, correct?
7      THE WITNESS: Yes, ma'am.
8      VIDEO TECHNICIAN: Okay. Great.
9      And we're -- this is taken in the
10 matter of Ada Anglemeyer, et al. versus
11 Northampton County filed in the U.S. District
12 Court for the Eastern District of Pennsylvania,
13 Case Number of which is 19-3714.
14     My name is Summer Menkee. I'm the
15 videographer. We have Torre Lynn Adams as our
16 court reporter. And we are both representing
17 the Esquire Deposition Solutions.
18     And just a courtesy, will everyone
19 re -- remember to please mute yourself when
20 you're not speaking and remember to unmute when
21 you're ready to speak.
22     And, Counsel, will you please
23 state your name and whom you represent, after
24 which the court reporter will swear in the

Page 6
1  witness.
2      MR. ZEIGER: Brian Zeiger for the
3  plaintiffs.
4      MR. BRADFORD: Kevin Bradford for
5  all the current defendants.
6      MR. WYSOCKY: Matthew Wysocky for
7  the Pennsylvania State Police CERT team.
8      MR. ZEIGER: Okay. Good
9  afternoon --
10     COURT REPORTER: I didn't swear
11 him yet. Sorry, sir.
12     MR. ZEIGER: Sorry.
13     COURT REPORTER: That's okay.
14     - - -
15     TROOPER MATTHEW WYSOCKY, after
16 having been duly sworn, was examined and
17 testified as follows:
18     - - -
19     EXAMINATION
20     - - -
21 BY MR. ZEIGER:
22     Q.   Good morning, Trooper. How are
23 you today?
24     A.   Good. And yourself?

Page 7
1      Q.   Your name is Wysocky; is that
2  right?
3      A.   That's correct, yes.
4      Q.   Make sure I'm pronouncing it
5  right.
6      Okay. So, do you remember the
7  date of February 23, 2018?
8      A.   I do vaguely, yes.
9      Q.   Okay. Were you employed as a
10 Pennsylvania State Trooper at that time?
11     A.   Yes. Yes, I was.
12     Q.   And at approximately 4:00 a.m.,
13 did your tour of duty take you to some kind of
14 meeting about something with the CERT team?
15     A.   Yes, it did. Yes. It would be --
16 it would have been a warrant service on that
17 day.
18     Q.   Okay. And was the warrant service
19 eventually conducted at 340 Old Allentown Road,
20 Bushkill Township, Northampton County?
21     A.   Yes, it was.
22     Q.   And at 4:00 a.m., were you briefed
23 on that?
24     A.   Yes. Yes, we attended a

Page 8
1  pre-deployment briefing.
2      Q.   Okay. And do you remember being
3  part of executing the warrant?
4      A.   Yes, I do.
5      Q.   Okay. So, do you think you did
6  anything wrong that day in your -- in your tour
7  of duty?
8      A.   Absolutely not.
9      Q.   Okay. And if there's someone
10 who -- who claims that you injured them, do you
11 accept responsibility for causing that injury?
12     MR. BRADFORD: Objection to form.
13 BY MR. ZEIGER:
14     Q.   You can answer.
15     MR. BRADFORD: You can answer.
16     I'm sorry, I occasionally will
17 object to form, as I just did there, Trooper
18 Wysocky, but unless I instruct you not to
19 answer, you can go ahead and answer.
20     Normally, I follow that saying you
21 may answer. So, go ahead and attempt to answer.
22     THE WITNESS: I'm sorry. Could
23 you repeat the question again?
24 BY MR. ZEIGER:



Page 9

1  Q.  Sure.
2      If someone claims that you injured
3  them on that day, do you accept responsibility
4  for causing that injury?
5      MR. BRADFORD:  Objection to form.
6      Actually, I'm telling him not to
7  answer.  That's a ridiculous question.  We had
8  this conversation before.
9      MR. ZEIGER:  Okay.  Let me just
10 put on the record that, you know, in any civil
11 matter a defendant who's named in the case can
12 accept responsibility for what they're accused
13 of doing in the lawsuit and make it just about
14 the value of the case or claim that the person's
15 not really injured or something like that or
16 that the case isn't worth much.
17     So, in a car accident case, in a
18 rear-ender, someone can come in and say, you
19 know, I did -- I did rear end that person, I did
20 cause that accident.  So, all of these questions
21 are going towards liability.  That's the
22 intention of the question.
23     And certainly, a defendant can
24 accept responsibility for either an injury or --

Page 10

1  or causation or something related to -- for
2  which they're sued for.
3      This is a named defendant in the
4  case under 1983 for excessive force and he
5  should answer.
6      MR. BRADFORD:  Well, Brian, you're
7  asking him for a legal conclusion.  You can
8  certainly ask him for what he did and who he did
9  it -- who he interacted with, but then you're
10 giving him this hypotheticals that he doesn't
11 know, that someone was injured and they say it
12 happened that day.  And if he tells me that he
13 did it, do you accept responsibility, that's --
14 that's -- that's not a fair question.  It's not
15 a proper question for purposes of a deposition.
16 We're here to get facts.
17     MR. ZEIGER:  Okay.
18 BY MR. ZEIGER:
19  Q.  One of the named plaintiffs, Jim
20 Kluska, claims that you injured his shoulder.
21 Do you accept responsibility for that?
22     MR. BRADFORD:  Same objection.
23     You -- you can -- you can attempt
24 to answer that.  I think it's an improper

Page 11

1  question, but go ahead, Trooper.
2      THE WITNESS:  I will not claim
3  responsibility for injuring anything as in this
4  case, I did not act out of the realm of my
5  duties.  I didn't act intentionally, recklessly,
6  negligently.
7  BY MR. ZEIGER:
8   Q.  Okay.  But even within the course
9  of your scope of duties, if you acted within the
10 scope of your employment, if Joe Kluska is
11 accusing you of injuring him, do you accept
12 responsibility for causing that injury?
13     MR. BRADFORD:  Same objection.
14     You can -- you can --
15     THE WITNESS:  No.  No, I wouldn't
16 accept responsibility.
17 BY MR. ZEIGER:
18  Q.  No problem.
19     All right.  So, I'm going to move
20 on.
21     Do you remember you filled out
22 some paperwork in this case?
23  A.  I do -- what type of paperwork
24 would it be?

Page 12

1   Q.  A callout report.
2   A.  Yes.  Yes, I completed a callout
3  report.
4   Q.  Okay.  I'm going to show you the
5  callout report now.  Just bear with me while I
6  try to do this.  Okay?
7   A.  Okay.
8   Q.  Can you see that on your screen,
9  Trooper?
10  A.  Yes.
11  Q.  Do you see a sticker on the bottom
12 right side of your screen that says Wysocky-1?
13  A.  Yes, I do.
14  Q.  Okay.  I'm going to scroll up to
15 the top.  Okay?
16  A.  Okay.
17  Q.  Can you tell me what this document
18 is, if you know?
19  A.  This is a Pennsylvania State
20 Police Special Emergency Response Team callout
21 report that we complete at the end of each
22 warrant service or any activation that we -- we
23 go to.
24  Q.  Okay.  And is this yours from the



Page 13
1  incident report we're here today to talk about?
2     A.    Yes, it is.
3     Q.    Okay. I'm going to start at the
4  top and sort of make my way down. Okay?
5     A.    Sure.
6     Q.    If at any time you need me to
7  enlarge anything or stop, just interrupt me and
8  I'm happy to do that. Okay?
9     A.    Yes, sir.
10    Q.    So, it says here date of
11 activation is 2-23-18. That means that that's
12 the date that you were alerted that you were
13 going to be on a CERT team job; is that right?
14    A.    That's correct, sir.
15    Q.    And 2-28-18, that means that's the
16 date of the actual report -- I'm sorry. Let's
17 back up.
18         Date of activation of 2-23-18 is
19 the day that you guys executed the warrant,
20 correct?
21    A.    Yes, sir.
22    Q.    Okay. And 2-28-18 is the day that
23 you sat down and actually typed this document,
24 correct?

