## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                          - - -
     ADA ANGLEMEYER, et al.    :  CIVIL ACTION
 4                             :
           v.                  :
 5                             :
     NORTHAMPTON COUNTY        :  NO. 19-3714
 6
 7                          - - -
 8                   October 1, 2020
 9                          - - -
10             Videotape deposition of TROOPER
11   PETER DEL GAIZO, taken pursuant to notice, was
12   held remotely, commencing at 10:18 a.m., on the
13   above date, before Torre Lynn Adams, a Court
14   Reporter and Notary Public in the Commonwealth
15   of Pennsylvania.
16                          - - -
17
18
19
              ESQUIRE DEPOSITION SOLUTIONS
20                   Suite 2600
                 1835 Market Street
21         Philadelphia, Pennsylvania 19103
                   (215) 988-9191
22
23
24
```

## Page 2

```
 1   APPEARANCES:
 2
 3       LEVIN & ZEIGER
         BY:  BRIAN ZEIGER, ESQUIRE
 4       Two Penn Center
         1500 John F. Kennedy Boulevard
 5       Suite 620
         Philadelphia, Pennsylvania 19102
 6       (267) 328-5506
         zeiger@levinzeiger.com
 7       Representing the Plaintiffs
 8
 9
         OFFICE OF ATTORNEY GENERAL
10       BY:  KEVIN R. BRADFORD, ESQUIRE
         21 South 12th Street
11       2nd Floor
         Philadelphia, Pennsylvania 19103
12       (215) 560-2262
         Representing the Defendants
13
14                      - - -
15   ALSO PRESENT:
16       SUMMER MENKEE, Videographer
17                      - - -
18
19
20
21
22
23
24
```

## Page 3

```
 1                          - - -
 2                      I N D E X
 3                          - - -
 4   Testimony of:  TROOPER PETER DEL GAIZO
 5       By Mr. Zeiger                      6, 44
 6       By Mr. Bradford                       43
 7                          - - -
 8                    E X H I B I T S
 9                          - - -
10   NO.          DESCRIPTION                PAGE
11             (None)
```

## Page 4

```
 1                          - - -
 2              DEPOSITION SUPPORT INDEX
 3                          - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line   Page Line        Page Line
 7   None
 8
 9
10   Request for Production of Documents
11   Page Line   Page Line        Page Line
12   None
13
14
15   Stipulations
16   Page Line   Page Line        Page Line
17   5    1-6
18
19
20   Question Marked
21   Page Line   Page Line        Page Line
22   None
```



SUMMARY JUDGMENT EXHIBIT 8

Page 5

1           - - -
2      MR. BRADFORD: Mini and full PDF.
3      VIDEO TECHNICIAN: Good morning.
4 We're now on the video record.
5      The time is 10:18 eastern standard
6 time on October 1st, 2020. And this begins the
7 videotape deposition of Trooper Del Gaizo taken
8 in the matter of Ada Anglemeyer, et al. versus
9 Northampton County filed in the United States
10 District Court for the Eastern District of
11 Pennsylvania. The case number of which is
12 19-3714.
13      My name is Summer Menkee. I'm
14 your videographer today. And we have our court
15 reporter, Torre Lynn Adams. We are representing
16 Esquire -- Esquire Deposition Solutions.
17      And everyone who's not speaking,
18 please mute your audio and just remember to
19 unmute when you are ready to speak.
20      Counsel, go ahead and state your
21 name for the record and whom you represent,
22 after which our court reporter will swear in the
23 witness.
24      MR. ZEIGER: Good morning. It's

Page 6

1 Brian Zeiger for the plaintiffs.
2      MR. BRADFORD: And this is Kevin
3 Bradford on behalf of all the current
4 defendants.
5           - - -
6      TROOPER PETER DEL GAIZO, after
7 having been duly sworn, was examined and
8 testified as follows:
9           - - -
10       EXAMINATION
11           - - -
12 BY MR. ZEIGER:
13   Q.  Hi, Trooper. Good morning. How
14 are you?
15   A.  Good morning, Brian. I'm good.
16 How are you doing?
17   Q.  Good.
18      So, do you remember an incident
19 from on or about February 23, 2018?
20   A.  I do, I'm familiar with it.
21   Q.  And were you working as a
22 Pennsylvania State Trooper at that date and
23 time?
24   A.  Yes, sir, I was.

Page 7

1   Q.  And did your tour of duty that day
2 take you to at or near 340 Old Allentown Road in
3 Bushkill Township, Northampton County,
4 Pennsylvania?
5      COURT REPORTER: I'm sorry --
6      THE WITNESS: Yes --
7      COURT REPORTER: -- sir. Can you
8 give me the address again? I beg your pardon.
9      MR. ZEIGER: Hi. Good morning.
10 How are good?
11      COURT REPORTER: Good.
12      MR. ZEIGER: I didn't see that was
13 you.
14      340 Old Allentown Road, Bushkill
15 Township, Northampton County, Pennsylvania.
16      VIDEO TECHNICIAN: And can
17 everybody hear Mr. Zeiger?
18      COURT REPORTER: He's a little
19 low.