Page 14
1     A.    That's correct, sir.
2     Q.    Okay. And then under name it says
3  Trooper Matthew Wysocky, that's you, right?
4     A.    Yes, it is.
5     Q.    And then it says Warrant Service.
6  That means that you're going to go and execute a
7  warrant somewhere. Right?
8     A.    That's correct. Yes, sir.
9     Q.    And then it says 340 Old Allentown
10 Road, Bushkill Township, Northampton County,
11 Pennsylvania. Doesn't say Pennsylvania, but
12 that means that's the place where the warrant
13 was to be executed, correct?
14    A.    That's correct, sir.
15    Q.    And that's a large parcel of land,
16 it's not just a -- one individual building,
17 right?
18    A.    According to the brief, yes,
19 that's correct, it was a large parcel with
20 multiple structures.
21    Q.    And when you got there, was that
22 briefing true, it was a large parcel of land
23 with multiple structures?
24    A.    Yes, it was.

Page 15
1     Q.    And that includes a garage and a
2  house, correct?
3     A.    Yes, I would assume so. I was not
4  assigned to those specific buildings, but from
5  my recollection, yes, it did include that.
6     Q.    Where were you assigned?
7     A.    I was assigned to the main
8  structure.
9     Q.    Okay. And now, it says Date and
10 Time of Notification, 2-21-18, 1945. That means
11 that's when you were told you were going to have
12 a job on the CERT team, right?
13    A.    Yes.
14    Q.    And then when it says date and
15 time of arrival, it says Date of Arrival, it
16 says 2-23-18, 400 hours, that means you were
17 briefed for what was going to happen for the
18 warrant job at 4:00 in the morning on
19 February 23, 2018, right?
20    A.    Yes, sir.
21    Q.    And then it says overtime hours
22 used 6.5. That means that you did this as all
23 overtime, right?
24    A.    I would not say it was all

Page 16
1  overtime. I -- I may have been working a -- I
2  may have been working normal -- yes, yes. I was
3  not working that day, I would assume. I assume
4  that would be correct, yes.
5     Q.    Right, because next to it on the
6  left, it says straight time hours used, zero.
7     A.    Yes, sir.
8     Q.    So, that means you were not on
9  duty that day, right?
10    A.    Correct.
11    Q.    So -- so, overtime hours used,
12 6.5, that means you got paid in addition to your
13 normal salary for executing this warrant,
14 correct?
15    A.    That's correct, yes.
16    Q.    Okay. I'm going to go down a
17 little bit here. I'm going to scroll a little
18 bit so I can see it a little better.
19         "For this particular activation, I
20 did not notify a shift supervisor as a result of
21 this warrant service occurring during my
22 regularly scheduled days off."
23         So, that's the same thing you just
24 testified to up top.



Page 17

1  "And there were no notifications
2  made to my schedule."
3       So, you agree with both of those
4  statements, correct?
5  A.   Yes, sir.
6  Q.   "On the above date and time, I
7  attended the pre-deployment briefing for this
8  warrant service at PSP Belfast."
9       So, that means at 4:00 a.m. you
10 were in a room with some kind of supervisor and
11 they -- they discussed this matter and told you
12 what was going to happen that day, right?
13 A.   Yes, sir.
14 Q.   And next sentence says "I was
15 assigned to east utility van with Corporal John
16 Chulock as the team leader."
17      What does that mean?
18 A.   That means that that's the vehicle
19 that I was specifically assigned to for this
20 activation, went with a team of guys, and John
21 Chulock would have been the corporal in charge
22 of that van or -- in this particular instance,
23 he would have been in charge of that particular
24 van.  So, he would have been front seat

Page 18

1  passenger ultimately.
2  Q.   "Additionally, I was assigned the
3  duties of assistant breacher and one side
4  clearing."  What does that mean?
5  A.   That was my duties.  So, that was
6  my specific assignment.  I was assigned to the
7  van for -- I was assigned to the van, and then
8  more specifically, I was assigned as an
9  assistant breacher, that would have been to
10 assist the primary breacher, which in this case
11 would have been Trooper Peter Del Gaizo.  And
12 then upon breach, we would assist with -- with
13 clearing of the residence.
14 Q.   So, some other -- something called
15 a ram?  Are you familiar with that tool?
16 A.   Yes, sir.
17 Q.   Did you have a ram that day?
18 A.   I did not.  I had a -- I had other
19 tools.
20 Q.   Okay.  So, the next sentence says
21 "Trooper Peter Del Gaizo was the primary
22 breacher."
23      That's consistent with what you
24 already testified to, correct?

Page 19

1  A.   Yes, sir.
2  Q.   And the next line says "I was
3  armed with my Glock 21 pistol, a Halligan bar
4  and a 16-pound sledgehammer."
5       Is that right?
6  A.   Yes, sir.
7  Q.   Okay.  So, the Glock pistol,
8  that's just your -- your service weapon, right?
9  A.   Yes, sir, my issued -- yes, my
10 issued standard.
11 Q.   And Halligan bar, what's that?
12 A.   Halligan bar is a -- it's an iron
13 tool used to -- to assist with forcible entry if
14 needed.  If there would be a -- sort of a locked
15 door or something along the lines of that, we
16 would use that to assist with opening the door.
17 Q.   Is that what non-police officers
18 call a crowbar?
19 A.   It's a form of a crowbar, yes.
20 Q.   About how long is it?
21 A.   30 inches.
22 Q.   About how much does it way weigh?
23 A.   Seven pounds, five pounds.
24 Q.   Okay.  And next says "And a

Page 20

1  16-pound sledgehammer."
2       So, that's just a sledgehammer
3  that -- that any non-police officer would just
4  call a sledgehammer, it's the same item?
5  A.   Fair to say, yes.
6  Q.   Okay.  "And after the briefing,
7  several rehearsals were conducted in the parking
8  lot of PSP Belfast."
9       Can you explain what that means?
10 A.   Prior to deployment, what we do
11 with that, with warrant services we run dry runs
12 and rehearsals to make sure that -- that -- that
13 everyone is where they need to be, and to make
14 sure we have down our routine that could
15 possibly occur upon execution of the warrant
16 service.
17 Q.   Okay.  What did you, personally,
18 rehearse?
19 A.   I, personally, rehearsed assisting
20 Trooper Peter Del Gaizo in opening the door, a
21 couple different scenarios simulating that
22 there's a storm door, simulating that it's
23 locked, simulating that the door is open,
24 running through multiple scenarios.



Page 21

1   Q.   Okay. And did you see someone
2  there named Painter?
3   A.   I believe -- I believe he was
4  there, yes.
5   Q.   So, you know someone named
6  Painter?
7   A.   I do -- his first name, could you
8  say his first name from me?
9   Q.   If only I could remember his first
10 name, I would say it to you.
11        MR. BRADFORD:  Clinton.
12        THE WITNESS:  Clinton Painter?
13        MR. ZEIGER:  Thank you.
14 BY MR. ZEIGER:
15  Q.   Is he a Trooper?
16  A.   He is a trooper -- he's either a
17 trooper or a corporal of the State Police, I'm
18 not sure.
19  Q.   He worked as a law enforcement
20 officer for the Pennsylvania State Police,
21 correct?
22  A.   That's correct, yes.
23  Q.   So, did you see him rehearse
24 anything in the parking lot?