20      VIDEO TECHNICIAN: He's the lowest
21 of any --
22      COURT REPORTER: Yeah, he's a
23 little --
24      MR. BRADFORD: Yeah. Brian,

Page 8

1 you're kind of quiet. I don't know if you can
2 get close to --
3      MR. ZEIGER: Okay. Is that
4 better?
5      VIDEO TECHNICIAN: Uh-hum.
6      MR. BRADFORD: Yep.
7      MR. ZEIGER: Okay. Okay. And so,
8 if it happens again, tell me, I might have to
9 restart my computer.
10      VIDEO TECHNICIAN: And the only
11 other option is, because I know leaning into the
12 computer can be annoying for like an hour, the
13 only other option I've seen people do that works
14 really well is keeping their video on, but the
15 sound off and -- and then calling in via the
16 phone connection for their audio, but that would
17 be completely up to you as long as everybody can
18 hear you.
19      MR. ZEIGER: I've done about 30
20 depositions with this computer already with this
21 setup and sometimes I just need to restart the
22 computer.
23      VIDEO TECHNICIAN: Okay. Then
24 I'll let you guys troubleshoot that.



Page 9

1  MR. ZEIGER:  So, if you think --
2 if people can't hear me, then I will -- hold on
3 one second.
4  VIDEO TECHNICIAN:  We can go off
5 the record briefly if you want to --
6  MR. ZEIGER:  Yes. -can everyone
7 hear me now?
8  MR. BRADFORD:  Ten times better.
9  VIDEO TECHNICIAN:  Amazing.
10  MR. ZEIGER:  Yeah, I increased the
11 microphone volume.  Sorry, Trooper.  Let's get
12 back to business here.
13  Back on the record.
14 BY MR. ZEIGER:
15  Q.  So, Trooper, you remember that
16 day?
17  A.  Yes.
18  Q.  And you were working as a
19 Pennsylvania State Trooper on that day, right?
20  A.  Yes, sir.
21  Q.  And did you have an opportunity to
22 enter a building?
23  A.  I did.
24  Q.  And did you use force when you

Page 10

1 entered the building?
2  A.  I was the breacher.
3  Q.  Breacher, you were the breacher?
4  A.  I was the breacher.  I was the
5 primary breacher.
6  Q.  Okay.  But I mean, after you went
7 into the building, did you use force with any
8 human beings that were not troopers?
9  A.  I just grabbed a hold of a woman,
10 middle-aged woman.
11  Q.  Do you think you did anything
12 wrong that day in your function as a
13 Pennsylvania State Trooper?
14  A.  No, not at all.
15  Q.  Okay.  So, in regards to the
16 breaching, you don't think you did anything
17 wrong?
18  A.  Yes.
19  Q.  And in regard to dealing with the
20 middle-aged woman, you don't think you did
21 anything wrong?
22  A.  No.
23  Q.  Okay.  So, I'm going to pull up a
24 document here on a screen share, and bear with

Page 11

1 me here because I'm not the most technologically
2 savvy guy in the planet --
3  A.  Don't worry about it.
4  Q.  -- as you just witnessed.
5  Can you see that on your screen?
6  A.  Yes, sir.
7  Q.  Okay.  And you see at the bottom
8 there's a sticker and it says Del Gaizo -- Del
9 Gaizo-1?
10  A.  Yes.
11  Q.  Am I pronouncing your name
12 correctly?
13  A.  It's Del Gaizo.
14  Q.  Okay.  And so, do you know what
15 this document is?
16  Do you want me to blow it up?
17  A.  No.  I see it.  That's my callout
18 report.
19  Q.  Okay.  And what's a callout record
20 report?
21  A.  It documents basically what the
22 --what our actions were during the warrant
23 service.
24  Q.  Okay.  And is this your callout

Page 12

1 report from the case that we're here for today?
2  A.  Yes.
3  Q.  Okay.  And so, I'm just going
4 to go -- go -- go through it.
5  So, it has the date of activation.
6 That means the day that the police work was
7 actually done?
8  A.  Yes, that's the date that CERT was
9 requested.
10  Q.  Okay.  And the date of the report
11 means that that's the day you typed this up?
12  A.  Yes.
13  Q.  And then it has your name.  That's
14 your name, right?
15  A.  Yes.
16  Q.  And then it has the address that
17 we're talking about, correct?
18  A.  That's correct.
19  Q.  And on the -- the 2-23-18 date, it
20 says 04:00.  That means that you guys met at
21 4:00 a.m. to go over the case?
22  A.  That's correct.
23  Q.  And overtime used four hours means
24 that you worked four times more than your



Page 13

 1  regular schedule would be in order to be part of
 2  this job, right?
 3      A.   Yes, sir.
 4      Q.   Okay.  And then I'm going to
 5  scroll down to the typed part here.  It says "On
 6  2-21 at 950 hours, you notified Sergeant Brian
 7  Roberts via E-mail of this CERT activation."
 8           What does that mean?
 9      A.   1950 hours, so when we get
10  activated, we have to notify our direct
11  supervisor.  They could if they wanted to change
12  our regular -- regularly scheduled shift to
13  reflect straight time, but I -- if you have
14  Court or something, you get the overtime.
15      Q.   Okay.
16      A.   I'm a patrol trooper.  That's my
17  general -- CERT is part-time -- part-time team.