Page 22

1   A.   I did not.
2   Q.   Okay. Was he there?
3   A.   He was there, yes.
4   Q.   Do you remember what his job
5  assignment was that day?
6   A.   I do not.
7   Q.   Do you remember seeing him in the
8  house?
9   A.   No, I do not.
10  Q.   Do you remember seeing him push an
11 old lady into a wall with a shield?
12  A.   No.
13  Q.   Did you ever see an ambulance come
14 to the location of the house?
15  A.   No, I don't recall an ambulance
16 showing up to the house.
17  Q.   Okay. I'm going to move on to the
18 document on your screen.
19       "Upon arriving at the subject
20 residence, the team deployed from the vehicles
21 and advanced to the front porch of the
22 structure."
23       Is that all correct?
24  A.   Yes.

Page 23

1   Q.   "I opened the front storm door and
2  determined that the one side main door was
3  locked and secured."
4        So, you were holding open the
5  storm door at that point?
6   A.   Yes.
7   Q.   Okay. "At that time, Trooper Del
8  Gaizo and I utilized the ram tool and impacted
9  the one side main door in the area of the knob
10 and dead bolt locking mechanism, which resulted
11 in a successful breach."
12       So, that means that Del Gaizo had
13 the -- the ram or you both had the ram?
14  A.   We would both have the ram at that
15 time. We would use the two-man breaching method
16 to impact the door.
17  Q.   And then so, that means that you
18 take this ram, you sort of swing it backwards
19 and then the two of you push it forward with all
20 your might, and the physics of that move is
21 supposed to pop the door open?
22  A.   Yes, that's correct.
23  Q.   Okay. If Del Gaizo said that he
24 did it himself and you were holding the door for

Page 24

1  him, that would be a mistake?
2        I mean, the screen door?
3   A.   The screen door? I might have
4  handed the scene door off to him depending on
5  how it opened. If it would have opened a
6  specific way, he would have stepped into the
7  screen door and I would have left the screen
8  door go. I can't recall whether the screen door
9  would have exactly opened.
10  Q.   I'm going to ask a different group
11 of questions then. Okay?
12       So, Del Gaizo testified earlier
13 this morning that when you got to the scene,
14 that you opened the screen door and held it
15 open.
16       Do you remember if that's true?
17  A.   I cannot recall.
18  Q.   And then Del Gaizo testified that
19 while you were holding screen door open, that he
20 used the ram alone and breached the door alone
21 by himself?
22       MR. BRADFORD:  Objection to form.
23       You can answer.
24 BY MR. ZEIGER:



Page 25

```
 1   Q.     Is that what happened?
 2   A.     I -- I would say that I probably
 3   assisted him with the ram tool in breaching the
 4   door.
 5   Q.     Okay.  So -- so, he's mistaken
 6   probably?
 7          MR. BRADFORD:  Objection to form.
 8          THE WITNESS:  I could -- I
 9   couldn't say -- say if -- if he would have been
10   or not.  I'm not sure that he -- if you're
11   telling me he testified to that, then I would
12   say that -- that I -- I did assist him with
13   breaching the door.
14          MR. BRADFORD:  You did or did not?
15          THE WITNESS:  I did.
16          MR. BRADFORD:  Okay.  Trooper,
17   your main memory controls here.  So, he's going
18   to try to -- you know, he's giving you
19   information maybe to help revive your memory
20   further, but if that doesn't do it, your memory
21   controls.  Just answer the question based on
22   your knowledge.  You don't have to agree with
23   something that you don't agree with.
24   BY MR. ZEIGER:
```

Page 26

```
 1   Q.     And let me give you an instruction
 2   as well, because I don't do the instructions at
 3   the beginning of my depositions, because I think
 4   it's a waste of everyone's time.  I'm going to
 5   do that now.
 6          I agree completely with your
 7   lawyer.  If you don't recall, you shouldn't
 8   guess.  If I ask you to estimate and you can't
 9   estimate, you should say I can't estimate.
10          We're here today to discover what
11   happened.  Your lawyer and I were not there.  We
12   don't know what actually happened.  There are no
13   trick questions.
14   A.     Right.
15   Q.     I am simply here for the purpose
16   of getting something down on the record for you
17   to be able to explain your version of what
18   happened so I can discover what really occurred.
19          Do you understand that?
20   A.     Yes.  Yes, sir.
21   Q.     Okay.  Very good.
22          All right.  Moving on.
23          "Once inside the residence, I
24   began repeatedly announcing State Police search
```

Page 27

```
 1   warrant."
 2          Is that true?
 3   A.     Yes.
 4   Q.     And do you know in the order of
 5   troopers, do you know where you were to get into
 6   the property, beginning, middle, end?  Do you
 7   have an estimate?
 8   A.     I would have been in the
 9   beginning.
10   Q.     Okay.  So, one of the first ones
11   in?
12   A.     Yes.
13   Q.     Where was the ram when you went
14   in?
15   A.     I don't recall.
16   Q.     Where was the Halligan bar?
17   A.     I don't recall that either.
18   Q.     Where was the sledgehammer?
19   A.     I don't recall.
20   Q.     And -- okay.  "And I proceeded
21   into a bedroom located in the one/four corner of
22   the first floor and addressed a male located in
23   the bed."
24          What is one/four mean?
```

Page 28

```
 1   A.     That's the location of the
 2   residence where that bedroom would have been
 3   located.  So, looking at the house, if -- if the
 4   walls were numbered starting with the front wall
 5   as one, going in clockwise motion two, three,
 6   four, that bedroom would have been in that front
 7   one/four corner of the residence.
 8   Q.     And first floor -- how many floors
 9   were there?
10   A.     Two.
11   Q.     And is the first floor the top
12   floor or the bottom floor?
13   A.     It's the main floor.
14   Q.     Okay.  Is the other floor above it
15   or below it?
16   A.     Second floor would be above it.
17          MR. BRADFORD:  Okay.  Can I jump
18   in here real quick?  Are you sure you weren't on
19   the upper floor?
20          THE WITNESS:  I don't recall.  We
21   went in the front door and that's the floor that
22   that bedroom was on.
23          MR. BRADFORD:  Okay.
24   BY MR. ZEIGER:
```



Page 29

1  Q. All right. So, you don't recall
2  whether the first floor is the upper or lower
3  floor, I guess, is your answer, right?
4  A. Correct.
5  Q. Okay. "And addressed a male
6  located in the bed."
7    What does that mean?
8  A. It means as soon as I entered the
9  bedroom, the male was in the bed and then I went
10 to his location.
11 Q. Anyone else in the room?
12 A. It was the female also in the bed
13 and Trooper Del Gaizo.
14 Q. And the two people that were in
15 the bed, what were they wearing?
16 A. I don't recall.
17 Q. Were they under the covers or over
18 the covers?
19 A. Under the covers.
20 Q. Were they asleep?
21 A. I don't recall.
22 Q. Did they appear to be asleep?
23 A. Yes.
24 Q. And what did you see Del Gaizo do

Page 30

1  when you entered the room?
2  A. Del Gaizo addressed the female in
3  the same manner that I addressed the male.
4  Q. I know I may have asked you this
5  three questions ago, but the word addressed is
6  boggling to me. I'm having a hard time with
7  that.
8    Can you tell me what the word
9  addressed means?
10 A. He approached her and he went to
11 her location. He rendered the necessary means
12 of securing her and rendering the occupants of
13 the room and the room safe. I think that's all
14 addressed.
15 Q. How did he secure her?
16 A. I can't recall.
17 Q. And you addressed the male. Did
18 you secure him?
19 A. Yes, sir.
20 Q. Okay. What, if any, interaction
21 did you have with him before you -- you -- you
22 put -- I'm going to withdraw that and I'm going
23 to rephrase that. I can't I'll never get the
24 words out.