18  So, my main job is a patrol trooper.
19      Q.   I understand.
20           And the next paragraph says "On
21  2-23-18 at 0400, I attended a briefing for this
22  warrant."
23           What does that mean?
24      A.   I attended a briefing.  It's a

Page 14

 1  synopsis of the investigation, the local
 2  investigators.  It's a synopsis of what their
 3  findings were, why CERT was activated and then
 4  to go through safety concerns and -- and
 5  people's criminal history, and who's supposed to
 6  be at the house, the layout of the house, the
 7  threats at the house and everyone's particular
 8  assignments.
 9      Q.   Okay.  And it says "I was assigned
10  to primary breacher with Trooper Wysocky."
11           Am I saying his name right?
12      A.   Yes, you actually are.
13      Q.   Okay.  And -- and what does that
14  mean primary breacher?
15      A.   So, every -- every -- every
16  residence or house or structure, we assign
17  sides.  And I was assigned the primary breacher
18  of the one side.  So, the primary bulk of the
19  team was going to go through the door that I was
20  breaching.
21           There's also a secondary --
22  there's also a primary and secretary.  So, if
23  the primary fails, there's a secondary breach
24  with other members to make entry into the

Page 15

 1  residence.
 2      Q.   So, Wysocky was there with you
 3  then, he was also the primary?
 4      A.   He -- yes, he was -- he was my --
 5  he's been my assistant.  He was the A breacher
 6  they call it.
 7      Q.   Okay.  And so, what did you
 8  actually do to breach the property?
 9      A.   I had a ram, and I hit the door
10  with the ram and breached it.
11      Q.   By yourself?
12      A.   Opened it.
13      Q.   By yourself?
14      A.   Broke it open.
15      Q.   By yourself?
16      A.   Yes, by myself.
17      Q.   So, basically, the ram is like a
18  long cylinder that has like a handle on it?
19      A.   Has two handles on it, that's
20  correct.  It's like a 30 foot --
21      Q.   And you use some kind of force,
22  and through physics, that ram hits the door and
23  the idea is to pop it open?
24      A.   Yes.

Page 16

 1      Q.   And did you do that in this case?
 2      A.   I did.
 3      Q.   And did it work?
 4      A.   Yes, it did.
 5      Q.   And where was Wysocky when you
 6  were doing that?
 7      A.   Right next to me.  He was holding
 8  screen door so it didn't interfere with my
 9  swing.
10      Q.   After you do it, what do you do
11  with the ram?
12      A.   I hold on to it.
13      Q.   As you go through the house?
14      A.   I hold onto it in my left arm,
15  yeah, as I go through the house, in case someone
16  else needs to -- in case we run into an issue
17  inside and we need to breach the door inside.  I
18  don't have to run outside and waste time, I have
19  it on me.
20           But usually if I'm going through a
21  room, I would just leave it right next to me and
22  then deal with whatever I have to deal with
23  inside that room.
24      Q.   And how much does it weigh?



Page 17

1   A.   30 pounds.
2   Q.   Okay. Again -- and -- and you
3   carry that in with you as you go up steps or
4   down steps or whatever?
5   A.   Yes.
6   Q.   Okay. And so, as you popped the
7   door open, where is Wysocky? He's holding that
8   screen door?
9   A.   Yes.
10  Q.   And then are you the first guy in
11  or does someone go in ahead of you?
12  A.   The whole team goes in, me and
13  Matt were like the last two in.
14  Q.   Sure.
15       Because once you pop it open, the
16  guys with the shields go in first and then you
17  follow them?
18  A.   That's -- that's the idea, that
19  they have the protection, so you know, no one
20  gets injured. And I had my hands full with the
21  ram, so --
22  Q.   Exactly. And you don't have your
23  service revolver or your Glock or whatever it
24  is?

Page 18

1   A.   Not at that time.
2   Q.   Because you have the ram?
3   A.   Correct.
4   Q.   Right.
5       "Upon my arrival to the warrant
6   scene, I exited the utility van and made my way
7   up to the residence with Trooper Wysocky. And
8   then checked the main door to see if it was
9   locked and it was. I then waited for
10  announcements to start and announced State
11  Police, search warrant while knocking. After a
12  period of time without a response from within
13  the residence, I breached the door. Once the
14  door was open, the team made their way into the
15  residence. Trooper Wysocky and I made our way
16  into the residence and helped secure it with
17  other members."
18       So that basically caught up to all
19  your previous answers?
20  A.   Yes.
21  Q.   -- is that correct?
22  A.   That's correct.
23  Q.   Did anything else happen during
24  that period of time that's not in your report?

Page 19

1   A.   No, not that I recall.
2   Q.   Understood.
3       "And Trooper Wysocky and I secured
4   one male and one female who were in the front
5   bedroom."