Page 31

1    What, if any, interaction did you
2  have with that male while you were addressing
3  him?
4  A. Minimal. I went to his location
5  in the bed. We -- we secured him as quickly as
6  we could and then we located him to the floor
7  area.
8  Q. I -- if you're going to say "we,"
9  I'd like to know exactly what you did and
10 exactly what Del Gaizo did. So, can you repeat
11 your answer, but please don't say "we"? I
12 struggle with pronounce greatly.
13 A. Yeah, sure.
14    I approached the male. I
15 attempted to get his arms from him from
16 underneath the covers, so I could visualize his
17 arms. And I assist -- I put his arms behind his
18 back at that time so I could assist with
19 applying flex cuffs to him before I --
20 Q. Please finish. I'm sorry. I
21 apologize.
22 A. That was all on the bed before I
23 located him to the floor.
24 Q. So, he was flex cuffed before he

Page 32

1  was put to the floor?
2  A. Yes.
3  Q. Okay. I think I understand now.
4    And where -- where is Del Gaizo
5  while you're putting the flex cuffs on him while
6  he's still in bed?
7  A. Del Gaizo with me. He's in the --
8  in the vicinity of me as well.
9  Q. Okay. So, that male must have
10 been on his stomach, right?
11 A. Yes, at one point.
12 Q. Well, I mean, at the part -- at
13 the time you flex cuffed him in the bed, he
14 would have had to be on his stomach, correct?
15 A. Correct.
16 Q. Okay. So, when you came in the
17 room, was he on his stomach or did you flip him
18 over onto his stomach?
19 A. I don't recall.
20 Q. All right. Let's move on here
21 with the document.
22    "The male was secured and Trooper
23 Del Gaizo assisted with applying flex cuffs."
24    Is that true?



Page 33

1   A.   Yes.
2   Q.   "The male was then moved to the
3   floor where he was patted down for officer
4   safety."
5        Is that correct?
6   A.   Yes.
7   Q.   Did you find anything on him?
8   A.   No.
9   Q.   Okay. Did you see a gun in the
10  room anywhere?
11  A.   Yes.
12  Q.   Where was the gun?
13  A.   The gun was located on the
14  headboard of the bed.
15  Q.   Did you see him go for the gun at
16  all at any point in time?
17  A.   No.
18  Q.   He wasn't arrested for anything
19  related to that gun, was he?
20  A.   I couldn't say.
21  Q.   Why not?
22  A.   Because it's not on us to -- to
23  say whether or not they're charged with any sort
24  of crimes or if they are or not, in fact,

Page 34

1   charged with crimes. It's just our job to go in
2   and secure the residence and the occupants at
3   that time.
4   Q.   Are you aware -- did you have the
5   male charged with anything else?
6   A.   I couldn't say.
7   Q.   That's fair. Okay.
8        And the male was then moved to the
9   floor where he was patted down for officer
10  safety. I know I repeated that already.
11       How was he moved from the bed to
12  the floor?
13  A.   We would have just carried him
14  from the bed right onto the form.
15  Q.   What part of your body touched
16  what part of his body?
17  A.   My hands would have been around
18  his arms.
19  Q.   Okay. You didn't like lift up his
20  wrist by where the flex cuffs were in order to
21  get him off out of the bed, did you?
22  A.   No.
23  Q.   Because you're trained not to do
24  that, right?

Page 35

1   A.   No, not in particularly.
2   Q.   You understand that if you have
3   someone cuffed in some way, whether it's flex
4   cuffs or handcuffs, and you lift them up by the
5   back of their wrist and move their wrist towards
6   like the 12:00 upward motion, that someone could
7   become severely injured, right?
8   A.   Yes.
9   Q.   So, if you did that, that would
10  violate some policy of the Pennsylvania State
11  Police, correct?
12  A.   Yes.
13  Q.   Okay. And in this case, your
14  claim is you did not do that to that male,
15  right?
16  A.   Correct.
17  Q.   Okay. And you didn't see Del
18  Gaizo do that, did you?
19  A.   No, I did not.
20  Q.   "The male was then assisted off
21  the floor and placed on a chair."
22       Where was the chair from?
23  A.   The chair was from the bedroom.
24  Q.   Okay. And who placed them on the

Page 36

1   chair?
2   A.   I did.
3   Q.   Without Del Gaizo?
4   A.   I can't recall.
5   Q.   And how did you get him into the
6   chair?
7   A.   We rolled him onto his side and
8   assisted him up.
9   Q.   Because he was on his stomach
10  before that?
11  A.   Yes.
12  Q.   So, went from being on his stomach
13  to -- on the bed to his stomach on the ground?
14  A.   Yes.
15  Q.   And then you lift -- and then --
16  and then you rolled him to the side and then
17  helped him up to get into the chair?
18  A.   Yes, sir.
19  Q.   Then it says "I remained with the
20  male until released by investigators."
21       What does that mean?
22  A.   That means that I would have
23  remain -- I did remain in the room until the
24  investigating officers or -- or people assisting



Page 37

1  with the investigation came and took custody of
2  the -- of the individuals in the room.
3      Q.    "In this room, there was the
4  pistol located on the headboard of the bed."
5          That's consistent with your
6  previous testimony, correct?
7      A.    Yes.
8      Q.    "The residents and all occupants
9  encountered by other team members were
10 subsequently released into the custody of the
11 investigators."
12         That's consistent with your
13 previous testimony, correct?
14     A.    Yes, correct.
15     Q.    "I attended the after action
16 debriefing at PSB Belfast."
17         Can you explain what that means?
18     A.    After each activation, we -- we
19 conduct a debrief.  It's to speak about the
20 outcome of the execution of the warrant service
21 on our end.
22     Q.    Okay.  I'm going to scroll down
23 "The team was dismissed at approximately
24 0730 hours."

Page 38

1          That means at 7:30 in the morning
2  the job was over?
3      A.    Yes, sir.
4      Q.    Okay.  So, did you ever come to
5  learn what the woman's name was in the room?
6      A.    No, I didn't.
7      Q.    If I told you her name was Renee,
8  would that refresh your recollection?
9      A.    It could be.
10     Q.    Why do you say that?
11     A.    I do recall the intelligence brief
12 that there was a female by the name of Renee.
13     Q.    Okay.  And if I told you that the
14 gentleman's name -- well, do you know the
15 gentleman's name in the room?
16     A.    I don't, no.
17     Q.    If I told you his name was Joseph
18 or Joe, would that refresh your recollection?
19     A.    No.
20     Q.    Okay.  So, previously, Del Gaizo
21 testified that he only touched the woman in the
22 room and he did not touch the male in the room.
23 And here, in your statement, you say that you
24 and Del Gaizo both touched the male.