6       Do you remember who they were?
7   A.   I remember they -- you know, as
8   I'm looking through the -- the documents that
9   were presented to me of the pictures of the
10  people, I can almost be certain that it was
11  Renee Kluska, and I don't know if I'm
12  pronouncing their name correctly, apologize and
13  Joseph Kluska.
14  Q.   Okay. I think they pronounce it
15  Kluska, but that's okay.
16  A.   Okay.
17  Q.   And so, I'm just going to make a
18  statement that Renee claims that she was not
19  injured by you or Wysocky, but Joe claims he was
20  injured by you or Wysocky. Okay?
21  A.   Okay.
22  Q.   And so, that's part of the reason
23  why we're here today. Okay.
24       So, I'm also going to put on the

Page 20

1   record that they're married?
2   A.   Okay.
3   Q.   Okay.
4       So -- so, it says "Trooper Wysocky
5   and I secured one male and female who were in
6   the front bedroom."
7       And you've identified them. Did
8   you physically touch either of them with your
9   hands or your body in any way?
10  A.   Yes. Renee.
11  Q.   Renee. Okay.
12       And then when you touched Renee,
13  what part of your body touched what part of her
14  body?
15  A.   My hands and her shoulders.
16  Q.   Okay. And what -- and what --
17  A.   Pardon me. And her hands, her
18  wrists.
19  Q.   What did you do to secure her?
20  A.   I asked her to get out of bed --
21  well, I didn't ask. I told her to get out of
22  bed and she was -- she was complying. She
23  complied. So, then I grabbed a hold of her
24  shoulders, assisted her in getting out of bed,



Page 21

 1  turned her around and then grabbed her hands and
 2  flex cuffed her.
 3       Q.    Was she arrested for anything?
 4       A.    She was just detained.  Everyone
 5  gets detained in the house for safety concerns,
 6  for the safety -- until the house is clear.  And
 7  then the investigators, the local investigator,
 8  state investigator, whoever is the primary
 9  investigator, will come in and determine
10  criminal charges if any are applicable.
11       Q.    And to your knowledge, was she
12  charged with anything?
13       A.    That I have no idea.  I don't
14  know.
15       Q.    Okay.  And did you have any
16  contact with Joe Kluska?
17       A.    Not that I remember.  I don't
18  think so.
19       Q.    Okay.  So, did you see Wysocky
20  have any contact with Joe Kluska?
21       A.    I did.
22       Q.    Okay.  And can you describe that,
23  please?
24       A.    Sure.

Page 22

 1             So, while I was dealing with
 2  Renee, I heard Trooper Wysocky, you know, giving
 3  Joseph commands to get out of the bed, which,
 4  you know, then they started -- Joe was having a
 5  argument, yelling back and forth.  And then
 6  Trooper Wysocky grabbed him and pulled him out
 7  of bed.  And when they went to the ground next
 8  to the bed, that's when Trooper Wysocky rolled
 9  him over, flex cuffed him, stood him up and sat
10  him in the chair.
11       Q.    Did you hear Kluska, Joe Kluska
12  say anything?
13       A.    I did not.  I just heard the
14  arguing back and forth, Trooper Wysocky giving
15  him commands and Kluska not complying.  Once he
16  was flex cuffed, that was it.
17       Q.    And flex cuffs are like zip -- zip
18  ties?
19       A.    Yeah, zip ties -- pretty much a
20  thick zip tie, yes.
21       Q.    And when you and Wysocky went in
22  the room, did you go in together?
23       A.    We went in together, yes.  I went
24  in first.  I went to the left.  So, she was

Page 23

 1  obviously -- if you're laying in the bed, she
 2  was on the right portion of the bed.  He was on
 3  the left portion of the bed.  I went left to
 4  deal with her and he went right.
 5             I know it sounds confusing, but --
 6       Q.    No, it's actually not.  I totally
 7  understand what you're saying.  Good
 8  description, I think.
 9             And what was Renee wearing?
10       A.    That I don't remember.
11       Q.    What was Joe wearing?
12       A.    I don't remember that either.
13       Q.    They were both asleep, though,
14  when you entered the room, correct?
15       A.    As far as I know, yes, they were
16  in bed under the covers, I don't know if they
17  were asleep or awake.
18       Q.    Okay.  But it was like 6:00 a.m.
19  at this point, right?
20       A.    Yes.
21       Q.    And they're on a different floor
22  then the entry point, correct?
23       A.    They were on the floor that I
24  entered.

Page 24

 1       Q.    Oh, they were on the main floor
 2  then?
 3       A.    Yes.
 4             MR. BRADFORD:  Can I jump in real
 5  quick just to make sure we're clear?
 6             So, you were on the upper floor;
 7  is that fair to say that?
 8             THE WITNESS:  Yeah.  Yeah.  I was
 9  the upper floor.
10             MR. BRADFORD:  Okay.
11             THE WITNESS:  That's correct.
12             MR. ZEIGER:  Okay.  I think that's
13  a good point, Kevin.  That's why I'm confused.
14  BY MR. ZEIGER:
15       Q.    So, the floor that you breached on
16  is the same floor that they were on, which is
17  also called the upper floor?
18       A.    Yes.
19       Q.    Got it.  Okay.
20             And did -- did anyone get any
21  medical attention that you -- that you saw, Joe
22  or Renee?