Page 39

1          Can you rectify that in any way?
2          MR. BRADFORD:  Objection to form.
3          THE WITNESS:  No, I'm not.
4  BY MR. ZEIGER:
5      Q.    So, your statement that you wrote
6  here in Wysocky-1 that we just went over on your
7  screen, you maintain that's what happened when
8  you went into the room?
9      A.    Yes, sir.
10     Q.    There's no mistakes at all in
11 this?
12     A.    No, sir.
13     Q.    There's no omissions from it?
14     A.    No, sir.
15         MR. BRADFORD:  Object to form.
16 BY MR. ZEIGER:
17     Q.    So, if Del Gaizo had a different
18 set of facts as far as who touched the male,
19 he's wrong?
20         MR. BRADFORD:  Objection to form.
21         THE WITNESS:  I couldn't say, sir.
22 BY MR. ZEIGER:
23     Q.    Well, either you're wrong or he's
24 wrong.

Page 40

1          MR. BRADFORD:  Trooper, are you
2  sure that Del Gaizo touched the male?
3          THE WITNESS:  I couldn't say.
4  BY MR. ZEIGER:
5      Q.    So, now you're not sure?
6      A.    I know for sure that I -- that I
7  touched the male.
8      Q.    All right.  I'm going to go back
9  to this document again.  I just want to -- I
10 want to get everything on the record and give
11 you a full and fair opportunity to speak about
12 what happened.
13         I'm not the most technologically
14 savvy guy, but I'm going to try and use some
15 technology here.
16         You see that underline I just put
17 on there?
18     A.    Yes, sir.
19     Q.    It says "The male was secured by
20 Trooper Del Gaizo assisted with applying flex
21 cuffs."
22         That's what it says, right?
23     A.    Yes.
24     Q.    And this is your statement, right?



Page 41

1  A.   Yes, it is.
2  Q.   Okay. So, did -- did Del Gaizo
3  help you in applying the flex cuffs to the male,
4  yes or no?
5  A.   Yes.
6  Q.   Okay. So, before when your lawyer
7  asked a question in the middle of this and you
8  said you weren't sure, you are sure now that Del
9  Gaizo did help you apply the flex cuffs, right?
10  A.   Yes.
11  Q.   Okay. And so, if Del Gaizo said
12  that he never touched the male before, your
13  testimony today is that Del Gaizo's mistaken; is
14  that correct?
15       MR. BRADFORD:  Objection to form.
16       THE WITNESS:  Yes.
17  BY MR. ZEIGER:
18  Q.   That's a yes?
19  A.   Yes.
20  Q.   All right. I'm going to go to a
21  different document.
22       Can you see that on your screen?
23  A.   Yes, sir.
24  Q.   And you see that sticker, says

Page 42

1  "Plaintiff's Exhibit Wysocky-2"?
2  A.   Yes, sir.
3  Q.   Okay. I'm going to scroll up
4  here.
5       It says Defendant's Response to
6  Plaintiff's Interrogatories. Do you see that?
7  A.   Yes.
8  Q.   All right. I'm going to go all
9  the way to the end.
10       Second to last page, it says
11  "Verification."
12       Do you see that?
13  A.   Yes, sir.
14  Q.   And that's your signature in your
15  own handwriting on that document, right?
16  A.   Yes, it is.
17  Q.   Okay. And this means that you
18  verified that the answers and responses that
19  were contained in this document were true and
20  accurate to the best of your ability; is that
21  right?
22       MR. BRADFORD:  The facts -- the
23  factual information.
24       MR. ZEIGER:  Right, the facts that

Page 43

1  are important here.
2  BY MR. ZEIGER:
3  Q.   I agree with your lawyer.
4       Is that right?
5  A.   Yes.
6  Q.   All right. Now, when you did
7  these, did you answer all these or did you just
8  give the -- or did your lawyer do it for you?
9  A.   I answered them.
10  Q.   Okay. And then your lawyer typed
11  them up?
12  A.   Yes.
13  Q.   Okay. And by the way, before we
14  get into this, on that previous document that I
15  showed you, Wysocky-1, are there any other
16  mistakes on that document other -- other than
17  that -- that one thing I -- I highlighted?
18  A.   No.
19  Q.   Are there any omissions, anything
20  you left out in there that you wish you had put
21  in?
22  A.   No.
23  Q.   Okay. I'm going back up to the
24  top here on this one, just bear with me for a

Page 44

1  minute.
2       I'm going to go to Number 6. Do
3  you see that?
4  A.   Yes.
5  Q.   Do you want me to blow it up?
6  A.   Could you, please?
7  Q.   Yeah, absolutely.
8       Did that blow it up?
9  A.   No -- that's -- I don't know if
10  that's -- oh, there we go. Thank you.
11  Q.   You're welcome.
12       Okay. Do you see Number 6?
13  A.   Yes.
14  Q.   I've got to enlarge my screen to
15  be able to read it now. Okay.
16       Can you still see it?
17  A.   Yes, sir.
18  Q.   Okay. I'm going to read this
19  aloud.
20       "As explained in his callout
21  report, responding party located a white male
22  and white female he found together in the front
23  bedroom on the upper floor of the house and that
24  he was involved in securing both individuals.

Page 45

1  The woman was too young to be to female
2  plaintiff.  Responding party is currently
3  without knowledge or information sufficient to
4  form a belief as to whether the male is one of
5  the plaintiffs given the limited description of
6  the plaintiffs provided in the Complaint.
7       "Upon information and belief, this
8  individual did not have any injuries or require
9  any medical treatment.  All individuals were to
10 be secured as part of the process of securing
11 the premises pursuant to the warrant, which is
12 what happened."
13      Do you remember giving that answer
14 to your lawyer?
15 A.   Yes.
16 Q.   Okay.  I'm going to make a
17 statement now.  The male in the bed was a
18 gentleman named Joe Kluska or Joseph Kluska.
19 He's one of the named plaintiffs in this case
20 and he is accusing you of injuring his
21 shoulders, both of them.  Okay?
22      MR. BRADFORD:  I'm objecting to
23 that.  It's a statement, not a question.
24      MR. ZEIGER:  Yes, it's a

Page 46

1  statement.
2  BY MR. ZEIGER:
3  Q.   Okay.  The question is, based on
4  that statement, do you have any knowledge about
5  injuring the man's shoulder who you flex cuffed
6  while laying on his stomach in bed that morning?
7  A.   No, I don't.
8  Q.   Did you get anyone any medical
9  care for any kind of shoulder injury in that
10 room?
11 A.   No, I didn't.
12 Q.   Did that male ask you for any help
13 or any medical attention regarding his
14 shoulders --
15 A.   No.
16 Q.   -- regarding how you flex tied
17 him?
18 A.   No, he didn't.
19 Q.   Okay.  And -- and if he -- he were
20 to say that you did injure his shoulders based
21 on your actions in the room that day, what's
22 your response to that?
23      MR. BRADFORD:  Objection.
24      You can answer.

Page 47

1       THE WITNESS:  I'm sorry.
2       MR. BRADFORD:  You can answer.
3       THE WITNESS:  I would say it was a
4  possibility that his shoulder may -- may have
5  been injured; however, back to my original
6  statement, it wasn't done intentionally or
7  recklessly or negligently.
8  BY MR. ZEIGER:
9  Q.   So, the answer is, you may have
10 injured his shoulder, you're just not sure?
11 A.   Right.
12 Q.   Okay.
13 A.   There was nothing said that day of
14 -- there was no mention of it.
15 Q.   I'm just trying to understand,
16 though, did you see anyone else touch that guy
17 that day other than you or Del Gaizo?
18 A.   No.
19 Q.   Okay.  So, if he claims that
20 there's some trooper that injured his shoulder,
21 whether it's -- whether it's actually injured or
22 not, though, there's no other troopers that had
23 any physical contact with him that you're aware
24 of, correct?