23       A.    No, not -- not in my --
24       Q.    And Joe didn't say anything else



Page 25

1  to you?
2    A.   I didn't hear Joe say anything,
3  no.
4    Q.   Okay. And did you recover
5  anything in the room?
6    A.   We did not. There was a handgun
7  on the headboard of their bedroom, but that's
8  the only thing that I saw in plain view.
9    Q.   As far as you know, neither Joe
10 nor Renee were arrested for anything to do with
11 that gun, right?
12   A.   Not that I know. It's not illegal
13 to have a gun in your house unless you're a
14 felon.
15   Q.   Right.
16        And next, it says "After the
17 residence was cleared and secured, it was turned
18 over to the investigators."
19        Who were the investigators?
20   A.   The Northampton County Drug Task
21 Force. I believe it was Detective Michael
22 Hunstrum (ph), Hunstrum. He was the primary
23 investigator.
24   Q.   "I then left the scene with the

Page 26

1  team back to the AP." What does AP mean?
2    A.   AP is the assembly point. So,
3  every -- every warrant we go on, there's
4  assembly point. It's usually the closest state
5  barracks to the warrant location. And that's
6  where we debrief, go over things that went
7  right, things that we can improve on and so on.
8    Q.   And after that, you were
9  dismissed, correct?
10   A.   That's correct.
11   Q.   And all you had on you that day
12 was a Glock 21 and the ram?
13   A.   That's -- that's -- yes, that's
14 all I had.
15   Q.   Okay. And by 7:30 a.m., you were
16 dismissed?
17   A.   That's correct.
18   Q.   I'm going to unshare this and go
19 to another document.
20   A.   Okay.
21   Q.   Can you see that?
22   A.   Yes.
23   Q.   That says Del Gaizo-2, correct?
24   A.   Yes.

Page 27

1    Q.   Okay. I'm going to scroll up.
2  This says "Defendant Del Gaizo's response to
3  Plaintiff's Interrogatories."
4        Do you see that?
5    A.   I do.
6    Q.   Okay. I'm going to scroll down
7  for a little bit here. Go all the way to the
8  bottom here.
9        Okay. This is a document called a
10 Verification. And it means that the answers
11 contained are truthful and there's a date and
12 signature.
13       Is that your signature?
14   A.   That is.
15   Q.   And did you answer the questions
16 on here or did your lawyer do it?
17   A.   I did it.
18   Q.   Okay. And then your lawyer typed
19 them up for you?
20   A.   Yeah, I believe so.
21       MR. BRADFORD: Would you say it's
22 a collaboration between you and your lawyer?
23       MR. ZEIGER: I don't want to --
24 I'm trying to avoid the objection of

Page 28

1  attorney/client privilege.
2        MR. BRADFORD: Yeah. I know. I
3  know. Yeah. The verification says he verified
4  the factual information in there. I typed it
5  up, of course; provided the information.
6        MR. ZEIGER: You'd be surprised,
7  there's some lawyers that do it for their client
8  and then --
9        MR. BRADFORD: Without talking to
10 them?
11       MR. ZEIGER: No comment.
12 BY MR. ZEIGER:
13   Q.   Okay. Give me a second. I'm
14 going to go to a specific page here.
15   A.   Sure.
16   Q.   Okay. Before we got this, was
17 there a trooper there who is like an
18 African-American guy who was like rather large?
19   A.   Trooper King you're referring to?
20 The dude is humongous. He's stacked. Yeah,
21 he's a big guy. If that's the guy you're
22 talking about, he's a very big guy.
23   Q.   Do you -- did you have any
24 interaction with him on this job?



Page 29

1  A.  Not that I remember.
2  Q.  Did you have any interaction with
3  an older lady in this case?
4  A.  An old woman?
5  Q.  Yes.
6  A.  No.
7  Q.  Did you see an ambulance get
8  called for an old woman?
9  A.  I did not.
10  Q.  Okay.  Did you see King interact
11  with an older woman at any point in time in this
12  case?
13  A.  No, not at all.  I think they were
14  on a -- a different floor.
15  Q.  Did you -- did you ever hear King
16  say anything to Painter like this is too much or
17  this is carried away or, you know, calm down a
18  little bit or something to that nature?
19  A.  No.
20  Q.  Okay.  All right.  I'm on Number 6
21  here.  Okay.
22      Can you see Number 6 on your
23  screen?
24  A.  Yes, I can.

Page 30

1  Q.  I'll blow it up.  I'm going to
2  blow it up.
3  A.  Okay.  That's better.
4  Q.  Okay.  You can see Number 6?
5  A.  Yes.
6  Q.  This is a question about force.
7  I'm going to read the answer.  Okay.  And then
8  we're going to go through it just like we did on
9  that -- on that CERT report.  Okay.
10      "As explained in his callout
11  report, responding party located a white male
12  and while female he found together in a front
13  bedroom on the upper floor of the house."
14      That's about the same answer you
15  gave previously, correct?
16  A.  That's correct.
17  Q.  "Responding party flexed cuff the
18  female only."
19      That's Renee, we agreed on that,
20  correct.