Page 48

1  A.   Correct.
2  Q.   I'm going to keep going here.
3       Did you have a body cam on?
4  A.   No.
5  Q.   Do you know why not?
6  A.   We don't have body cam -- cameras
7  in the Pennsylvania State Police.
8  Q.   Have you ever complained to your
9  supervisor that you want one?
10 A.   No.
11 Q.   Are you a member of a union?
12 A.   Yes.
13 Q.   Have you ever filed a grievance
14 with your union that you want a body cam?
15 A.   No.
16 Q.   Why not?
17      MR. BRADFORD:  Objection to form.
18      You can answer.
19      THE WITNESS:  Because -- because I
20 don't believe that -- that we need them right
21 now.  If they would give us one, then I would
22 wear it, I'd be more than happy to wear it;
23 however, I -- I was never faced with a situation
24 where I would be dishonest or use excessive



Page 49

1  force or anything of that nature that I would
2  need to -- to cover myself in -- in a case of an
3  instance that -- that I would do something
4  wrong.
5  BY MR. ZEIGER:
6      Q.   I mean, Trooper, in the most
7  respectful way I can possibly frame this next
8  question, in this case, you are being accused of
9  using excessive force against Joe Kluska.  You
10 understand that, right?
11     A.   Yes.
12     Q.   So, you have been accused of using
13 excessive forces before in your line of duty,
14 specifically this case that we're here for,
15 right?  You get that?
16     A.   Yes.
17     Q.   So, do you -- let me ask the
18 question again about the -- about the body cam.
19          So, why have you never requested
20 to wear a body cam or file grievance with your
21 union to wear a body cam?
22          MR. BRADFORD:  Objection to form.
23          You can answer.
24          THE WITNESS:  Because we -- we

Page 50

1  don't have -- I mean, we have -- on -- on the
2  road, there's MVRs, there's things -- different
3  other recording systems that we have.
4           You know, CERT -- CERT is a
5  part-time entity for me.  It's -- we're not full
6  time.  On the road -- on the road, we're covered
7  by -- by other means of -- of recording systems,
8  but as far as MVRs or microphones.
9  BY MR. ZEIGER:
10     Q.   Can you promise me that today
11 after this deposition's over, that you're going
12 to go to your union and file a grievance, and in
13 the grievance, say you want a body cam for the
14 future in your job as a Pennsylvania State
15 Trooper?  Can you give me that promise today?
16          MR. BRADFORD:  Objection.
17 BY MR. ZEIGER:
18     Q.   Can you --
19          MR. BRADFORD:  Objection to the
20 question.
21          Do not answer that.
22          This is ridiculous.  Come on,
23 Brian.
24 BY MR. ZEIGER:

Page 51

1      Q.   You can answer if you want.
2           MR. BRADFORD:  No, he's not
3  answering that question.
4  BY MR. ZEIGER:
5      Q.   Moving on.
6           Okay.  In Number 13 here, it says
7  "Describe in detail your tactical approach for
8  securing the property."  It says "Responding
9  party's exact role as specified in his callout
10 report and the warrant service plan.  Document's
11 in plaintiff's possession for months.  Was set
12 by CERT leadership.  Upon information and
13 belief, the search warrant specifically included
14 three structures; the residence, a nearby garage
15 and a trailer.  Responding party does not recall
16 any other structures that were not secured."
17          Is that true?
18     A.   Yes.
19     Q.   Do you recall any information at
20 all that in the house that there was any illegal
21 activity occurring?
22     A.   I don't recall.
23     Q.   Okay.  So, do you know that the
24 garage is the location where -- where apparently

Page 52

1  there was illegal activity occurring?
2      A.   I don't recall.
3      Q.   Okay.  Moving on.
4           Number 14 has to do with whether
5  or not any methamphetamine was recovered by the
6  CERT team.  And your response was "Responding
7  party did not discover any suspected
8  methamphetamine while securing the party.
9  Responding party does not know what each of the
10 other CERT members discovered."
11     A.   That --
12     Q.   That means you did not recover any
13 methamphetamine, correct?
14     A.   Correct.
15     Q.   And did you observe anyone commit
16 any crime, that if it was your job, you would
17 have made an arrest for?
18     A.   I did not observe anything.
19     Q.   I'm going to keep going down.
20          Next question on that here is
21 Number 16, and this is about a firearm's arrest.
22          So, you said there was a firearm
23 on the headboard, correct?
24     A.   Yes, sir.



Page 53

1  Q. If this was your job and you were
2  the -- the trooper making the decision, you
3  would not have arrested the male or female in
4  the room for anything related to the firearm; is
5  that correct?
6  A. I couldn't say.
7  Q. Why not?
8  A. Because I'm unaware of any
9  additional investigatory information besides us
10 going in to secure the -- the property and the
11 occupants.
12 Q. Correct.
13    So, the answer to my question then
14 is no, you didn't have any information or
15 observe anything at that time that would lead
16 you to make an arrest for anything related to
17 that firearm based on what you did that day,
18 right?
19 A. Correct, correct.
20 Q. Okay. I'm going to unshare this
21 document and I am going to go to another one.
22    Do you see that sticker Wysocky-3?
23 A. Yes, sir.
24 Q. I'm going to scroll up. This is a

Page 54

1  document titled at the top. It says "Concise
2  Officer History, Corporal Matthew Wysocky."
3     Is that you, Matthew Wysocky?
4  A. Yes, sir.
5  Q. And have you ever seen this
6  document before, Concise Officer History?
7  A. No, sir.
8     Could you blow that up a little
9  bit for me, please?
10 Q. Yes, absolutely.
11 A. I'm sorry.
12 Q. No. I wish I was a little better
13 at the technology.
14    Is that better or no?
15 A. Yes, that's fine. That's fine.
16 Q. Have you ever seen this document
17 before?
18 A. No, sir.
19 Q. I'm going to go through the
20 document with you now. It's not that long,
21 three pages.
22    It said you were hired on May 9th
23 of 2011. Do you see that?
24 A. Yes, sir.

Page 55

1  Q. And I'm going to just scroll down
2  here. The first one is April the 4th of 2012.
3  It says "Allegation vehicle code driving vehicle
4  at safe speed regulation review."
5     Do you remember that matter?
6  A. Yes.
7  Q. So, you know, it's -- as a
8  nonmember of law enforcement, it's a little hard
9  for me understand it. It says you were driving
10 the vehicle at a safe speed.
11    So, that would not seem like what
12 that's -- it would seem like that's what we're
13 all supposed to do, is drive at a safe speed.
14 So, can you explain what that -- what happened?
15 A. That was someone on the interstate
16 just made a complaint to Harrisburg that my
17 vehicle may have been speeding. And by the
18 looks at it, I got supervisor resolution, which
19 means that my supervisor spoke to me about it
20 and went over the regulation with me.
21 Q. So, the allegation was that you
22 were, in fact, not driving a vehicle at a safe
23 speed; is that right?
24 A. Yes, it's not driving a vehicle at

Page 56

1  a safe speed, but -- it says it the way it is,
2  it's driving the vehicle at safe speed --
3  Q. Police officers make words out of
4  things that don't make sense sometimes.
5     Okay. I'm going to scroll down.
6     The next is July 25, 2018. It's a
7  use of force matter. It says "Effective, not
8  effective; verbal commands not effective;
9  physical constraint, effective; service being
10 conducted, arresting."
11    And there's -- there's actually
12 another one just -- just below it that --
13 it's -- it's from the same matter, I believe.
14 Because that one says duplicate. And this one
15 says "Allegation: Use of force. Force used to
16 overcome resistance justified. October 1st,
17 2014."
18    Do you remember that matter?
19 A. No, I don't.
20 Q. Okay. But that says justified, so
21 there was no finding against you, correct?
22 A. Correct.
23 Q. Okay. I'm going to scroll down.
24    This says "January 26, 2015,