21  A.  Yes, that's correct.
22  Q.  "The woman was too young to be the
23  only female."  I'm not sure what that means.
24      MR. BRADFORD:  Female plaintiff.

Page 31

1  There's only one female plaintiff in this
2  lawsuit.  So, it's not her is what he's saying.
3  BY MR. ZEIGER:
4  Q.  Okay.  I'll read it again, because
5  that's my fault.
6      "The woman was too young to be the
7  only female plaintiff."
8      So, what did you mean by that?
9  A.  I guess the plaintiff is that
10  older woman, and she's clearly not an older --
11  that older of a woman.
12  Q.  Okay.  "Responding party is
13  without knowledge or information sufficient to
14  form a belief as to whether the male, who was
15  secured by Wysocky, is one of the plaintiffs
16  given the limited description of the plaintiffs
17  provided in the Complaint."
18      You -- you believe now today?
19  A.  Yes.  So, I mean, I -- I wasn't
20  able to view the pictures or anything like that,
21  you know, but now, yes, I'm fairly certain that
22  Joe was the -- you know, the other person in
23  that room.
24  Q.  And -- and -- and Joe Kluska is

Page 32

1  that plaintiff?
2  A.  Yes.
3  Q.  Okay.  Next, it says "Upon
4  information and belief, neither the male nor the
5  female had any injuries or require any medical
6  treatment."
7      Is that right?
8  A.  Yes, that's correct.
9  Q.  So if I told you today that --
10  that Joe had shoulder surgery as a result of his
11  interaction with you and Wysocky, your response
12  would be that you have no response to that?
13  A.  Right, I have no response to that.
14  Q.  "All individuals were to be
15  secured as part of the process of securing the
16  premises pursuant to the warrant, which is what
17  happened."
18      That's consistent with your
19  previous answers, right?
20  A.  Yes.
21  Q.  Okay.  Moving down.
22      Number 8 talks about arrests.  And
23  this answer says that you did not participate in
24  making any arrests, right?

Page 33

1  A. That's correct. We didn't arrest
2  anyone, we just detained everyone in the
3  residence.
4  Q. Okay. Are you aware that this was
5  an investigation for methamphetamine operation,
6  like a lab?
7      MR. BRADFORD: Objection to form.
8      THE WITNESS: I am.
9  BY MR. ZEIGER:
10  Q. And you didn't find anything
11  related to any kind of methamphetamine or
12  methamphetamine lab in this residence, did you?
13  A. We don't search the residence,
14  just secure everyone involved. So, I -- I
15  didn't find anything.
16  Q. Right. And in plain view, you
17  didn't see anything, right?
18  A. Just the handgun.
19  Q. But you said the handgun's not
20  illegal, so that's not really --
21  A. Yes, no, I didn't see any
22  methamphetamine or meth-making materials.
23  Q. Okay. And if Joe was arrested for
24  something, you have no idea what that's about,

Page 34

1  right?
2  A. I have no clue.
3  Q. Okay. And as far as you know, the
4  operation that was conducted was just for
5  methamphetamine or a meth lab, right?
6  A. It was -- yes, it was a drug
7  warrant, search warrant.
8  Q. But that's the drug that was
9  mentioned in the warrant, correct?
10  A. Correct.
11  Q. There was no video, correct?
12  A. Like body cam video --
13  Q. Correct?
14  A. -- you mean?
15      No.
16  Q. You were not wearing a body cam,
17  correct?
18  A. We don't have them, no.
19  Q. Have you ever complained that you
20  want one?
21  A. It would be helpful. I haven't
22  complained.
23  Q. I agree it would be helpful to --
24      MR. BRADFORD: I'm for it, too,

Page 35

1  man.
2      THE WITNESS: Prevents a lot of
3  this stuff.
4  BY MR. ZEIGER:
5  Q. Right. No, I get it.
6      So, are you in a union?
7  A. I am, yes.
8  Q. Have you ever filed a grievance
9  with your union about not having a body cam?
10  A. No. We have do have cameras,
11  patrol cameras. We patrol around in our cars
12  and we wear a mic, but we don't have body cams.
13  I assume it's because of the expense of 5,000
14  troopers to have them.
15  Q. I would argue that there's certain
16  undercover narcotics officers that would object
17  to them is what --
18  A. I --
19  Q. -- I don't think it's the expense.
20  If you get them, everyone else has to get them
21  -- pardon me -- and then everyone would have to
22  get them.
23      And the narcotics officers would
24  lose their minds.

Page 36

1      All right. Let's go back to this
2  case.
3      Other than the document that we
4  already went over, that was Del Gaizo-1 one, are
5  you aware if you filled out any other paperwork
6  regarding this incident?
7  A. That's it.
8  Q. I'm going to keep going here.
9      Number 11 here, I asked you about
10  other law enforcement. And so basically, this
11  is consistent with your previous answer. I
12  understand that that's Northampton Drug Task
13  Force contacted the Pennsylvania State Police to
14  request a CERT unit because they didn't have the
15  manpower to take down this property, to execute
16  the warrant; is that right?
17  A. That's correct.
18  Q. And that's consistent with your
19  answer in Number 11 here, correct?