Page 57

1  Charges: Use of force; Legal Intervention,
2  1-25-15, justified; vehicle pursuit 1-25-15,
3  justified."
4          Do you remember that -- that
5  incident?
6     A.   I don't.
7     Q.   Okay.  I'm going to scroll down.
8          "Use of force, May 12, 2017; use
9  of force, effective, noneffective; Taser,
10 effective; service being conducted, 302
11 commitment, disposition finding EIP entry."
12         Do you remember that one?
13    A.   No, I don't.
14    Q.   Okay.  Do you remember Tasing
15 someone in a 302?
16    A.   I do remember Tasing a female
17 once.  I -- I would have -- I would have to
18 assume it may be for what -- in relation to
19 this.
20    Q.   Okay.
21         Next one.  Use of force,
22 September 13, 2017, CERT-CHEM deployment;
23 Effective."
24         Let's go to the next page to make

Page 58

1  sure there's nothing else here.
2          Seems like the same one again.
3  CERT-CHEM deployment, not effective; service
4  being conducted, 302 commitment."
5          So, is it -- is a CERT-CHEM
6  deployment meaning you're using mace or pepper
7  spray or some other kind of spray, is that what
8  that means?
9     A.   Yes, sir.  That just means we're
10 deploying some sort of chemical agent into the
11 residence in order to effect a peaceful
12 resolution.
13    Q.   Okay.
14         In this case, it says "It is not
15 effective," meaning it did not work.
16         Do you remember that incident?
17 Did you use some kind of spray in a 302
18 incident?
19         MR. BRADFORD:  Objection to form.
20         THE WITNESS:  I don't recall.
21 BY MR. ZEIGER:
22    Q.   Scrolling down.
23         "October 25, 2017, CERT-CHEM
24 deployment, effective."

Page 59

1          Do you remember that one?
2     A.   No, sir.
3     Q.   Okay.  The next, January the 9th,
4  2018 allegation, "Dissatisfied with service
5  provided.  Counselled."
6          Do you remember that one?
7     A.   No, I don't.
8     Q.   Did a supervisor in January --
9  around January 24th of 2018 from the
10 Pennsylvania State Police talked to you about
11 the way you talk to citizens?
12         MR. BRADFORD:  Objection to form.
13         You can answer.
14         THE WITNESS:  Yes, I believe that
15 was a private complaint through Harrisburg.
16 BY MR. ZEIGER:
17    Q.   Do you know what the complaint was
18 about?
19    A.   Me wanting to tow vehicle from
20 private property.
21    Q.   Why did you want to tow the
22 vehicle?
23    A.   Because it was obstruction of the
24 roadway.

Page 60

1     Q.   Did you have it towed?
2     A.   No.
3     Q.   Okay.  Moving on.
4          "February 16th of 2018, CERT
5  chemical deployment, not effective" --
6          MR. ZEIGER:  Sorry.  We're on to
7  two now.
8  BY MR. ZEIGER:
9     Q.   "Service being conducted,
10 arresting; disposition finding information
11 only."
12         Do you remember that job?
13    A.   No, sir.
14    Q.   Okay.  And there's no -- the next
15 one here is January 11, 2019, but before we get
16 that far, I note that the case that we're here
17 for happened on February 23rd, 2018.  And I note
18 there's no entry here; is that correct?
19    A.   Yes, sir.
20    Q.   And so, that means that you did
21 not self-report the use of any force in this
22 case, correct?
23    A.   Correct, sir.
24    Q.   Do you have a duty to self-report



Page 61
1  when you use force?
2         MR. BRADFORD:  Objection to form.
3         You can answer.
4         THE WITNESS:  Yes, sir, any -- any
5  sort of less -- less lethal force, yes.
6  BY MR. ZEIGER:
7     Q.    Okay.  And scrolling down in this
8  case, you're -- you're claiming you did not use
9  any force, right?
10    A.    Correct, sir.
11    Q.    Okay.  "January 11, 2019, use of
12  force, CHEM deployment, effective; service being
13  -- service conducted, arresting for information
14  only."
15        Do you see that?
16    A.    Yes, sir.
17    Q.    Okay.  And the next one
18  "December 30, 2019, CERT-CHEM deployment,
19  effective; service being conducted, arresting,
20  disposition, information only."
21        Do you see that?
22    A.    Yes, sir.
23    Q.    That -- you don't remember either
24  of those two, do you?

Page 62
1     A.    No, I don't recall.
2     Q.    All right.  So, on this, you agree
3  that the number it says total is 12; is that
4  right?
5     A.    Yes.
6     Q.    All right.  Is there anything else
7  that -- about this incident that occurred when
8  you executed this warrant that you haven't told
9  us?
10    A.    No, sir.
11        MR. ZEIGER:  I have no further
12  questions.
13        MR. BRADFORD:  I have a couple
14  questions, Trooper.
15          - - -
16          EXAMINATION
17          - - -
18  BY MR. BRADFORD:
19    Q.    I'm going to pull up --
20        MR. BRADFORD:  What was it called
21  the report, Brian?  Was it Exhibit 1?
22        MR. ZEIGER:  I'm going -- I'm
23  going to unshare that.
24        MR. BRADFORD:  First of all, yes.

Page 63
1  Thank you.
2         MR. ZEIGER:  Which document,
3  Kevin?
4         MR. BRADFORD:  I'll pull it up and
5  then you tell me which one it is.
6         MR. ZEIGER:  Okay.
7         MR. BRADFORD:  That's not it.
8         MR. ZEIGER:  That's Wysocky-1.
9         MR. BRADFORD:  Okay.  You got it.
10  Wysock-1.
11  BY MR. BRADFORD:
12    Q.    And, Trooper, I want to go back to
13  that -- that one sentence that you were asked
14  several times about and I -- I highlighted it
15  instead of underlining it.
16        First of all, can you see that?
17  Do you need that bigger?
18    A.    Can you just -- yes, could you
19  just zoom in?
20        Thank you, perfect.
21    Q.    And this is -- this is your
22  callout report, right?
23    A.    Yes, it is.
24    Q.    I want to direct your attention to

Page 64
1  the one sentence, "The male was secured and
2  Trooper Del Gaizo assisted with applying flex
3  cuffs."
4         Now, first of all, do you have an
5  independent recollection of exactly what you did
6  in that room that day?
7     A.    No.
8     Q.    Is it fair to say your memory is
9  really just based off what you wrote in this
10  report?
11    A.    Yes.
12        MR. ZEIGER:  Can you hold on for
13  one second, Kevin?  Hold on.  Pardon me.
14          - - -
15        (Whereupon, a discussion was held
16  off the record at this time.)
17          - - -
18        MR. ZEIGER:  Sorry.  I -- I had a
19  COVID-19 security related issue at my office.
20        Go ahead.  Sorry about that.
21        MR. BRADFORD:  Quickly resolved.
22  BY MR. BRADFORD:
23    Q.    Okay.  And you -- and you told
24  Mr. Zeiger that Del Gaizo assisted in applying

Page 65
1  flex cuffs to the male based on the sentence in
2  your callout report?
3      A.    Correct.
4      Q.    Now, I read this sentence.  It
5  says "The male was secured and Trooper Del Gaizo
6  assisted with applying flex cuffs."
7           It doesn't say applying flex cuffs
8  to who.  Is it possible you were referring to
9  the female?
10     A.    Yes.
11     Q.    So, is it fair to say that you
12 don't know if Trooper Del Gaizo assisted in
13 applying flex cuffs to the male?
14     A.    I'm sorry, what was that?  Is it
15 fair to say?
16     Q.    Is it fair to say that you are not
17 -- as you sit here today, and even after reading
18 this report, and now, reconsidering what's in
19 this report based on what I just told you, that
20 you're not sure if Trooper Del Gaizo assisted in
21 applying flex cuffs to the male?
22     A.    Yeah.  Yes.  He assisted with
23 applying flex cuffs to all occupants of the
24 room.