20  A. Yes.
21  Q. Number 13, "Responding parties
22  exact role specified in this callout report and
23  the warrant service plan was set by CERT
24  leadership. Upon information and belief, the



Page 37
1  search warrant specifically included three
2  structures; the residence, nearby garage and a
3  trailer.  Responding party does not recall any
4  other structures that were not secured."
5       So, this is a big parcel of land,
6  correct?
7    A.   Yes, it was.
8    Q.   Right.  And so, there's multiple
9  buildings on the parcel of land, correct?
10   A.   Correct.
11   Q.   And to your knowledge, one of them
12 is -- is called like a garage.  I see that's
13 actually written here in your answer.  You use
14 the word garage, right?
15   A.   Correct.
16   Q.   And by garage, that's more like an
17 auto body garage kind of idea, right?
18   A.   I wasn't in the garage, so I have
19 no idea.  I just recalled a garage.  That was a
20 separate team that was responsible for securing
21 that -- that building.
22   Q.   And are you aware that the folks
23 down at the Northampton County investigation, of
24 the drug investigation stated that the drug

Page 38
1  operation was being conducted in that garage?
2       MR. BRADFORD:  Object to the form.
3       You can answer.  You can answer,
4  Pete.
5       THE WITNESS:  Oh.  As far as I
6  know.  I only know during the brief that four
7  controlled guys were brought out of that
8  so-called garage.  That's all that I know.
9  BY MR. ZEIGER:
10   Q.   Understood.
11       So, when you went into the house,
12 you had no knowledge that there was anything
13 related to the manufacturing or delivering of
14 methamphetamine in the house, right?
15   A.   I don't really understand, like
16 did you think I -- did I think that there was
17 meth inside the house, is that --
18   Q.   No.  Well, I mean, you can answer
19 that question as well.
20       I mean, did you think there was
21 meth inside the house?
22   A.   You know, we're always taught, you
23 know if you discover a gun, there's probably
24 another one.  So, if there's meth in the garage,

Page 39
1  or alleged meth in the garage, I'm sure it's
2  other places, so, you know.
3    Q.   But based on information from the
4  Northampton County Drug Task Force, they didn't
5  give in you any information that any narcotics
6  activities were taking place in the house?
7    A.   No, not that I remember.
8    Q.   Okay.  I'm going to keep going.
9        And the next, Question 14, is
10 about evidence of narcotics.  And your answer
11 was "Responding party did not discover any
12 suspected methamphetamine while securing the
13 property.  Responding party does not know what
14 each of the other CERT members discovered."
15       Is that correct?
16   A.   That's correct.
17   Q.   Okay.  Number 16 has to do with
18 firearm arms.  And just skipping down, you --
19 you were given information that some of the --
20 some of the parties may have a firearm; is that
21 right?
22   A.   That's correct.
23   Q.   Were you given any information
24 that there was any kind of illegality related to

Page 40
1  the firearms?
2    A.   There were some people that --
3  that were potentially were going to be in the
4  structure that weren't allowed to possess any
5  weapons, but there were some that could.  So,
6  that's really all the information I knew.
7        And there was a lot of weapons up
8  to a 50-caliber rifle.
9    Q.   Understood.
10       But you didn't arrest anyone for
11 any kind of illegal weapons charge, did you?
12   A.   We are not responsible for any of
13 that.  That's the local investigators.  And like
14 I said, I have no idea if they did that or not.
15   Q.   Understood.
16       So, the answer is no, you did not
17 arrest anybody, right.
18   A.   Did not, sorry.
19   Q.   No problem.
20       And you did not observe anything
21 regarding any firearms that you believe was
22 illegal, that if you're the person who was in
23 charge of --
24   A.   I lost you on the end.



Page 41

1   Q.   My bad.  Oh, I did it, too.  We're
2  even now.
3        You didn't observe anybody -- you
4  didn't observe anyone commit any violations of
5  the Uniform Firearm Act that if you were the
6  person making the decisions regarding who to
7  arrest, that you would have said yes, arrest?
8   A.   No.
9   Q.   Okay.  Scrolling down.
10       MR. BRADFORD:  Brian, Matt Wysocky
11 is going to log in soon.  So, I don't know
12 how -- if you can move quickly on this or we can
13 bump him up if you want.  I'm just letting me
14 know.
15       MR. ZEIGER:  I beg your pardon,
16 Kevin, but what's Matt's scheduled time?
17       MR. BRADFORD:  He's currently
18 noon, but he's just hanging out.  He's a party,
19 so he can jump in.
20 BY MR. ZEIGER:
21  Q.   Trooper, did you observe anyone
22 else do anything wrong?
23  A.   No, I didn't notice anyone do
24 anything wrong.

Page 42

1   Q.   Okay.  And if -- if Joe Kluska
2  says he was injured, you don't have any
3  explanation for how he might have been injured?
4   A.   No, I have no -- can you repeat?
5  I'm sorry.
6   Q.   If Joe Kluska says he injured his
7  shoulder as a result -- or shoulders, plural, as
8  a result of the way you and Wysocky treated him,
9  do you have any explanation as to how he could
10 have received that injury?