Page 66
1      Q.    Right.  And that's what we're
2  trying to establish.  And that's where we got
3  hung up a little bit, is in this report, it says
4  "Trooper Del Gaizo assisted with applying flex
5  cuffs."  It didn't say to whom.
6           So, if he said I only applied flex
7  cuffs to the female, would that be -- does that
8  make sense to you based on this report?
9      A.    Yes.
10     Q.    Okay.
11          MR. BRADFORD:  Brian, do you want
12 to explore this further, you know, we can do
13 that after I'm done here.
14          And that's actually --
15 BY MR. BRADFORD:
16     Q.    What was the -- what was the
17 lighting in the room when -- when you entered
18 the room?
19     A.    I don't recall.
20     Q.    Is it fair to say you didn't --
21 you didn't know the layout of the house at all
22 when you entered the house?
23     A.    Yes.
24     Q.    So, you only knew the people that

Page 67
1  were supposed to be in there, but you
2  didn't know -- you had no idea where they would
3  actually be located?
4      A.    Correct.
5           MR. BRADFORD:  Okay.  I'm done,
6  Brian.
7                - - -
8           EXAMINATION
9                - - -
10 BY MR. ZEIGER:
11     Q.    Trooper, I mean, your testimony
12 today is -- is that Del Gaiz -- Del Gaizo helped
13 with you the male, right?
14     A.    Yes.
15     Q.    Okay.  Whether -- and that
16 includes securing him, right?
17     A.    Whether he helped me with securing
18 or assisting the male or is there some -- some
19 way or shape or manner, he -- he assisted me in
20 the room with securing the individuals.  I -- I
21 don't recall to -- to what extent.
22     Q.    Okay.  That includes securing him
23 in the bed, flex cuffing them in the bed, taking
24 him to the floor and then sitting him up in the

Page 68
1  chair, all four of those things, you're not sure
2  which, but you believe that Del Gaizo helped you
3  with some or all of those four, correct?
4      A.    Yes.
5           MR. BRADFORD:  You're using
6  pronouns.  You mean they for both of them?
7  You're talking about both people.
8           THE WITNESS:  They, the male and
9  female were secured.
10          MR. ZEIGER:  Kevin, I'm confused.
11 I didn't say that.
12          MR. BRADFORD:  Yes, you did.  You
13 said you assisted them.  You said them.
14          MR. ZEIGER:  I'm going --
15 I'm going -- I'm going to re -- re -- rephrase
16 all this.  Okay.
17 BY MR. ZEIGER:
18     Q.    Trooper, I'm only talking about
19 the male in the bed.  Okay.
20          In regard to the male that was in
21 the bed, I'm going to call him Joe Kluska.
22 Okay?
23     A.    Yes.
24     Q.    In regard to Joe Kluska, just to



Page 69
1  be clear, your testimony is, in regard to
2  securing Joe Kluska in the bed, in regard to
3  putting the flex cuffs in Joe Kluska in the bed,
4  in regard to moving Joe Kluska onto the floor
5  and in regard sitting up Joe Kluska in a chair,
6  it's your belief that Officer -- that Trooper
7  Del Gaizo helped you do some or all of those
8  four things regarding Joe Kluska, correct?
9      A.    Yes.
10          MR. ZEIGER:  Thank you.  I have
11 nothing further.
12              - - -
13          EXAMINATION
14              - - -
15 BY MR. BRADFORD:
16     Q.    And you base that information off
17 this single sentence in your call report,
18 correct?
19     A.    Yes.  Yes.
20     Q.    And again, you don't independently
21 recall Trooper Del Gaizo making physical contact
22 at all with Joe Kluska?
23     A.    That's correct, yes.
24     Q.    And would you agree with me that

Page 70
1  this sentence in your -- in your callout report
2  could be interpreted in a fashion that Trooper
3  Del Gaizo assisted in applying flex cuffs only
4  to the female?
5      A.    Yes.
6      Q.    So, the bottom line is, you're not
7  sure if Trooper Del Gaizo, as you sit here
8  today, lay a hand on Joe Kluska while you were
9  in that room?
10     A.    That's correct.
11          MR. BRADFORD:  Okay.  Thank you.
12              - - -
13          EXAMINATION
14              - - -
15 BY MR. ZEIGER:
16     Q.    Would you agree with me, Trooper,
17 that you authored this report about -- within
18 four days of when this incident occurred,
19 correct -- five days?
20     A.    I did, yes.
21     Q.    And you would agree that now,
22 we're about two-and-a-half years later, after
23 this happened, right?
24     A.    Yes.

Page 71
1      Q.    And you would agree that the time
2  that you wrote this, this incident was fresher
3  in your mind and your memory than it is today,
4  correct?
5      A.    Correct.
6      Q.    And this is your report and you
7  authored it, right?
8      A.    Yes.
9      Q.    You were the typist, right?
10     A.    Yes.
11     Q.    And you had full and fair
12 opportunity to read it and proofread it and add
13 anything else in that you wanted at that time,
14 right?
15     A.    Yes, sir.
16     Q.    And I asked you today if there
17 were any mistakes or omissions in this report
18 and you said no to both of those, correct?
19     A.    Correct.
20          MR. ZEIGER:  I have nothing
21 further.
22          MR. BRADFORD:  Okay.  I'm done
23 with it.
24          MR. ZEIGER:  All right.

Page 72
1  Officer -- stay safe, Trooper.
2          VIDEO TECHNICIAN:  Are you
3  ready --
4          THE WITNESS:  Thank you, sir.
5          VIDEO TECHNICIAN:  Before he
6  leaves the room, are we ready to do the
7  conclusion of his deposition?
8          MR. ZEIGER:  Yes.
9          VIDEO TECHNICIAN:  Okay.  One
10 moment, please.
11          All right, everyone.  This
12 concludes the videoconference deposition of
13 Trooper Wysocky.  We ask that all participants
14 handle their transcript and video orders later.
15          We are going off the video record
16 on October 1, 2020 at 12:18 p.m.
17          MR. ZEIGER:  I need PDF of the
18 minuscript and I need the video in the cheapest
19 format.
20          (Witness excused.)
21          (Deposition concluded at 12:18
22 p.m.)



Page 73

```
 1                  CERTIFICATE
 2
 3           I HEREBY CERTIFY that the witness
 4   was duly sworn by me and that the deposition is
 5   a true record of the testimony given by the
 6   witness.
 7
 8           Torre Lynn Adams
 9
             Torre Lynn Adams,
10           Court Reporter and Notary Public
             Dated:   October 15, 2020
11
12
13
14
15
16           (The foregoing certification of
17   this transcript does not apply to any
18   reproduction of the same by any means, unless
19   under the direct control and/or supervision of
20   the certifying reporter.)
21
22
23
24
```

Page 74

```
 1                LAWYER'S NOTES
 2   PAGE   LINE
 3   ____   ____   _____
 4   ____   ____   _____
 5   ____   ____   _____
 6   ____   ____   _____
 7   ____   ____   _____
 8   ____   ____   _____
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
```