11       MR. BRADFORD:  Objection to form.
12       You can answer.
13       THE WITNESS:  I would assume being
14 flex cuffed behind the back, you know, if you
15 have shoulder issue, it could probably
16 exacerbate that injury, but it is what it is.
17 You have to be secured.
18 BY MR. ZEIGER:
19  Q.   Understood.
20       So, you didn't -- you didn't see
21 any -- anything in regard to that?  You didn't
22 observe that personally, correct?
23  A.   I just saw with him with his hands
24 behind his back flex cuffed sitting in the

Page 43

1  chair.  That's it.  I didn't hear him say
2  anything about an injury.  I'm sure Matt -- Matt
3  may have, but I did not.
4   Q.   Okay.  And you -- you don't -- you
5  don't think you did anything wrong?  I asked you
6  that already, I just want to be sure.  You don't
7  think you did anything wrong?
8   A.   Yes, I don't think I did.
9   Q.   And if Joe injured his shoulder,
10 you don't accept any responsibility for anything
11 dealing with that shoulder?
12       MR. BRADFORD:  Objection to form.
13       THE WITNESS:  No.
14       MR. ZEIGER:  Okay.  I have nothing
15 further.  Thank you and be safe.
16          - - -
17       EXAMINATION
18          - - -
19 BY MR. BRADFORD:
20  Q.   Quick question, the handgun that
21 was on the headboard?
22  A.   Yes.
23  Q.   Did you observe that before or
24 after the Kluska were flex cuffed?

Page 44

1   A.   It was -- it was before.  When I
2  entered the room, there was -- obviously, there
3  were the two body -- I just saw two figures in
4  the bed.  And then we say the -- I saw the
5  handgun on the headboard.
6   Q.   Okay.  There was definitely a
7  handgun that was within arm's reach of the
8  individuals in the bed?
9   A.   Absolutely.  It was actually right
10 between them -- above them, it was above them,
11 but between them.
12       MR. BRADFORD:  Okay.  Okay.
13 That's it.
14          - - -
15       EXAMINATION
16          - - -
17 BY MR. ZEIGER:
18  Q.   Let me just follow up.
19       You never saw Renee or Joe motion
20 towards the gun, did you?
21  A.   No.
22  Q.   Okay.  And as far as you know,
23 neither Joe nor Renee were arrested for anything
24 related to that gun, were they?



Page 45
1  A. Not to my knowledge, no.
2      MR. ZEIGER: All right. I don't
3  have anything further.
4      Are you finished?
5      MR. BRADFORD: Yeah, no. I'm
6  good.
7      MR. ZEIGER: So, I'm --
8      VIDEO TECHNICIAN: Are you guys
9  ready to conclude -- do the conclusion to be
10 done for Dr. -- the doctor --
11     MR. BRADFORD: Yeah, Dr. Del
12 Gaizo, right.
13     THE WITNESS: That's what I should
14 have done.
15     VIDEO TECHNICIAN: Police work,
16 right. Okay.
17     So, everybody's in agreement to
18 conclude?
19     MR. BRADFORD: Yes.
20     VIDEO TECHNICIAN: Okay. This
21 concludes the videoconference deposition of
22 Trooper Del Gaizo. We just ask that all
23 participants stay connected briefly to provide
24 your transcript and video order.

Page 46
1      And I don't know how you guys want
2  to do this? Do you want to do this at the very
3  end of all three troopers or do you want to do
4  that each time?
5      MR. BRADFORD: Yeah, we can do it
6  at the end of all three, because that's the same
7  -- it's going to be the same.
8      VIDEO TECHNICIAN: If you want
9  one, you want them all?
10     MR. BRADFORD: Right. Right.
11 Exactly. I think.
12     VIDEO TECHNICIAN: All right,
13 gentlemen. Then we are going off the video
14 record at October 1st, 2020 at 10:54 a.m.
15     (Witness excused.)
16     (Deposition concluded at 10:54
17 a.m.)
18
19
20
21
22
23
24

Page 47
1           CERTIFICATE
2
3      I HEREBY CERTIFY that the witness
4  was duly sworn by me and that the deposition is
5  a true record of the testimony given by the
6  witness.
7
8           
9
           Torre Lynn Adams,
10          Court Reporter and Notary Public
           Dated:  October 15, 2020
11
12
13
14
15
16     (The foregoing certification of
17 this transcript does not apply to any
18 reproduction of the same by any means, unless
19 under the direct control and/or supervision of
20 the certifying reporter.)
21
22
23
24

Page 48
1           LAWYER'S NOTES
2  PAGE    LINE
3  ____    ____    _____
4  ____    ____    _____
5  ____    ____    _____
6  ____    ____    _____
7  ____    ____    _____
8  ____    ____    _____
9  ____    ____    _____
10 ____    ____    _____
11 ____    ____    _____
12 ____    ____    _____
13 ____    ____    _____
14 ____    ____    _____
15 ____    ____    _____
16 ____    ____    _____
17 ____    ____    _____
18 ____    ____    _____
19 ____    ____    _____
20 ____    ____    _____
21 ____    ____    _____
22 ____    ____    _____
23 ____    ____    _____
24 ____    ____    _____