### Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3  ADA ANGLEMEYER, et al)
 4                       )
 5    - vs -            ) No. 19-3714
 6                       )
 7  NORTHAMPTON COUNTY,  )
 8  et al               )
 9
10         Videotaped Video Teleconference
11  Deposition of ROBERT MCGARVEY, held on August 27,
12  2020, at 10:02 a.m., before Dolores M. Horne,
13  Professional Reporter and Notary Public, in and
14  for the Commonwealth of Pennsylvania.
15
16
17
18        ESQUIRE DEPOSITION SOLUTIONS
19        1835 Market Street, Suite 555
20      Philadelphia, Pennsylvania  19103
21            215-988-9191
22
23
24
```

### Page 2

```
 1  APPEARANCES:
 2
 3        THE ZEIGER FIRM
 4        BY:  BRIAN ZEIGER, ESQUIRE
 5        1500 John F. Kennedy Boulevard
 6        Suite 620A
 7        Philadelphia, Pennsylvania  19103
 8        (215) 546-0340
 9        Attorneys for the Plaintiffs
10
11
12
13        PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
14        BY:  KEVIN BRADFORD, ESQUIRE
15        1600 Arch Street
16        Suite 300
17        Philadelphia, Pennsylvania  19103
18        (215) 560-1031
19        kbradford@attorneygeneral.gov
20        Attorneys for the Defendants
21
22
23
24
```

### Page 3

```
 1            I N D E X
 2  WITNESS     EXAMINATION          PAGE
 3  ROBERT MCGARVEY
 4
 5        By:  Mr. Zeiger        5, 119
 6        By:  Mr. Bradford        111
 7
 8        E X H I B I T S
 9  NO.       DESCRIPTION        PAGE
10  McGarvey 1    Callout Report      18
11  McGarvey 2    Concise Officer     64
12                History
13
14
15
16
17
18
19
20
21
22
23
24
```

### Page 4

```
 1        DEPOSITION SUPPORT INDEX
 2
 3  Direction to Witness Not to Answer
 4  Page    Line   Page    Line   Page    Line
 5
 6
 7
 8  Request for Production of Documents
 9  Page    Line   Page    Line   Page    Line
10
11
12
13  Stipulations
14  Page    Line   Page    Line   Page    Line
15
16
17
18
19  Question Marked
20  Page    Line   Page    Line   Page    Line
21
22
23
24
```

SUMMARY
JUDGMENT
EXHIBIT
9



Page 5

1　　　　THE VIDEO TECHNICIAN:  We are now
2　on the record.  The time is now 10:02 on August
3　27, 2020.  This begins the video conference
4　deposition of Robert W. McGarvey taken in the
5　matter of Ada Anglemeyer, et al versus Northampton
6　County, et al, filed in the United States District
7　Court, Eastern District of Pennsylvania, Civil
8　Action No. 19-3714.  My name is George Ellis.  I'm
9　the remote videographer today.  The court reporter
10　is Dolores Horne.  We are representing Esquire
11　Deposition Solutions.  Counsel, will you please
12　state your name and who you represent after which
13　the court reporter will swear in the witness.
14　　　　MR. ZEIGER:  Brian Zeiger for the
15　plaintiffs.
16　　　　MR. BRADFORD:  Kevin Bradford for
17　all of the current defendants.
18　　　　ROBERT MCGARVEY, after having
19　been first duly sworn, was examined and testified
20　as follows:
21　　　　MR. ZEIGER:  Usual Stips?
22　　　　MR. BRADFORD:  Yes.
23　　　　　　* * *
24　　　　EXAMINATION

Page 6

1　　　　　　* * *
2　BY MR. ZEIGER:
3　Q.　　Your current rank is corporal?
4　A.　　Correct.
5　Q.　　Okay.  And what is the difference
6　between corporal and trooper?
7　A.　　I'm in a supervisory position of the
8　troopers, but we are still both -- I'm in -- in
9　the patrol function currently.
10　Q.　　Okay.  So, it's -- it's a higher rank
11　than trooper?
12　A.　　Correct.
13　Q.　　How many ranks higher is it than
14　trooper?
15　A.　　Just one.
16　Q.　　Understood.  Okay.  Corporal, do you
17　remember February 23rd of 2017?
18　A.　　I believe that -- yes.
19　Q.　　Okay.  And did you -- were you part of
20　some kind of SERT team on that day?
21　A.　　I was.
22　Q.　　And did you have an opportunity to have
23　a job in Northampton County?
24　A.　　Yes.

Page 7

1　Q.　　And do you remember that job?
2　A.　　I do.
3　Q.　　And thinking back, do you believe that
4　anything that you did in regard to that job that
5　you did wrong?
6　A.　　No.
7　Q.　　Do you think you made any mistakes?
8　A.　　No.
9　Q.　　Okay.  Do you think you used excessive
10　force?
11　　　　MR. BRADFORD:  Objection to form.
12　You can answer.
13　　　　THE WITNESS:  No.
14　　　　MR. BRADFORD:  Rob, I might
15　periodically object, so just let me get the
16　objection in and then you can answer unless I
17　instruct you not to.  And one other thing, Brian,
18　you said February 2017.  It's February 2018.
19　BY MR. ZEIGER:
20　Q.　　I beg your pardon.  Corporal, it's 2018.
21　Are your answers still the same to every question
22　I previously asked you?
23　A.　　Yes.
24　Q.　　Okay.  Are -- are you aware if anyone

Page 8

1　was injured as a result of anything that you did
2　on the day in question?
3　A.　　I am.
4　Q.　　Okay.  And do you know that person's
5　name?
6　A.　　I do not.
7　Q.　　Okay.  And if the person claims they
8　were injured, do you have any explanation as to
9　how they received the injury?
10　A.　　I just have the information I put in my
11　Callout report.
12　Q.　　Understood.  But did you make physical
13　contact with a human being on that day during that
14　job?
15　A.　　I did.
16　Q.　　Okay.  And whomever that person is, you
17　don't -- you don't know their name?
18　A.　　I do not.
19　Q.　　And can you tell us approximately their
20　age, if you recall?
21　A.　　I -- I can't.
22　Q.　　Would you say they were a teenager or
23　someone in their eighties or someone in their sort
24　of forties and fifties range?



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
9–12

Page 9

1  A.      It was an adult aged male that I
2  remember during the incident.
3  Q.      Not a senior citizen?
4  A.      No.
5  Q.      Okay.  And where did you first encounter
6  that adult aged male?
7  A.      Upon entry into the residence.
8  Q.      Was he in bed or was he sort of not in
9  bed?
10  A.      It was not in bed.
11  Q.      Okay.  And that's the only person that
12  you used any force with?
13          MR. BRADFORD:  Objection.
14          THE WITNESS:  Correct.
15          MR. BRADFORD:  Go ahead.
16          THE WITNESS:  Sorry about that,
17  Kevin.  Go ahead.
18  BY MR. ZEIGER:
19  Q.      To be honest with you, Kevin was slow on
20  the word objection there.  I'm just trying to be
21  neutral here.  But in any event, so, that's the
22  only individual with whom you used any force?
23  A.      Correct.
24  Q.      Okay.  If that person says they were

Page 10

1  injured as a result of the force that you used, do
2  you have an explanation for -- for that person's
3  statement?
4  A.      Just that the -- the actions that I took
5  that day.
6  Q.      Okay.  So, if they, in fact, are hurt or
7  were hurt, do you accept responsibility for
8  causing that injury to that person?
9          MR. BRADFORD:  Objection to form.
10  That's not a fair question.  Don't ask him that.
11  I'll tell him not to answer that.
12          MR. ZEIGER:  Well, so, I asked
13  you at the beginning if there were the usual
14  stipulations.  You said yes.  And, so, the only
15  thing that would be covered in that would be
16  privileged.
17          MR. BRADFORD:  But that's not a
18  fair question, Brian.  You know that.
19          MR. ZEIGER:  I think it is a fair
20  question if the officer says, you know, I caused
21  the injury, then we can move on.  If the officer
22  doesn't say he caused the injury, then we have a
23  problem.  I mean --
24          MR. BRADFORD:  You asked him if

Page 11

1  he accepted responsibility.  That's not a fair
2  question.
3          MR. ZEIGER:  So, I'm going to put
4  this on the record.  In a car accident case, there
5  are many times when someone is in a car accident
6  and the driver of one of the cars says, yes, I
7  caused the accident.  I dispute that they're
8  actually injured.  I dispute that the case is
9  worth this much or I dispute that they're actually
10  saying that happened but I caused the car
11  accident.  It's the same question I'm asking --
12          MR. BRADFORD:  You can ask him --
13  you can ask if he's used force and he used force
14  against the person and he's explaining that.  But
15  you're -- you're asking him to accept
16  responsibility for an injury.  That's a legal
17  conclusion.  That's an improper question.  Come
18  on.
19          MR. ZEIGER:  I think that he has to
20  answer it.  So, if you're -- if you're going to
21  instruct him not to answer, then eventually I'm
22  going to file a motion with the judge and when we
23  come back, you're going to pay for deposition --
24          MR. BRADFORD:  I'm instructing him

Page 12

1  not to answer if you are responsible for this
2  man's injuries.
3          MR. ZEIGER:  Hold on one second.
4  I'm sorry everyone.  I need to pause.  I'm sorry.
5          THE VIDEO TECHNICIAN:  Off the
6  record.  The time is 10:09.
7          (Whereupon a break was taken.)
8          THE VIDEO TECHNICIAN:  We are
9  back on the record -- we are off the record.
10          (Discussion off the record.)
11          THE VIDEO TECHNICIAN:  We are
12  back on the record.
13  BY MR. ZEIGER:
14  Q.      Good morning, Corporal.  Corporal, did
15  you cause any injury to that person as far as you
16  know?
17  A.      During the course of my conduct during
18  that incident, I do not believe I caused any
19  injury to anyone during that incident.  It was
20  after the fact.
21  Q.      Can you explain what you mean by after
22  the fact?
23  A.      When I received paperwork that there was
24  injuries incurred to the parties in this



Page 13

1 incident.

2 Q. Okay. Do you think if I gave you the
3 name of the person who claims you injured them
4 that that would refresh your recollection as to
5 their name?

6 A. I mean, I don't know specifically who
7 everyone is in this incident.

8 Q. Okay.

9 A. However, I mean, I know the gentleman
10 that I dealt with that day.

11 Q. Do you know his name, the gentleman you
12 dealt with?

13 A. I do not.

14 Q. If I said his name to you, would it help
15 refresh your recollection?

16 A. Please try.

17 Q. Jeffrey Anglemeyer.

18 A. I'm not -- I can't -- the main target of
19 this investigation was a Mark Anglemeyer. So I
20 remember that name.

21 Q. I understand. But this case has nothing
22 to do with Mark Anglemeyer. We didn't -- we
23 didn't claim any --

24 A. Okay.

Page 14

1 MR. BRADFORD: He was there -- the
2 actual claims were not brought by Mark Anglemeyer.

3 BY MR. ZEIGER:

4 Q. And we don't have any claims related to
5 Mark Anglemeyer, either. Our claims were all
6 about your entry into the building. We didn't sue
7 for a bad arrest for Mark Anglemeyer. That's not
8 part of this case.

9 A. Okay.

10 Q. And so, let's go through some
11 paperwork --

12 A. Yes.

13 Q. -- in the case. And, so, I'm sorry,
14 just -- just to make sure I asked the question
15 correctly. So, if you -- if you -- if Jeff was
16 actually injured as a result of this, do you -- do
17 you have any explanation for that?

18 A. Just with the totality of circumstances
19 with what was in front of me, I just used the
20 reasonable amount -- amount of force to, I guess,
21 obtain -- to obtain the lawful objective of the
22 incident.

23 Q. Okay. With that gentleman, can you
24 describe the force you used?

Page 15

1 A. He presented a verbally resistant
2 individual during this course of conduct who
3 failed to listen to commands on multiple
4 occasions. And our biggest thing is to secure
5 this residence and do it safely for -- for all,
6 including the people within and us. And he just
7 would not listen to any commands whatsoever. So
8 I -- I used my shield to take this individual to
9 the ground, to control, slash, gain compliance and
10 secure this individual.

11 Q. Okay. And, so, if he claims he was
12 injured as a result of the way you took him to the
13 ground, do you have a response to that?

14 MR. BRADFORD: Objection to form.
15 You can answer.

16 THE WITNESS: He claims that Rob
17 McCarthy took him to the ground?

18 MR. BRADFORD: The question
19 assumes that the adult male was Jeffrey
20 Anglemeyer, correct?

21 MR. ZEIGER: No. He doesn't
22 know. I'm trying to figure out who it was.

23 MR. BRADFORD: So the adult male.

24 MR. ZEIGER: I mean, he can say

Page 16

1 who it was. I mean, I believe it was Jeffrey
2 Anglemeyer but I'm not allowed to testify. So I
3 tried to refresh his recollection. He said it
4 doesn't work so the corporal is the person
5 testifying.

6 BY MR. ZEIGER:

7 Q. So, Corporal McGarvey, if the person
8 claims they were injured as a result of that force
9 that was used, what is your response?

10 A. That I used the reasonable amount of
11 force to secure this individual.

12 Q. But I'm talking about the cause of the
13 injury. I mean, did you see anyone else put their
14 hands on this gentleman?

15 A. He was passed off to another member to
16 be put in flex cuffs.

17 Q. Did you see anyone else -- did you see
18 them use any force against him?

19 A. No, because once other members come in
20 on scene, I -- I continued to search the
21 residence.

22 Q. So, the answer is, no, you didn't see
23 any other members of your team use any force
24 against that same gentleman?



Page 17

1  A.     I did not see, correct.
2  Q.     So, as far as you know, you're the only
3  person that used any force against the gentleman
4  on the day in question?
5  A.     I know I did, yes.
6  Q.     Okay.  All right.  Let's move on to some
7  paperwork.  I'm going to find the document in just
8  a second here that I would like to use and then
9  pull it up with the software.  Can you see that?
10  A.     I can.
11  Q.     Is that a little better?  Is that blown
12  up better?
13  A.     Yes, that works right there.
14          MR. ZEIGER:  Kevin, can you see
15  it?
16          MR. BRADFORD:  I can.  I want to
17  instructed Rob.  If you need to see any part that
18  is not shown because it's not blown up, let Brian
19  know.
20  BY MR. ZEIGER:
21  Q.     And I have the same instruction.  I want
22  you to have full access to everything.  I don't
23  want there to be any issues with that.  Okay?
24  A.     Yes.

Page 18

1  Q.     I'm sorry.  This is the wrong document.
2  Pardon me.  Here we go.  Can everyone see that?
3  A.     Yes.
4  Q.     I'm going to ask that this be marked
5  McGarvey 1.  Corporal, can you tell me what this
6  document is, please?
7  A.     Yes.  That's my Callout report for this
8  incident.
9  Q.     What is a callout report?
10  A.     A callout report details everything from
11  the incident number to the date, to the location,
12  to the hours used.  And then it documents the
13  actions that were taking place by myself during
14  this incident.
15  Q.     And without telling me about any
16  conversation you had with your attorney, can you
17  please tell me, did you have an opportunity to
18  review this document in preparation for your
19  deposition today?
20  A.     Yes, that's my -- yes, that's my Callout
21  report.
22  Q.     Okay.  And did you notify anyone --
23  again, I don't want to hear about any
24  conversations with your lawyer.  But did you

Page 19

1  notify anyone of any mistakes or omissions in this
2  report?
3  A.     No.
4  Q.     When the report was originally typed,
5  you can see at the top it says date of activation,
6  2-23-18, and it says date of report, 2-26-18.
7  Those -- those are both accurate dates, correct?
8  A.     Correct.
9  Q.     That means that this report was made
10  three days after the incident, correct?
11  A.     Correct.
12  Q.     And did you -- were you the typist?
13  A.     I was.
14  Q.     Okay.  And does anyone review this or do
15  you review your own and just submit?
16  A.     I type it and then I send it to my team
17  leader, as well as the one training officer that
18  files them.
19  Q.     Okay.  And were any corrections made by
20  anyone?
21  A.     No.
22  Q.     Okay.  Very good.  So, it says here
23  warrant service.  Can you tell us what that
24  means?

Page 20

1  A.     That's exactly what it says.  It was a
2  warrant service type incident.
3  Q.     Okay.  And when does that come up?  What
4  does that mean?  What does warrant service mean?
5  A.     Basically if there's a SERT or arrest
6  warrant and if it's a category of high risk, they
7  contact SERT and then we secure the premises for
8  that agency.
9  Q.     I see.  So they means like local police?
10  A.     It could be Pennsylvania State Police.
11  It could be local police.  It could be a federal
12  agency as well.
13  Q.     Okay.  And it says 340 Old Allentown
14  Road, Bushkill County, Northampton County.  What
15  is that address on there?  What does that mean?
16  A.     That would be the address of where this
17  incident happened.
18  Q.     The next line says date and time of
19  notification.  Is that when you were alerted by
20  Pennsylvania State Police that you would have a
21  SERT job?
22  A.     Correct.
23  Q.     And next it says date and time arrived
24  at assembly point, 2-23-18 at 4:00 hours.  Does



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
21–24

Page 21

1 that mean when you guys met in preparation to go
2 to do the warrant service?
3 A.     Yes.
4 Q.     Okay.  And then it says the -- the
5 amount of time that you used on this job.  And it
6 seems like a total of 14 and one-half hours.  Is
7 that fair to say?
8 A.     Correct.
9 Q.     And then I'm going to scroll down.
10 Okay?
11 A.     Yes.
12 Q.     So, the first part here where it says
13 2-21-18 at 19:43 hours, that's when you received
14 the notice; is that right?
15 A.     Yes.  It's just a repeat of the block
16 above.
17 Q.     And the next paragraph down says
18 2-23-17, which is -- which is what I was reading
19 from when I asked you the date and how I got it
20 wrong, but that's actually a typo.  That should
21 say 2-23-18; it that fair, Corporal?
22 A.     Could you please repeat that?  It says
23 my internet connection was unstable.  I didn't
24 hear anything.  I apologize.

Page 22

1 Q.     That's no problem at all.  The next
2 paragraph down it says, 2-23-17 at 4:00 hours.
3 And my question was, that's a typo, it actually
4 should read 2-23-18, correct?
5 A.     Yes, that would be a typo.
6 Q.     Okay.  Then it says PSP Belfast
7 Barracks.  And that's where you guys gathered in
8 preparation for the warrant service, correct?
9 A.     Yes.
10 Q.     Okay.  And it says your -- your
11 assignment and who you were in the -- in the job;
12 is that right?
13 A.     Yes.
14 Q.     Then the next line says that you had a
15 Glock 9 millimeter handgun and a Sig 45 handgun;
16 is that right?
17 A.     Yes.
18 Q.     And you had a shield, right?
19 A.     Yes.
20 Q.     Can you describe the shield, please?
21 A.     Yes.  It's basically a black square, a
22 little bit wider than my body, about 3 feet tall,
23 I guess, approximately 3 feet tall, black in
24 color.  There's a viewing port through the shield,

Page 23

1 two big lights on the shield and it says police on
2 the front.  It says Pennsylvania State Police or
3 police.  There are words to identify police on the
4 front of the shield.
5 Q.     And the lights in the viewing area, do
6 they stick outward from the shield or are they
7 flush with the shield?
8 A.     The viewing port is flush and then the
9 lights would protrude in the front of the shield.
10 Q.     Is there anything else that protrudes
11 from the shield?
12 A.     Maybe a border around the viewing port.
13 I would have -- maybe but it would only be a very
14 small amount if it -- if it did protrude at all.
15 Q.     And what would that be made -- what
16 substance would that be made out of, if you know,
17 plastic, metal?
18 A.     Kevlar metal, I believe.
19 Q.     Okay.  And in this case you said the
20 shield touched the person who you touched?
21 A.     Yes, I -- yes.
22       MR. BRADFORD:  Can we just use
23 adult aged male just so we're clear that's --
24       MR. ZEIGER:  I mean, I'm happy to

Page 24

1 use Jeff Anglemeyer.
2       MR. BRADFORD:  That's -- we don't
3 know it's him.  So just say adult aged male.  This
4 way we know we're talking about the same person
5 and we're not making any assumptions.
6       MR. ZEIGER:  I agree with you,
7 unless you want to stipulate that it's Jeffrey
8 Anglemeyer.
9       MR. BRADFORD:  I don't think it's
10 him.
11       MR. ZEIGER:  I see.
12       THE WITNESS:  Did you ask another
13 question there, Brian?
14 BY MR. ZEIGER:
15 Q.     I was thinking about your attorney's
16 response to what I said.
17 A.     I didn't know if my computer froze there
18 or not.  Do you go by Brian or Mr. Zeiger or --
19 Q.     Call me anything you like, my friend.
20 A.     Well, what would you prefer --
21 Q.     Brian.
22 A.     Thank you, sir.
23 Q.     Okay.  Well, then let me ask some
24 other -- let's take a break from this -- from this



Page 25

1  sheet of paper for a minute.  I'm going to give
2  you two other names.  And you tell me if either of
3  those names refresh your recollection as to the
4  identity of who this person is.  Richard
5  Anglemeyer; does that refresh your recollection?
6  A.      I believe he was a member of -- of the
7  household.
8  Q.      Okay.  Do you believe that's the person
9  who you had contact with?
10  A.      Sir, I couldn't tell you.  Like I
11  don't -- you have Richard -- I can't -- I couldn't
12  tell you whose names belong to who.
13  Q.      Okay.  But the person -- the person did
14  not appear to be in their seventies or eighties
15  who you made contact with, was -- were they?
16  A.      I mean, he was an older male.
17  Q.      He was older.  When I asked you before,
18  you said adult male so --
19  A.      Yes, adult male he was, yes, correct.
20  Q.      Okay.
21  A.      I've couldn't tell you his name, sir.
22  Q.      No problem.  Corporal, I'm trying to
23  distinguish between an adult male and an older
24  male.  I'm trying to put them in two different

Page 26

1  categories.  Okay?
2  A.      Okay.
3  Q.      So, let -- let me do it a different way.
4  Do you believe that -- that you had contact with
5  was -- could have been in their seventies?
6  A.      To be honest, seventy is old to me.  And
7  I -- the male I come in contact like he -- I don't
8  think he was that old.
9  Q.      I want to give you one more name, Joseph
10  Kluska.  Does that ring a bell?
11  A.      That name does not ring a bell.
12  Q.      Do you think the male could have been in
13  their forties that you had contact with?
14  A.      When you use the term senior citizen,
15  I'm like no.  But -- but I don't know, older male,
16  like not senior citizen age.
17  Q.      No problem.  I get it.  Let's go back to
18  the document.  So, the next paragraph reads, upon
19  arrival on the scene off the one-quarter corner of
20  the suspect's residence, I disembarked from the
21  East Tac Van.  Can you explain what that means?
22  A.      So, upon arrival on the scene, it was
23  off the one four corner.  The -- the side of the
24  structure or residence are numbered.  And, so, it

Page 27

1  was off that corner that I -- I exited the vehicle
2  I was riding in, which would have been that East
3  Tac Van.
4  Q.      Okay.  And the next line says, it should
5  be noted a compromise was called?
6  A.      Yes.
7  Q.      What does that mean?
8  A.      So, that comes from usually a team
9  leader that -- that is in one of the stacks
10  basically to -- a compromise is that they know our
11  presence is here.
12  Q.      Okay.  Who was the supervisor who said
13  that to you?
14  A.      That was -- that would have been a radio
15  call, and I could not -- I could not tell you who
16  made that call.
17  Q.      Okay.  So, it was no one in your van who
18  told you that?
19  A.      I heard it on the radio.  So, I mean, it
20  could have been but I'm not sure -- that would
21  have been outside the van.
22  Q.      Okay.  What would have been outside the
23  van?
24  A.      That compromise call.

Page 28

1  Q.      Okay.  And what position were you in the
2  van?
3  A.      I cannot tell you my seat position.  I
4  just know I exited that van.  I couldn't tell you
5  where I was at inside.  I was in the back.  I
6  wasn't in the front, I know that.
7  Q.      What does it mean when -- when a
8  compromise is called?  You might have answered
9  that.  Would you please answer again?  I don't
10  recall --
11  A.      Just that our presence is known.
12  Q.      Okay.  And how long after you received
13  that call did you exit the van?
14  A.      That would have been made outside of
15  the van.  So I would have exited --
16  Q.      Go ahead.
17  A.      I would have exited the van, and then I
18  would have had the compromise call after that.
19  Q.      Is that what happened or is that what
20  would have happened?
21  A.      No.  That's what happened.  I heard it
22  on my radio.
23  Q.      But your body radio?
24  A.      Yes, yes.  I have -- we each wear a



Page 29

1  portable radio.
2  Q.    Do you wear a body cam?
3  A.    I do not.
4  Q.    Do you know why not?
5  A.    I do not know.
6  Q.    Have you ever requested one?
7  A.    I have not.
8  Q.    Why haven't you?
9  A.    No one in the state police wears body
10  cams at this point.
11  Q.    I understand.  I mean, have you ever
12  written a letter to a supervisor saying I'd like
13  to be the first guy to wear one?
14  A.    I have not.
15  Q.    Why not?
16  A.    No reason.
17  Q.    Okay.  And, so, when you were outside of
18  the van when you received a call, how far away
19  from the property were you?
20  A.    We would have been on the property.
21  Q.    Now, my understanding is that this is a
22  large parcel of land.  Is that -- is that fair to
23  say?
24  A.    Yes.

Page 30

1  Q.    Okay.  And my understanding also is that
2  there's five buildings on the parcel of land; is
3  that fair to say?
4  A.    I know of three.
5  Q.    Okay.  Can you -- can you name all three
6  in your mind, how would you refer to them, please,
7  for the record?
8  A.    Yes.  The main structure, which is like
9  the main living quarters, the house, we'll call it
10  the house.  Then there's a trailer, which would be
11  a house as well and then a garage.
12  Q.    Okay.  And, so, when you received that
13  call, which -- were you near any of those
14  buildings?
15  A.    I was near the main -- the house, the
16  main house.
17  Q.    Okay.  And with your own eyes, did you
18  personally observe any compromise?
19  A.    When we were getting close to the --
20  no --
21  Q.    I'm sorry.  I'm not trying talk over you
22  in any way, Corporal.  Go ahead.
23  A.    I don't believe I witnessed that male
24  until, it may have been outside but like right

Page 31

1  upon entry.
2  Q.    Do you know today who that male was?
3  A.    I do not.
4  Q.    Understood.  And did you notice any
5  other type of compromise?
6  A.    I did not.
7  Q.    Did you -- did you hear anything in your
8  mind that said something is compromised?
9  A.    I did not.
10  Q.    Okay.  And how long after you heard the
11  call compromise was it that you made entry into
12  the house?
13  A.    I couldn't put a time, but it was
14  probably -- because everything happened so fast.
15  Q.    Say less than five minutes?
16  A.    Oh, yes.
17  Q.    Less than two minutes?
18  A.    Yes.
19  Q.    And, so, the next line says entry was
20  made into the four side door, which led into the
21  kitchen.  What does four side door mean?
22  A.    So, that's, again, we're using a
23  numbering system for the sides of the residence.
24  So the four side was our side of entry and that

Page 32

1  door would have been on the lower level of the
2  residence.
3  Q.    Okay.  And then it says upon entry a
4  white male was encountered who ran from this
5  room?
6  A.    Correct.
7  Q.    Okay.  And do you know who that white
8  male was?
9  A.    I do not.
10  Q.    Is that the same white male that you
11  used force with?
12  A.    Correct.
13  Q.    Okay.  The next line says, I cleared
14  into the kitchen, broke off from the train with
15  Corporal Lance Schimp behind me following the
16  white male's path of travel entering the living
17  room.  What does the word train mean in that
18  sentence?
19  A.    That's just the line of guys going into
20  the residence, the line of people.
21  Q.    Okay.  You stated you followed him into
22  the living room.  Is that room connected to the
23  kitchen or next to the kitchen?
24  A.    Yes.



Page 33

1  Q.    Was anyone else in the kitchen when you
2  entered?
3  A.    I did not see anyone.
4  Q.    Did you see anyone else in the hallway
5  between the kitchen and the living room?
6  A.    No.
7  Q.    Did you see anyone else in the living
8  room?
9  A.    I did not.
10  Q.    Okay.  Next it says here we encountered
11  the above white male again who was yelling at us
12  and who was always also disobeying all commands?
13  A.    Correct.
14  Q.    Okay.  And, by the way, was your face
15  covered?
16  A.    Yes.  I wear the helmet obviously, the
17  ear muffs.  I usually have glasses and then I have
18  a neck wrap that -- wrapped around a piece of
19  kevlar that I wear on my -- on my neck.
20  Q.    Okay.  Did you ever take any of that off
21  at any point during this operation?
22  A.    On the scene, no.
23  Q.    Did you ever identify yourself to any of
24  the occupants of the home?

Page 34

1  A.    Yes.
2  Q.    When was that?
3  A.    Upon entry.
4  Q.    What did you say?
5  A.    I say state police warrant service.
6  Q.    I understand that, Corporal.  I mean
7  like once everyone is in zip ties or cuffs and the
8  scene is secured, do you say my name is Corporal
9  McGarvey?
10  A.    I did not.
11  Q.    Does your outfit that you wear say
12  Corporal McGarvey on the outside anywhere?
13  A.    It does not.
14  Q.    Why is that?
15  A.    I couldn't tell you.
16  Q.    Have you ever asked anyone that you want
17  your name on the outside of your uniform?
18  A.    I have not.
19  Q.    Do you wear a badge?
20  A.    I do not.
21  Q.    Do you have a badge number on the
22  outside of your uniform?
23  A.    It does not.
24  Q.    So, let me give you a hypothetical.  If

Page 35

1  you did something wrong on the job and someone
2  wanted to complain about you, how could they do it
3  then?
4        MR. BRADFORD:  Objection to form.
5  You can answer.
6        THE WITNESS:  Piecing it
7  together.
8  BY MR. ZEIGER:
9  Q.    Say it again?
10  A.    I said piecing it together just with all
11  the information.
12  Q.    How would they piece it together?
13  A.    I guess kind of like what we're doing
14  now, like talking to all the people that were
15  involved and just going by what was said.
16  Q.    Is there any other way that you're aware
17  of?
18  A.    A way to identify?
19  Q.    Yes.
20  A.    Not that I would know of.
21  Q.    I mean, Corporal, let me rephrase it.
22  We're all humans and sometimes we make mistakes,
23  right?
24  A.    Correct.

Page 36

1  Q.    Regardless of this job, I'm saying in
2  the course of your employment with the
3  Pennsylvania State Police as a corporal on the
4  SERT team, if you made a mistake and someone
5  wanted to complain about you, how could they do
6  that?  How could they file a complaint?
7  A.    They could contact my supervisor to make
8  a complaint.
9  Q.    They wouldn't be able to identify you by
10  name or badge number, so what would -- if you
11  know, what would be the course of action?
12        MR. BRADFORD:  Other than what he
13  already explained?
14        MR. ZEIGER:  Yes, if he has some
15  kind of different answer or additional.
16        THE WITNESS:  I don't think I
17  have another answer.
18  BY MR. ZEIGER:
19  Q.    Okay.  The next line says here, we
20  encountered the above white male again who was
21  yelling at us and who was disobeying all commands.
22  Was it the same gentleman?
23  A.    That I -- that I seen initially coming
24  into the house?



Page 37

1  Q.    Yes.
2  A.    Yes.
3  Q.    Did the man seem disoriented?
4  A.    No.
5  Q.    Did the man seem like he had dementia or
6  Alzheimer's or anything of that nature, if you
7  know what that is?
8  A.    No.
9  Q.    Okay.  I then pinned the white male to
10  the ground with my shield because he still
11  continued to disobey commands and resist.  Can you
12  explain that line?
13  A.    Yes.  He would not follow any commands
14  that were given, get on the ground, get on the
15  ground.  Getting the residence secure, as we made
16  entry, he just continued to verbally yell.  As I
17  continued to close distance, he continued to yell
18  and not obey any commands.  Then I used --
19  Q.    Forgive me.  It says here at 4:00 hours
20  you were at the ESP Belfast Barracks.  But at what
21  time did you make entry approximately into the
22  home?
23  A.    06:00.
24  Q.    So, it was 6:00 a.m. that you went in?

Page 38

1  A.    Yes.  04 --
2  Q.    I'm sorry.
3  A.    It's the video.  I apologize.  04:00 we
4  have our briefing.  And the warrant is not a
5  nighttime search warrant.  So it would have been
6  06:00 hours or after we would have been at this
7  residence.
8  Q.    And it would have still been dark out in
9  February at 6:00 a.m, right?
10  A.    I believe so.
11  Q.    So, when you entered the home it was
12  still dark outside, correct?
13  A.    Yes, I believe so.
14  Q.    Okay.  And then it says using my shield
15  I took the white male to the ground to gain
16  control.  Can you explain what that means and
17  describe the actions you took?
18  A.    Yes.  Basically we were trying to secure
19  this residence.  And, I mean, we're looking out
20  for the safety of everyone involved.  We have a
21  male who is disobeying all commands, that is not
22  listening.  We can't control the scene, safety of
23  everyone.  So I used my shield to get him on the
24  ground to control him.  And then he was eventually

Page 39

1  flex cuffed.
2  Q.    Okay.  And how do you -- how do you do
3  that?  I mean, what is the -- what is the move
4  with the shield?  How do you use the shield to get
5  him on the ground?
6  A.    Basically come in, the shield is
7  between --
8  Q.    Your video went out.
9       MR. ZEIGER:  Let's go off the
10  record.
11       THE VIDEO TECHNICIAN:  Off the
12  record.
13       (Discussion off the record.)
14       THE VIDEO TECHNICIAN:  Back on
15  the record.
16  BY MR. ZEIGER:
17  Q.    Corporal, can you see the document
18  again?
19  A.    I can.
20  Q.    So, you used the shield to take him down
21  to the ground?
22  A.    Yes.
23  Q.    Do you know what part of the shield made
24  contact with what part of his body?

Page 40

1  A.    Probably the upper part.
2  Q.    Upper part of the shield or upper part
3  of the body?
4  A.    The shield would have met his upper
5  torso.
6  Q.    What part of the shield would have met
7  his upper torso, the upper or lower part of the
8  shield?
9  A.    Probably the entire shield.
10  Q.    And did you have the shield in your hand
11  and sort of lean into him and use it with force or
12  did you sort of pop the shield off your body and
13  knock him off his balance?
14  A.    I used the shield and try to go down to
15  the ground.
16  Q.    So like the leverage move, like you push
17  him, you're holding the shield and lean and take
18  him down that way sort of?
19  A.    Yes.
20  Q.    Okay.  And, so, therefore the lights or
21  the visibility area would have made contact with
22  his upper torso?
23  A.    It could have, yes.
24  Q.    And did you see that happen in this



Page 41

1  case?
2  A.    I did not.
3  Q.    Okay.  And after he -- so, the next line
4  says, I then pinned the white male to the ground
5  with my shield because he still continued to
6  disobey commands and resist.  Do you see that?
7  A.    Oh, yes.
8  Q.    Okay.  And, so, you're now laying on top
9  of him?
10  A.    I wouldn't say laying.  Like basically
11  shield down, I may have been on one knee just kind
12  of hold him to the ground.
13  Q.    Okay.  Then the next line says, another
14  member eventually placed this white male into flex
15  cuffs.  Who -- who was that?
16  A.    I do not know.  We had -- there was
17  multiple individuals, but it would have been --
18  excuse me -- someone towards -- behind me in the
19  stack.
20  Q.    So, once he was cuffed, what did you do
21  with him?
22  A.    Well, he would have been passed off to
23  those members.  And then I rejoined the clearing
24  element and continued to clear the residence.

Page 42

1  Q.    Did you -- did you see him again?
2  A.    I may have.  But I don't recall because
3  like if -- if a person is not in my custody or
4  being detained by me during -- during this
5  incident, like it's that person that is with them
6  to basically stay with them.
7  Q.    Did you ever -- did you ever see him in
8  a chair?  Did you ever see him seated in a chair?
9  A.    I did not.
10  Q.    Okay.  And did you see how he was exited
11  from the residence?
12  A.    I did not.
13  Q.    Do you know whether he was exited into
14  -- out of the residence?
15  A.    I did not.  You said -- say that
16  question again there, sir?  You said something
17  about exited?  I cut you off.
18  Q.    No.  I think I asked one question too
19  soon, too early.  So I was trying to do them out
20  of order, which is bad.  Let me start over.  I
21  apologize, Corporal.  Do you know, was he ever
22  exited out of the premises during the SERT
23  operation?
24  A.    I do not.

Page 43

1  Q.    The next line says -- let's talk about
2  flex cuffs.  What are flex cuffs?
3  A.    It's plastic basically handcuffs,
4  restraints.
5  Q.    Like a zip tie?
6  A.    You could compare them two.
7  Q.    And how are they put on?
8  A.    There's loops, hands go down in and then
9  they're tightened.
10  Q.    You just pull something and tighten them
11  up?
12  A.    Correct.
13  Q.    And how are they removed?
14  A.    Via a box cutter.
15  Q.    Like a scissors or a knife of some
16  sort?
17  A.    It's not -- it's made by the company
18  and, yes, it looks like a pair of scissors.
19  Q.    Understood.  Okay.  No problem.  And
20  then it says I then linked up with additional
21  members catching up to the train in the pool room.
22  And by pool room, is that like a billiards room or
23  somewhere where one would go swimming?
24  A.    That would be -- that would be where

Page 44

1  someone goes swimming.
2  Q.    Is that indoor or outdoor?
3  A.    That was an indoor.
4  Q.    Okay.  And what else is inside the pool
5  room?
6  A.    I believe there was a storage room on
7  the back side of it.
8  Q.    The next line says we cleared the pool
9  pump storage room.  Is that the room you're
10  referring to?
11  A.    Yes.  That would have been the pool and
12  then a pool pump storage room.
13  Q.    The next line says -- and in that pool
14  pump storage room, did you locate any person or
15  any item of interest?
16  A.    No.
17  Q.    The next line says, no other persons,
18  evidence was located.  Do you see that?
19  A.    Yes.
20  Q.    And then the next line says, a secondary
21  search was conducted.  Do you see that?
22  A.    Yes.
23  Q.    What does that mean, a secondary search
24  was then conducted?



Page 45

1  A.      That's -- we basically make sure we
2  didn't miss any persons within the residence.
3  Q.      And we're -- well, you were only looking
4  for one person, right?
5  A.      It's -- basically our job was to secure
6  the residence.  So it was basically I can't say
7  person.
8  Q.      But wasn't the reason you were there was
9  to arrest a gentleman named Mark Anglemeyer and
10 then search the property?  Weren't those your sort
11 of two dual goals at the same time?
12 A.      Our goal -- did someone speak?
13 Q.      Go ahead.
14 A.      Our goal -- I'm sorry.  Our goal was to
15 secure the -- secure the property.  That would
16 have been SERT's job function.
17 Q.      Okay.  In the next line it says, I did
18 not locate any additional persons or evidence.
19 So, can you explain what that means in relation to
20 the last answer you just gave?  If your only job
21 was to secure the premises, then why did you write
22 in here I did not locate any additional persons or
23 evidence?
24 A.      So, persons -- basically by securing the

Page 46

1  residence you're securing everything within,
2  meaning persons.  So I didn't locate any
3  additional persons because I didn't come in
4  contact with any.  And I put evidence in there
5  just because if any -- if I see anything in plain
6  view I'll notate it.  But we aren't searching for
7  evidence.
8  Q.      Okay.  The next line says, I exited the
9  four side of the suspect residence and provided
10 outside security.  So basically that means you
11 left the property and stood outside and waited
12 until you could go?
13 A.      I would have still been on the property
14 but outside of the residence.
15 Q.      Right.  And, so, but what were you doing
16 when you were standing out there?
17 A.      Just basically making sure everything
18 was under control.  And then secondaries were
19 done, so we were waiting for the primary
20 investigators to show up.
21 Q.      And did that all happen smoothly?
22 A.      Yes, I believe so.
23 Q.      The next line says, I was eventually
24 advised to return to the assembly point.  Is the

Page 47

1  assembly point the spot where you got out of the
2  van or the spot where you were briefed at 4:00
3  a.m.?
4  A.      Briefed at 4:00 a.m.
5  Q.      And did you do that?  Did you return
6  there to the Belfast Barracks with no issue?
7  A.      Correct, yes.
8  Q.      And after that your assignment was
9  complete, correct?
10 A.      Yes.
11 Q.      And you were debriefed?
12 A.      Yes, once we got back to the barracks.
13 Q.      Who debriefed you?
14 A.      The whole team -- the whole team
15 debriefs.
16 Q.      What does that mean?
17 A.      Basically just kind of walk through the
18 incident and go -- like basically tell what --
19 what you did in the team setting there.
20 Q.      The next line says, post activation
21 inventory complete.  What does that mean?
22 A.      Just making sure that I have all my gear
23 with me, it's all accounted for.
24 Q.      The next line says, weapon and equipment

Page 48

1  maintenance complete.  That's a similar task I
2  take it?
3  A.      Basically just making sure all of our
4  weapons are functioning, clean.  Just making sure
5  all of our tools are accessible, just making sure
6  everything is kind of ready for another -- for a
7  call out.
8  Q.      Okay.  I understand.  So let me ask you
9  this, Corporal.  How tall are you?
10 A.      Five, 9.
11 Q.      How much do you weigh?
12 A.      About 170.
13 Q.      And how old are you?
14 A.      Say again?
15 Q.      How old are you?
16 A.      Thirty-seven.
17 Q.      And how many years have you been a
18 corporal for the Pennsylvania State Police?
19 A.      I've been with the state police 13 and
20 one-half years.  I've been a corporal roughly
21 probably three and one-half.
22 Q.      And before -- before that 13 and
23 one-half years, did you have any jobs in security,
24 the armed forces or any other kind of law



Page 49

1 enforcement?
2 A.    I did not.
3 Q.    And -- and, so, your first job in
4 security law enforcement or military was working
5 for the Pennsylvania State Police; is that
6 correct?
7 A.    Correct.
8 Q.    Did you have any occupation before that
9 job?
10 A.    I did.  I worked multiple jobs.
11 Q.    None of them were anything remotely
12 related to what you do for a living now,
13 correct?
14 A.    Correct.
15 Q.    All right.  I'm going to stop sharing
16 this document for a moment.  So, Corporal, can you
17 tell me if there is a complaint made about you,
18 about what you -- what you do on your job, do you
19 know what the process is?
20 A.    It usually goes to a supervisor or else
21 they can make a complaint via a website.  And then
22 it kind of -- I guess it's investigated.
23 Q.    Okay.  By whom, if you know?
24 A.    So, it will go -- basically a blue team

Page 50

1 entry would be done.
2 Q.    What does that mean?
3 A.    That's so a blue -- it's like a blue
4 team system, I guess.  The complaint is put into
5 the system.  I don't know if that's the name of
6 the system or what.  But then that gets forwarded
7 to IAD, our internal affairs division.
8 Q.    Okay.  And the internal affairs
9 division, if you know, is that operated by the
10 Pennsylvania State Police?
11 A.    Yes.
12 Q.    And if you know, is there anyone who
13 works in the internal affairs unit that is a
14 civilian?
15 A.    I don't believe so.
16 Q.    To the best of your knowledge, everyone
17 who works there is an employee of the Pennsylvania
18 State Police?
19 A.    I believe so, unless they have clerks
20 and such.
21 Q.    I agree with you.  That was a bad
22 question.  That's my fault.  I understand what you
23 mean by your answer.  Let me rephrase it.  Of the
24 people investigating internal affairs complaints

Page 51

1 and/or making decisions regarding internal affairs
2 complaints, are you aware of anyone who has that
3 role that is not -- is not a Pennsylvania state
4 trooper?
5 A.    I am not.
6 Q.    Thank you very much.  I'm glad I was
7 able to clarify.  Now, are you aware, is there a
8 way for another trooper to make a complaint about
9 you or for you to make a complaint about another
10 trooper?
11 A.    Yes.
12 Q.    And can you explain your answer?
13 A.    Basically the same way.
14 Q.    How would that occur, like go on blue
15 system?
16 A.    Say again?
17 Q.    They would enter it into the blue
18 system?
19 A.    Yes, the blue team system.
20 Q.    Okay.  And is there a policy or
21 procedure that you're aware of with the
22 Pennsylvania State Police regarding filing a
23 complaint against a fellow trooper?
24 A.    I don't believe so.

Page 52

1 Q.    Like if you -- if you see a state
2 trooper steal a pack of gum, do you have a duty to
3 report them?
4 A.    Yes.
5 Q.    Okay.  So, can you explain your answer?
6 How would you -- how would you report that
7 officer?
8 A.    Via -- I mean, you probably tell your
9 supervisor.  But then it would be done via that
10 blue team -- blue team system.
11 Q.    And is that a mandatory report?
12 A.    For like wrongdoing?
13 Q.    Yes.
14 A.    Like -- like the guy stole the gum, a
15 pack of gum, yes.
16 Q.    So, it's mandatory that you must report
17 them?
18 A.    If I witnessed it, yes.
19 Q.    Moving on.  Is there any type of self
20 reporting required?
21 A.    If I stole a pack -- like going back to
22 the gum incident.  If I stole a pack of gum?
23 Q.    Well, I think perhaps there's a better
24 answer for -- for that.  But like say you're off



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
53–56

Page 53

1  duty and you get a DUI, I think it's probably a
2  better example for a self-reporting hypothetical.
3  Do you have a duty to self report?
4  A.     Yes.
5  Q.     Can you explain your answer?
6  A.     If I got a DUI off duty, that phone call
7  better be happening to report that.
8  Q.     You use that blue box system?
9              MR. BRADFORD:  Blue team.
10             THE WITNESS:  That's fine.  I
11 believe a supervisor would do that.
12 BY MR. ZEIGER:
13 Q.     So you would call your supervisor and
14 then your supervisor would have a duty to report
15 you and the supervisor would follow through with
16 the procedure you gave in your previous set of
17 answers regarding reporting on a fellow trooper?
18 A.     Well, he would do the -- the blue team
19 entry.  And then I -- it would go to IAD then.
20             MR. ZEIGER:  I beg your pardon.
21 I have to take a very brief recess.  Can we go off
22 the record.
23             THE VIDEO TECHNICIAN:  Off the
24 record, 10:57.

Page 54

1              (Whereupon a break was taken.)
2              THE VIDEO TECHNICIAN:  We are
3  back on the record.  The time is 11:03.
4  BY MR. ZEIGER:
5  Q.     So, Corporal, so back to the DUI
6  example.  So your answer is, is that in the DUI
7  example you would self report to your supervisor
8  and then they would report against a fellow
9  trooper, who is you, using the system that is in
10 place.  Is that -- is that your previous answer?
11 A.     Yes.
12 Q.     Now, what about use of force, same
13 example, you do something that you think you used
14 too much force, what would you do?
15 A.     I've never done that before, so I don't
16 know.
17 Q.     Very good.  Let me share another
18 document.  Can you see this document on your
19 screen?
20 A.     I can.
21 Q.     Is that your name at the top?
22 A.     Yes.
23 Q.     It says concise officer history.  What
24 does that mean?

Page 55

1  A.     I've never seen this document before.
2  To be honest with you, I would have to look it up
3  to tell you what that means.  Officer history is
4  just a history of my -- of me.
5  Q.     Okay.  I'm going to say for the record,
6  your lawyer can disagree, I'm going to make a
7  statement that the word concise kind of means
8  brief or abbreviate.
9              MR. BRADFORD:  I just want to make
10 it clear, Rob, if you don't know the answer to
11 something, the answer is I don't know.  If you're
12 making an assumption or guessing, if Mr. Zeiger
13 wants you to do that, go ahead.  But just make
14 sure you clarify that you're just guessing or
15 assuming or estimating --
16 BY MR. ZEIGER:
17 Q.     I agree with your attorney completely.
18 I don't want you to guess or assume or anything
19 unless I say can you estimate or something like
20 that.  But in your previous answer you said that
21 you weren't sure what the word concise meant.  And
22 I was saying that it means abbreviated or brief in
23 the English language.  I was just putting that out
24 there so that you have a better understanding of

Page 56

1  what I'm about to do.  Okay?
2              MR. BRADFORD:  I think he
3  understands generally what the word concise means.
4  I think he just doesn't know what concise officer
5  history, which is the title specifically of this
6  document.
7              MR. ZEIGER:  Then I misunderstood
8  his answer.
9  BY MR. ZEIGER:
10 Q.     Is that fair to say, Corporal?
11 A.     Yes.
12 Q.     Thank you.  So, the document that you
13 have on your screen is your concise history.  And
14 I'm going to represent to you that it is a history
15 of any complaints that are made -- have been made
16 about you.  Okay?
17 A.     Okay.
18             MR. BRADFORD:  I'm going to object
19 to that characterization on foundation grounds but
20 go ahead.
21             MR. ZEIGER:  I don't know how you
22 know that but maybe you have some document or some
23 other deposition where you have that knowledge.
24 BY MR. ZEIGER:



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
57—60

Page 57

1   Q.      Corporal, I'm going to state for the
2   record that your attorney provided me with this
3   document in response to a request for production
4   of documents in a discovery request from the case.
5   And the request was can you give a -- a history of
6   any complaints that were made about you in -- in
7   your employment with the Pennsylvania state
8   troopers and/or I write in the response, or a
9   concise officer history because I believe that
10  that is what law enforcement refers to the brief
11  version of someone's history, as opposed to
12  getting 1000 page document.  So this is the
13  document I believe that your lawyer gave me in
14  response to that.  If you believe that this is not
15  the correct document or it does not properly give
16  a concise history of complaints made against you,
17  I would ask your attorney to provide me with that
18  after today's deposition.
19          MR. BRADFORD:  And I'm just saying
20  that you're not characterizing this document.
21  You've requested, as you explained, you requested
22  the concise officer history or something along
23  those lines.  I provided that.  But this may not
24  necessarily -- each entry on here does not

Page 58

1   necessarily mean there was a complaint.  And
2   you're characterizing it as a complaint generates
3   an entry on here and I don't think that's correct.
4   But if you think it is and that's your
5   understanding and you have some other basis for
6   that knowledge, go ahead and tell him that's your
7   understanding but I just want to clarify that for
8   the record.
9           MR. ZEIGER:  I understand.  Let
10  me ask another question.
11          MR. BRADFORD:  Let me say one
12  more thing, Brian, so we're hopefully on the same
13  page.  If there's a particular use of force, it
14  might generate an entry on here.
15          MR. ZEIGER:  Right, understood.
16  BY MR. ZEIGER:
17  Q.      So, let me ask you this, Officer.  Have
18  you ever known another state trooper to report you
19  for using too much force?
20  A.      No.
21  Q.      And you've never self-reported use of
22  force?  You just gave me that answer like five
23  questions ago, right?
24  A.      No.

Page 59

1   Q.      So, therefore, if there's any use of
2   force that is listed on your concise officer
3   history, it, therefore, is from a civilian making
4   a complaint against you, correct?
5   A.      No.
6   Q.      It's not reasonable to say that?
7   A.      Yes.
8   Q.      So, now I don't understand.  So no other
9   trooper has ever made a complaint against you.
10  You've never self reported and we have your
11  concise history.  There are -- there are issues in
12  here that say use of force.  How else could they
13  be reported on here, if you know?
14  A.      Any time a taser is deployed, pepper --
15  pepper spray, that's an automatic blue team
16  entry.
17  Q.      I'm going to stop sharing the document
18  for a minute.  Corporal --
19  A.      Yes.
20  Q.      -- I asked you before if there was any
21  self reporting mechanism that goes on regarding
22  use of force and you said yes.  And I said have
23  you ever self reported and you said no.  Remember
24  that --

Page 60

1           MR. BRADFORD:  You said
2   complaint, there was complaint of use of force.
3           MR. ZEIGER:  I'm like -- I'm
4   going back ten questions now, Kevin.
5           MR. BRADFORD:  Okay.  Go ahead.
6   BY MR. ZEIGER:
7   Q.      I asked you if there was any self
8   reporting, and you told me there was.  And I gave
9   you the DUI -- DUI example.  Do you remember that?
10  A.      Yes.
11  Q.      And then I asked you if the same would
12  apply with use of force, and you said, yes, was
13  your answer that it would apply in the same way.
14  Do you remember that answer?
15  A.      Yes.
16  Q.      And I asked you if you ever self
17  reported and your answer was no.
18  A.      I believe I did say no.
19          MR. BRADFORD:  No.  Your question
20  was if someone used too much force, that's
21  where -- that's where I think we're getting lost
22  here.
23  BY MR. ZEIGER:
24  Q.      Well, let's -- let's get found.  Okay.



Page 61

1  Tell me about self reporting regarding force?
2  A.      Okay.
3  Q.      Have you ever been involved in any self
4  reporting using force?
5  A.      Yes.
6  Q.      Can you explain your answer?
7  A.      The -- any time a taser is deployed,
8  acetone is used or the pepper spray is used,
9  that's an automatic blue team entry.  And I've
10 used my taser before.
11 Q.      Okay.  And, so, what is process then for
12 that?
13 A.      I report that and that is a blue team
14 entry and that gets moved on to IAD.
15 Q.      Okay.  And every time that happens, you
16 get investigated by IAD?
17 A.      Correct.
18 Q.      Okay.  And in any of those -- those
19 times, do they make a finding at the end of their
20 investigation?
21 A.      Yes.
22 Q.      And what is that finding, like how does
23 that happen?  Explain that.
24 A.      Through investigation, talking to

Page 62

1  everyone involved.
2  Q.      I mean, what are -- what are the choices
3  they have, it's founded or unfound or are there
4  other terms or vernacular that's used by
5  Pennsylvania State Police, explain that?
6  A.      I believe it would be founded and
7  unfounded.
8  Q.      Okay.
9  A.      I don't know.  Like you'd have to talk
10 to IAD, an investigator from IAD to be sure.  Like
11 I apologize.  I should have said I don't know on
12 that one.
13 Q.      That's -- and to your -- to your
14 knowledge, has there ever been a founded use of
15 force issue in your career with the Pennsylvania
16 State Police?
17 A.      Regarding myself?
18 Q.      Yes, regarding your history in the
19 employment in the -- with the Pennsylvania State
20 Police?
21 A.      No.
22 Q.      Has there ever been any finding against
23 you with the Pennsylvania State Police for any
24 reason at all through IAD?

Page 63

1  A.      I don't believe so.
2  Q.      Okay.  If I use the abbreviation EIP --
3  A.      Let me correct that real quick.
4  Q.      Please.
5  A.      I believe there was a complaint for --
6  this guy was reporting an incident.  I -- it was
7  over the phone and he was dissatisfied and that
8  went to a supervisor resolution.
9  Q.      Understood.  There's something called
10 EIP entry.  Do you know what that stands for?
11 A.      Yes.
12 Q.      Can you explain?
13 A.      Early intervention program.
14 Q.      What does that mean?
15 A.      I believe there's certain -- I don't
16 know.
17 Q.      Because I asked you, you know, what the
18 choices were and you said founded or unfounded as
19 far as resolution goes.  Remember that?
20         MR. BRADFORD:  Then he said I
21 don't know.  That's all.
22 BY MR. ZEIGER:
23 Q.      So, is it possible there's another one
24 called EIP?

Page 64

1  A.      I couldn't tell you 100 percent.  I
2  don't know.
3  Q.      I understand.  Let's go back to that
4  document.  Corporal, I'm showing you a document
5  I'm going to have marked as McGarvey 2.  I'm
6  telling you this is your concise officer history
7  that was provided to me by your attorney.  Okay?
8  A.      Yes.
9  Q.      And have you ever seen this document
10 before?
11 A.      I have not.
12 Q.      I'm going to go all the way to the last
13 page of this document.
14 A.      Yes.
15 Q.      Can you see that?
16 A.      Yes.
17 Q.      Okay.  This shows that there have been
18 13 reports, that's fair, incidents in regard to
19 your employment as a member of the Pennsylvania
20 State Police.  Do you agree it says 13?
21 A.      I would have to go through.  But I
22 imagine that they -- I don't -- I would imagine if
23 that's -- if they're -- if that's what comes down,
24 correct.



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
65–68

Page 65

1  Q.    That's fair enough.  I'm just saying you
2  see on your screen the number 13?  Like it says
3  13 --
4  A.    Yes, yes, I do.  I see 13.
5  Q.    Okay.  And I'm just going to go down
6  this list now.
7  A.    Okay.
8  Q.    There's -- one thing says accelerated
9  investigation, one.  Do you know what that is?
10  A.    I do not.
11  Q.    One says complaint, one.  Do you know
12  what that is?
13  A.    I would imagine that's a complaint.
14  Q.    The next one says firearm discharge,
15  one.  Do you know what that is?
16  A.    A firearm discharge, yes.
17  Q.    Supervisory resolution, one.  Do you
18  know what that is?
19  A.    Yes.
20  Q.    What was that one?
21  A.    A supervisory resolution.
22  Q.    But do you know what happened in the
23  incident?
24  A.    I believe that that was the one I told

Page 66

1  you about.
2  Q.    So, let's go back up to the top.
3  Accelerated investigation, one.  Do you know what
4  that case was?
5  A.    I do not.
6  Q.    Next, complaint, one.  Do you know what
7  that case was about?
8  A.    I believe that that was the one I told
9  you about.
10  Q.    Okay.  And the next one, firearm
11  discharge, one.  Do you know what that case was?
12  A.    I believe so.
13  Q.    Tell us about that case, please?
14  A.    I utilized bean bags on an individual
15  during an incident.
16  Q.    Okay.  And was that during a SERT
17  warrant execution?
18  A.    SERT barricade.
19  Q.    What does that mean?
20  A.    Basically that's -- it's an individual
21  has barricaded himself within a residence and this
22  fellow was armed.
23  Q.    And you discharged your firearm that had
24  bean bags in it as part of that operation?

Page 67

1  A.    Yes.
2  Q.    And that would be a self reported
3  incident, which is why it would be on here?
4  A.    Correct.
5  Q.    Supervisory resolution, you answered
6  that one.  And the next says use of force, nine.
7  Do you see that?
8  A.    Yes.
9  Q.    If you know, are any of those nine from
10  complaints from civilians or people or are they
11  all from times when you used some type of weapon
12  that caused you to self report?
13  A.    Looking at this document, I
14  would believe that all nine are the self
15  reporting.
16  Q.    Right.  So, you don't believe in your
17  career you've ever had anyone complain about you
18  using too much force?
19  A.    No.
20  Q.    Have you ever been sued before?
21  A.    I don't believe so.
22  Q.    Okay.  I understand.  Are you aware of
23  any of these use of force of nine on here that
24  were found against you?

Page 68

1  A.    No.
2  Q.    Did you self report in this case
3  regarding the Anglemeyer property that we're here
4  for in this case?
5       MR. BRADFORD:  Objection to
6  foundation.  You can answer.
7       THE WITNESS:  My supervisor knew.
8  BY MR. ZEIGER:
9  Q.    Okay.  And are you aware if any of these
10  nine include this incident that we're here for
11  today?
12  A.    I'm not sure.
13  Q.    Okay.  No problem.  So, I have some
14  followup questions here.  Okay.  Are you -- do you
15  need a break or are you -- are you good?
16  A.    I'm good.
17  Q.    Was there a very large African American
18  trooper that was working in your -- in your SERT
19  team as far as entry to the house goes, if you
20  recall?
21  A.    Yes, we have a black male that is part
22  of our SERT team.
23  Q.    And what is his name?
24  A.    Brian King, Corporal Brian King.



Page 69

1  Q.      How big of a guy is he?
2  A.      Six, 4, 230.
3  Q.      Fair enough.  And did you have any
4  interaction with him on the day in question?
5  A.      I'd have to look at the activation
6  report but, no, I don't believe so.
7  Q.      Well, the previous document we were on,
8  is that the activation report?
9  A.      No.  That was my report.
10  Q.      But you didn't -- what is the activation
11  report?
12  A.      That is basically the warrant service
13  briefing report.
14  Q.      Understood  But I'm asking a different
15  question.  Just from your memory, did you have any
16  interaction with Mr. King that day?
17  A.      No.
18  Q.      What is his rank?
19  A.      Corporal.
20  Q.      Corporal, same as yours?
21  A.      Correct.
22  Q.      Okay.  And did you -- do you have any
23  memory seeing him enter the house?
24  A.      I do not.

Page 70

1  Q.      Was he in the train?
2  A.      I can't tell you.  I don't know.
3  Q.      How many trains were there?
4  A.      Two.
5  Q.      Do you know if he was on your train or
6  the other one?
7  A.      I'm not sure.
8  Q.      Were both trains into this main
9  property, the -- the residence where people were
10  living?
11  A.      Yes.
12  Q.      Okay.  Do you know, were any videos
13  taken at any point in time by anyone?
14  A.      During the incident?
15  Q.      Regarding -- regarding the job, the SERT
16  job --
17  A.      Sorry.  I cut you off.
18  Q.      It's okay.  From beginning to end of
19  this SERT job that we're here to talk about, are
20  you aware of anyone videotaping it?
21  A.      Including the briefing?
22  Q.      No.  Once you were in route to the
23  property.
24  A.      From the point we were in route to the

Page 71

1  property, no.
2  Q.      And after the property was secured, was
3  anyone -- was any video taken?
4  A.      I'm not 100 percent sure.
5  Q.      So, what information were you given in
6  the debriefing about what to expect that you might
7  encounter when executing this warrant, if you
8  recall?
9  A.      During the -- you said debriefing or
10  briefing?
11  Q.      Briefing.
12  A.      During the briefing.  Basically all the
13  details, all the intel on this service to include
14  who is -- the requesting agency was, the details
15  of their investigation and -- which was a meth
16  investigation involving the parties -- the one
17  party, a lot of information was CI intelligence,
18  as well as officer intelligence.  There was drugs,
19  guns, multiple people and it was told that there
20  was hostility towards law enforcement.
21  Q.      Let's break that down.  Who was hostile
22  against law enforcement?  Where did that come
23  from?
24  A.      It was said multiple times during the

Page 72

1  video, as well as it was also in the warrant
2  service packet, that it was related in there,
3  too.
4  Q.      I meant more like the source.
5  A.      The source I could not tell you.
6          MR. BRADFORD:  Are you asking who
7  told McGarvey or who told the person who told
8  McGarvey?
9          MR. ZEIGER:  Who told the person
10  who told McGarvey, if he knows.
11          THE WITNESS:  No.
12  BY MR. ZEIGER:
13  Q.      And when you -- when you went in was
14  corporal the highest ranking person who went in,
15  into the building?
16  A.      Through the execution of the warrant
17  service, yes.
18  Q.      And you mentioned something about a meth
19  investigation, correct?
20  A.      Correct.
21  Q.      What information did you have about it
22  being a meth investigation?
23  A.      That multiple purchases were made.  The
24  prime suspect in that case was a Mark Anglemeyer



Page 73

1  and they were done on this property, the
2  purchases.
3  Q.     There was no allegation of anyone named
4  Ada Anglemeyer that was involved in any kind of
5  narcotics investigation, correct?
6  A.     Correct.
7  Q.     There was no -- no one named Richard
8  Anglemeyer that was involved in any kind of
9  narcotics investigation, correct?
10  A.     No.  There was multiple people named.
11  It was just unknown if they were connected at
12  all.
13  Q.     No.  I'm not asking for a
14  generalization.  I'm asking specifically.  Did you
15  have any specific information to know that anyone
16  named Ada Anglemeyer was involved in any kind of
17  narcotics transaction?
18  A.     No.
19  Q.     You did not have any information that
20  anyone named Richard Anglemeyer was involved in
21  any narcotics transaction, correct?
22  A.     No.  The main target, which would have
23  been that Mark Anglemeyer.
24  Q.     You do not have any information that

Page 74

1  Jeffrey Anglemeyer was involved in any narcotics
2  transactions; did you?
3  A.     No, not that I recall.
4  Q.     You did not have any information that
5  Joseph Kluska was involved in any narcotics
6  investigation, correct?
7  A.     No.  Everything was --
8  Q.     Okay.  Now, as far as these guns go,
9  right -- let me ask some foundational questions
10  before I get into that.  So, you understand that
11  in order to have a license to carry you can't have
12  a prior record in Pennsylvania, you agree with
13  that statement?
14  A.     Yes.  They're enumerated offenses that,
15  certain offenses that prohibit you from having a
16  license to carry.
17  Q.     Right.  So, if someone has a license to
18  carry, can you come to the conclusion as a state
19  trooper that they are law abiding citizens?
20         MR. BRADFORD:  Objection to form.
21  BY MR. ZEIGER:
22  Q.     You can answer.
23  A.     I mean, you could still have a criminal
24  history and carry.

Page 75

1  Q.     How is that?  Explain that.
2  A.     If it's not the enumerated -- the
3  enumerated sections, you can have a license to
4  carry.
5  Q.     Okay.  But basically the entire crimes
6  code is the enumerated sections, correct?
7  A.     I -- I can't tell you 100 percent.
8  Q.     You have to fill out an application with
9  the Pennsylvania State Police in order to get a
10  license to carry, correct?
11  A.     Correct.
12  Q.     And you have to indicate on there
13  whether you have any prior record, correct?
14  A.     I think it's with the sheriff's
15  department.
16  Q.     Okay.  With the sheriff's department you
17  have to indicate on that form whether you have a
18  prior record, correct?
19  A.     Correct.
20  Q.     And if you lie on that application in
21  order to get a license to carry, that's a crime in
22  and of itself, correct?
23  A.     Yes.
24  Q.     And in the 13 years you've been a

Page 76

1  trooper, have you ever arrested anyone for that?
2  A.     I have not.
3  Q.     Okay.  But you're aware that people get
4  arrested for that?
5  A.     Yes.
6  Q.     Okay.  In this case were you aware if
7  anyone in the residence had a license to carry?
8  A.     I know during the briefing multiple
9  people had a license to carry.
10  Q.     So, isn't it reasonable that -- that
11  none of those people had a prior criminal
12  record?
13  A.     Not that I know of.
14  Q.     In the briefing when they said that
15  there were guns there and people had a license to
16  carry, did you ask anyone whether any of those
17  people had a prior -- prior criminal record?
18  A.     I knew people had criminal records
19  within the residence, but I couldn't tell you
20  which ones.
21  Q.     Who did you know had a prior record?
22  A.     I know Mark did, Mark Anglemeyer.
23  Q.     Understood.  But of the people who had a
24  license to carry, did you identify any of them



Page 77

1  that had a prior criminal record?
2  A.    I don't believe so.  I don't know 100
3  percent.
4  Q.    Right.  So, the people that have a
5  license to carry, were -- were any guns registered
6  to them?
7  A.    Yes, I believe so.  There was multiple
8  people that had guns registered to them.
9  Q.    What is illegal about that?
10 A.    Nothing.
11 Q.    Okay.  So, in -- in your analysis, in
12 your briefing where you said there were people
13 with guns in the house what -- what -- what makes
14 that illegal?
15        MR. BRADFORD:  Objection to form.
16 You can answer.
17        THE WITNESS:  Repeat your question
18 there, sir.
19 BY MR. ZEIGER:
20 Q.    If multiple people in the residence had
21 a valid license to carry and firearms registered
22 to them, what -- how does that -- what is illegal
23 about that?
24 A.    I don't believe anything.

Page 78

1  Q.    Well, when I asked you about being
2  briefed and you said you were given all of this
3  information about this dangerous situation or
4  criminal activity is the fact that people had guns
5  that were validly registered and had a valid
6  license to carry, how does that contribute at all
7  to your analysis of what you're going to encounter
8  when you go into this house?
9         MR. BRADFORD:  Objection to form.
10 You can answer.
11        THE WITNESS:  Guns -- please
12 repeat.  The object -- that throws me off there.
13 I apologize.
14        MR. BRADFORD:  I'm going to object
15 to this argumentative question, but you can keep
16 going down this road if you want -- want to,
17 Brian.  Go ahead.
18 BY MR. ZEIGER:
19 Q.    You -- you said that when you were
20 briefed there were a list of factors that you were
21 given?
22 A.    Yes.
23 Q.    And one of the factors you were given
24 was that multiple people in the home had guns or

Page 79

1  there were multiple guns in the home; is that
2  correct?
3  A.    Yes.
4  Q.    Okay.  And I don't understand why that's
5  part of this analysis, so I'm asking questions
6  regarding that.  Okay?
7  A.    Okay.
8  Q.    Okay.  So I then asked you if you
9  checked to see if the people in the house had guns
10 registered to their names and a valid Pennsylvania
11 license to carry and you said yes to both of
12 those, correct?
13        MR. BRADFORD:  You're asking if he
14 personally did or if this information was
15 presented to him --
16        MR. ZEIGER:  I'd like to discover
17 that.  I'm trying -- I'm trying to get at why the
18 fact that someone has a valid license to carry
19 contributes to some kind of danger  --
20        MR. BRADFORD:  So you're asking
21 him why this information was presented to him is
22 the --
23        MR. ZEIGER:  How it's relevant to
24 him in his execution of the warrant is what I'm

Page 80

1  going to get at at the end of the question.  I'm
2  trying to lay a foundation so you don't object and
3  say there's no foundation.
4         MR. BRADFORD:  Okay.  Well, I'm
5  just trying to keep us all on the same page here.
6  You're mixing things up in your question.  Go
7  ahead.
8  BY MR. ZEIGER:
9  Q.    Understood.  So, let me just be clear.
10 You were unaware -- so, you were aware that people
11 had lawfully registered firearms in the property,
12 correct?
13 A.    Correct.
14 Q.    You were aware that people had a valid
15 license to carry in Pennsylvania who lived in that
16 property, correct?
17 A.    Right.
18 Q.    And you were unaware of any of those
19 people who had valid registered guns and/or valid
20 license to carry who had any criminal record,
21 correct?
22 A.    You said aware, correct?
23 Q.    What -- you -- you were not aware that
24 any of the people that had a registered firearm or



Page 81

1   a valid license to carry had any criminal record
2   in Pennsylvania, correct?
3   A.      I don't believe so.
4   Q.      Right.  So, the only person that was
5   identified by anyone as having anything to do with
6   methamphetamine was Mark Anglemeyer, correct?
7   A.      For certain, yes.
8   Q.      Okay.  So, tell me how it is that the
9   people who have lawfully registered firearms,
10  lawfully registered license to carry and no
11  criminal record somehow present some kind of
12  danger to your time when you enter the property?
13          MR. BRADFORD:  Objection to form.
14          THE WITNESS:  That's -- we had
15  an intel briefing, I believe it was like eight
16  adults -- during the briefing we were given an
17  intel of possibly eight adults being in the
18  residence.  And then it was broken down into --
19  into their background.  And that intel is usually
20  given by the negotiators of the team.
21  BY MR. ZEIGER:
22  Q.      I understand.  So, tell me how it is
23  that if any of the people other than Mark
24  Anglemeyer had guns, how -- how did that affect

Page 82

1   what was -- why was that a factor in -- in your
2   thinking about going into this property?
3   A.      That was intel that was passed on to us.
4   Q.      I understand.  But you were the highest
5   ranking person or one of the highest ranking
6   people that made entry into this property,
7   correct?
8   A.      No.  The team dynamic, there's -- the
9   rank structure is not within the SERT team.  So
10  the decision to make entry into this house would
11  have fallen -- the intel would have been given to
12  a team leader or the team coordinator or assistant
13  coordinator and then they would have went through
14  the chain of command within the structure of our
15  bureau -- bureau of emergency special operations.
16  Do you understand that?
17  Q.      I do.  But I still don't have an answer
18  to really the -- the foundational question here.
19  How did it contribute to the ideas of what you
20  might face when you go in, the fact that there
21  were law abiding citizens that had valid guns and
22  valid license to carry?
23          MR. BRADFORD:  Objection to form.
24          THE WITNESS:  That was intel that

Page 83

1   was passed to us by the -- by the people who did
2   the pre-plan for the -- for the warrant service.
3   BY MR. ZEIGER:
4   Q.      Corporal, I understand it was intel
5   passed to you.  But I'm asking you to tell me in
6   your own mind how that affected your mindset when
7   you went into the property?
8   A.      My mindset is always -- I mean, look at
9   the hands, make sure there's no weapons in the
10  hands.  I mean, I kind of have that mindset with
11  all the warrant services that I do.
12  Q.      I understand.  But with the exception of
13  one of the eight people there, you're not giving
14  me any information that you suspected any of these
15  other people of committing any kind of crime,
16  correct?
17  A.      Our -- our main job, as I said before,
18  is secure the residence.  And by doing that, we
19  secure all people with -- inside as well for
20  the -- for the safety of all, for them, as well as
21  us.  And then the investigation can come in and do
22  the rest on their part.
23  Q.      I understand.  But you said earlier that
24  one of the factors that you were given in intel

Page 84

1   that contributed to sort of your sense of what you
2   might face when you go in there were guns.  That
3   was your answer, right?
4   A.      Yeah, they told us guns was present,
5   correct.
6   Q.      Right.  So that put you on like a
7   heightened alert in some sense, correct?
8   A.      I was -- on all the warrants that we do
9   they're considered high risk.  I mean, I'm on
10  heightened alert no matter what -- what the
11  warrant is or what the service is.
12  Q.      So, the fact that some people have guns
13  in the house has no bearing on actually really
14  what you do when you go into that house because
15  every job you have, you're on the highest level?
16  A.      I feel like I am, yes.
17  Q.      Okay.  So, in this case whether there
18  were guns there or not wouldn't have made a
19  difference in -- in your actions, correct?
20  A.      I don't believe so.
21  Q.      And whether there were guns there that
22  were lawfully possessed guns or unlawfully
23  possessed guns would not have affected your
24  thinking before you went into that property,



Page 85

1 correct?
2 A. No.
3 Q. Okay.
4 A. Sorry for that miscommunication. I hope
5 I wasn't -- I don't know. I apologize for that.
6 Q. No, it's -- it's no problem. I'm just
7 having a very hard time wrapping my head around
8 the information that somehow because someone is
9 exercising their second amendment rights that
10 somehow causes the Pennsylvania State Police SERT
11 team to think that the people are dangerous
12 because you can't have a license to carry if
13 you're a criminal. So it's illogical. It doesn't
14 make any sense to me at all --
15        MR. BRADFORD: If you're a
16 criminal in the house with the lawful guns, you
17 could use the guns.
18        MR. ZEIGER: But that's a
19 violation of 6105, which is a felony -- you get
20 five to ten for that. You can't live with the
21 guns. So that person should be charged with that.
22 BY MR. ZEIGER:
23 Q. So, again, other than Mark Anglemeyer,
24 there's no other people that that applies to. So

Page 86

1 it's illogical to me. I don't understand it. So,
2 corporal, do you have any explanation as to -- to
3 why that would heighten yourself, you can -- can
4 you please give me that answer?
5 A. I'm at heightened for all of them. So
6 it -- it wouldn't have heightened it any more than
7 it already is.
8 Q. Pardon me for one second. Now, the
9 information that you received, there was no
10 allegation of any meth lab in the property upon
11 which you entered, correct?
12 A. I don't believe so.
13 Q. And there was no allegation of any
14 criminal activity taking place in the property in
15 which you entered, correct?
16 A. I don't believe so.
17 Q. Now, earlier you stated that you
18 believed there were three buildings on the parcel
19 of property, correct?
20 A. Correct.
21 Q. One you identified as a garage,
22 correct?
23 A. Correct.
24 Q. I'm sorry. Can you repeat your

Page 87

1 answer?
2 A. Correct.
3 Q. And by garage, it is a place where cars
4 are fixed or a place where cars are stored or
5 both?
6 A. I cannot tell you.
7 Q. Okay. The information that you had was
8 that whatever operation for methamphetamine was
9 occurring happened in the garage, correct?
10 A. I knew it was one of the out buildings.
11 I didn't know if it was -- I can't recall if it
12 was the garage.
13 Q. Okay. But, again, you had no
14 information that there was any criminal activity
15 taking place in the house where people were
16 living, correct?
17 A. Yes, it was unknown.
18 Q. Okay. And when you went in to the
19 house, did you personally observe any
20 methamphetamine operation?
21 A. I did not.
22 Q. Did you or any members of your team
23 recover any methamphetamine in the house where
24 people were living?

Page 88

1 A. I did not.
2 Q. Did you or any member of your team
3 recover anything that would contribute to some
4 type of manufacturing or delivery of
5 methamphetamine, for example, small baggies,
6 scales, scientific equipment?
7 A. I did not.
8 Q. Did you or any member of your team find
9 any United States currency that had been
10 previously marked by law enforcement, whether it's
11 your group of law enforcement or another?
12 A. I did not.
13 Q. Did you find any evidence at all of any
14 criminal conduct related to any kind of
15 methamphetamine operation in that residence where
16 people lived?
17 A. I did not.
18 Q. If you are aware, did any member of your
19 team find any information in that building where
20 people lived that had anything to do with any kind
21 of methamphetamine operation?
22 A. I did not.
23 Q. You did not. Okay. And regarding the
24 other building, are you aware that there was



Page 89

1 another SERT team that entered another building?
2 A.    Beside -- besides Pennsylvania State
3 Police?
4 Q.    No.  Pennsylvania State Police SERT team
5 entered another building as well?
6 A.    Just the three buildings that I
7 mentioned to you.
8 Q.    And those guys all worked with you?
9 A.    Yes.
10 Q.    Were they all part of the same
11 briefing?
12 A.    Yes.
13 Q.    Do you know -- if you know, did any of
14 those other state troopers that did not enter the
15 main residence encounter any human beings in any
16 of the other buildings?
17 A.    I do not recall.
18 Q.    Do you know if any of those other state
19 troopers that did not enter the main residence
20 found any evidence of any kind of methamphetamine
21 operation going on in any of the other
22 buildings?
23 A.    I don't know.
24 Q.    I couldn't understand your answer.

Page 90

1 A.    I do not know.
2 Q.    Do you know in the building you entered
3 if any other troopers that were part of your SERT
4 team in the residential building found any
5 evidence of any kind of methamphetamine operation
6 going on in that -- in that building?
7 A.    I do not know.
8 Q.    Are you aware of anyone other than
9 Richard Anglemeyer that was arrested for anything
10 related to any kind of methamphetamine
11 operation?
12 A.    I do not know.
13 Q.    Did you personally arrest anyone for
14 anything related to methamphetamine?
15 A.    I did not.
16 Q.    Did you observe any other troopers
17 arrest anyone other than Mark Anglemeyer for
18 anything related to any kind of methamphetamine
19 operation?
20 A.    I did not.
21 Q.    Did you arrest anyone, place anyone
22 under arrest for anything else or --
23 A.    I did not.  Sorry about that.  I did
24 not.

Page 91

1 Q.    No problem.  Now, earlier in your
2 deposition, there's just a couple of things I just
3 want to go back and try to tie up a little bit.
4 Okay.  You made some comment that the gentleman
5 that you hit with your shield was disobeying
6 commands and resisting.  Do you remember you said
7 that?
8 A.    Yes.
9 Q.    Did you arrest him for anything related
10 that conduct?
11 A.    I did not.
12 Q.    Why not?
13 A.    We -- our sole priority is to secure the
14 scene.
15 Q.    Well, what would happen if you secured
16 the scene but observed criminal conduct; what
17 would you do?
18 A.    If I observed criminal conduct?
19 Q.    Yes.
20 A.    Report that to the investigating
21 agency.
22 Q.    Did you do that in this case?
23 A.    I did not.
24 Q.    Well, what if the person took a swing at

Page 92

1 you, what would you do then?
2 A.    Report that to the investigating
3 agency.
4 Q.    So -- so if you were injured and you
5 wanted the person charged with aggravated assault
6 against law enforcement, you would not make an
7 arrest for that?
8 A.    Repeat?
9 Q.    If you were assaulted by someone while
10 executing a warrant and you wanted to arrest that
11 person for assault on a police officer, what would
12 you -- what would you do?  Would you arrest them
13 or would you have to report that as well?
14 A.    That would fall -- you would report
15 that.
16 Q.    So, everything would get reported?
17 A.    Correct.
18 Q.    And in this case -- I might have just
19 asked this.  I apologize.  I just can't remember.
20 Did you report anything in this case?
21 A.    I reported in my callout report, what
22 was in there.
23 Q.    Did you say to anyone this guy should be
24 arrested for -- for something regarding not



Page 93

1  following the commands and resisting?
2  A.    I did not.
3  Q.    Why not?
4  A.    Our -- because we were secure -- we
5  wanted to get control of the scene, so that was
6  our main priority is secure and control the scene.
7  Q.    But if he was resisting arrest, that's a
8  crime in Pennsylvania; you would agree, right?
9  A.    It's not -- it is a crime in
10  Pennsylvania, I do agree.
11  Q.    And you did not recommend an arrest for
12  that in this case?
13  A.    He was not under arrest. We were trying
14  to gain control of the scene.
15  Q.    What about disorderly conduct?
16  A.    We were -- I mean, we could sit here
17  with the crimes code and go over that, but I mean,
18  our main goal was to control -- to secure the
19  scene and that's -- that's what we did.
20  Q.    So, you just chose not to recommend an
21  arrest?
22  A.    No.
23  Q.    Now, let's go back to this again. So,
24  these lights on the shield, how far out do they

Page 94

1  protrude off the shield?
2  A.    Approximately 2 inches.
3  Q.    And are they circular or square?
4  A.    Ours are square.
5  Q.    Any edges on them?
6  A.    They are covered by like a cage.
7  Q.    Okay. And describe the cage?
8  A.    It's a metal, kind of puts -- a wire
9  that like kind of protects from the sharp edges.
10  Q.    I'm going to ask your attorney to
11  provide me with a picture of the shield just as a
12  future --
13        MR. BRADFORD: There's a picture
14  in the videos.
15  BY MR. ZEIGER:
16  Q.    Okay. But if there's a picture of one,
17  I would be grateful if your attorney could get me
18  one. I'll ask you that in a cordial and
19  cooperative way without --
20        MR. BRADFORD: You know I'm always
21  cordial and cooperative, Brian.
22        MR. ZEIGER: As am I. As am I.
23  BY MR. ZEIGER:
24  Q.    So, to your knowledge, the person that

Page 95

1  you struck with the shield, did that cage come in
2  contact with that person's body?
3  A.    First I wouldn't say struck. Come in
4  contact with but, yes, it did come in contact with
5  his body, the shield did.
6  Q.    And I may have asked you this already.
7  But did you report that force? Did you self
8  report that force?
9  A.    Yes. That would have been in my callout
10  report.
11  Q.    And in that concise officer history that
12  I showed you, if -- if you know, should it be in
13  there?
14  A.    No, because I didn't know if there --
15  no.
16  Q.    Why not? Why is it not in there?
17  A.    Well, it could be in there, but I was
18  never interviewed by IAD.
19  Q.    I see. Let me -- I'm going to scroll --
20  I don't want to make you -- okay. I'm going to
21  represent, to speed this up, that these are in
22  chronological order on this report. Okay. So you
23  don't have to go through every page. On your
24  screen do you see where it says October 3, 2017?

Page 96

1  A.    Yes.
2  Q.    And then the next one after that says
3  October 16, 2019?
4  A.    Okay.
5  Q.    It's fair to say there's nothing in here
6  from February of 2018, correct?
7  A.    No.
8  Q.    Okay. So, the -- use of the shield
9  against whatever this gentleman's name is is not
10  reported on here, correct?
11  A.    Correct.
12  Q.    So, you did not self report through this
13  blue box system, correct?
14        MR. BRADFORD: Objection to form.
15        THE WITNESS: No.
16  BY MR. ZEIGER:
17  Q.    And your supervisor didn't report you on
18  here for use of force, either, correct?
19  A.    He did not.
20  Q.    So, a couple of more questions and then
21  I think we're going to be at the very end here.
22  So, are -- are you aware there is a use of force
23  policy for the Pennsylvania State Police?
24  A.    Yes, sorry, yes.



Page 97

1   Q.      Can you tell me what it is?
2   A.      It's our FR9-3, it's our use of force
3   policy.  Basically we're allowed to use reasonable
4   force with the totality of circumstances in
5   performance of our duty for lawfully -- for lawful
6   objectives.
7   Q.      Okay.  And are you -- are you aware of
8   the term excessive force?  Have you heard that
9   term before?
10  A.      I have.
11  Q.      Okay.  And do you know what the
12  Pennsylvania State Police policy is regarding
13  excessive force?
14  A.      No -- well, no use of force policy is
15  allowed -- no excessive force is allowed.
16  Q.      Why is that, if you know?
17  A.      Because you are only supposed to use the
18  reasonable force for -- to come to a lawful
19  objective.
20  Q.      And, so, you're aware in your capacity
21  as a corporal or state trooper for the last 13
22  years that you are not allowed to use excessive
23  force, correct?
24  A.      Correct.

Page 98

1   Q.      And you know that that is a rule in our
2   community, right?
3   A.      I do.  I do.
4   Q.      Okay.  And other than a methamphetamine
5   operation by this gentleman, Mark Anglemeyer, were
6   you aware of any other crimes that were being
7   alleged in your -- in your briefing before you --
8   you entered on the SERT team?
9   A.      I do not recall any other crimes being
10  mentioned.
11  Q.      Okay.  And when you -- and the crime,
12  actually, that was -- Mark Anglemeyer was being
13  accused of was manufacturing, possession with the
14  intent to deliver narcotics, to wit,
15  methamphetamine.  That's what he was -- that was
16  the allegation, right?
17  A.      Yes.
18  Q.      And that's the only one?
19  A.      I believe so.  I can't recall what --
20  what all crimes were mentioned.  I -- that one was
21  mentioned for sure.
22  Q.      When you entered the property, you did
23  not see any immediate threat to yourself; did
24  you?

Page 99

1   A.      The male who disobeyed commands.
2   Q.      Explain your answer.  How was that an
3   immediate threat to you?
4   A.      Basically our -- our job is to
5   secure/control this residence.  And that, like
6   I -- I mentioned before is all the people inside.
7   And he just disobeyed commands and -- and left
8   that area.
9   Q.      Did you have a picture of Mark
10  Anglemeyer shown to you before you went into the
11  property?
12  A.      Yes.
13  Q.      So, you had an idea what Mark Anglemeyer
14  looked like before you went into the property,
15  right?
16  A.      Yes.
17  Q.      When you saw that man disobey, was it
18  Mark Anglemeyer who disobeyed you?
19  A.      It was not.
20  Q.      Okay.  So, you had no information on
21  that person being dangerous at all; did you?
22  A.      Which person?
23  Q.      The person that you encountered that was
24  disobeying your commands, you had no previous

Page 100

1   information that person was part of any kind of
2   criminal enterprise on the day in question; did
3   you?
4   A.      I don't recall.
5   Q.      You had no information that he was
6   involved in any -- whomever you saw, he was
7   involved in any kind of methamphetamine operation,
8   correct?
9   A.      Yes.  I can't recall this fellow's
10  identity.
11  Q.      Understood.  But the only person you had
12  information on that was suspected of committing a
13  crime was Mark Anglemeyer, correct?
14  A.      Correct, for purposes of that search.
15  Q.      And you had a picture of him, right,
16  before you went in?
17  A.      Yes.
18  Q.      And when you went into the house, the
19  person you encountered that was ignoring your
20  commands was not Mark Anglemeyer, right?
21  A.      No.
22  Q.      So, what evidence did you have of that
23  gentleman being an immediate threat to you?
24  A.      Just that he failed to obey all commands



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
101–104

Page 101

1  and basically give up the structure.
2  Q.      He didn't run from you; did he?
3  A.      He moved in a quickened pace. I believe
4  I said run in my -- in my report.
5  Q.      Did he try to get out of the room he was
6  in?
7  A.      Yes, he did get out of the room he was
8  in.
9  Q.      Did he get out of the house?
10  A.      No.
11  Q.      Okay.  And did he pull a weapon on
12  you?
13  A.      He did not.
14  Q.      Did you see a gun or knife in his
15  hand?
16  A.      I did not.
17  Q.      Did he have any kind of attack dog or
18  anything like that with him?
19  A.      I didn't -- no.
20  Q.      Okay.  Would you say -- so, when you're
21  in the room with him when you used the shield, is
22  he talking back to you or is he trying to get out
23  of the room?
24  A.      He's kind of deep in the room and I'm

Page 102

1  just giving him simple commands that he's just
2  failing to following.
3  Q.      So, it's -- it's doorway -- it's hall --
4  it's wall four, doorway, kitchen, living room,
5  poolroom; is that the correct order?
6  A.      So, we went in, it was the kitchen room
7  and then me and Corporal Schimp went to the right
8  and it kind of went -- there was like another
9  threshold and that went into the living room.
10  Q.      And then next to the living room, is
11  that the pool room?
12  A.      Yes, deep in the structure was the pool.
13  Q.      Is there any room between the living
14  room and the pool room?
15  A.      Yes.  There was a bedroom.
16  Q.      Okay.  Is there a hallway between the
17  living room and the bedroom and the pool room?
18  A.      I believe so.
19  Q.      And the gentleman that you used force
20  against, did you -- did you see him once you're in
21  the living room trying to get into that hallway?
22  A.      No.
23  Q.      So, he wasn't trying to run away from
24  you or escape from you from that living room once

Page 103

1  you were in there with that shield, correct?
2  A.      I don't know.
3  Q.      But did you see him trying to run?
4  A.      Yes, he ran from the first room to the
5  second.
6  Q.      I understand.  I'm asking about the
7  second room.  Once you're in the second room with
8  him and you have the shield up, do you -- do you
9  see him trying to run from the -- from the second
10  room to another room out of that room?
11  A.      No.
12  Q.      Okay.  Is he saying anything to you at
13  that point in time?
14  A.      Not that I can make out.
15  Q.      Are you telling him you have a
16  warrant?
17  A.      State Police search warrant multiple
18  times, show your hands, get on the ground.
19  Q.      Okay.  And, again, as far as any kind of
20  resisting arrest goes, you claim that that is not
21  possible because he wasn't under arrest, so you
22  couldn't arrest him for resisting an arrest that
23  didn't occur; is that right?
24  A.      Yes.  He was -- yes, he was resisting

Page 104

1  commands, not following commands, just
2  disobedient.
3  Q.      Okay.  But, Corporal, it's really
4  important for me.  Okay.  There's a huge
5  difference for me between resisting arrest like a
6  crime in Pennsylvania under the crimes code and
7  just being resistant to your commands.  They are
8  not the same thing.  Do you understand -- do you
9  understand that they're not the same thing?
10  A.      Resist, resisting arrest --
11  Q.      So, resisting arrest is a crime in
12  Pennsylvania --
13  A.      Yes.
14  Q.      -- that's criminal conduct, right?
15  A.      Yes.
16  Q.      Resisting your commands is not a crime
17  and it's not criminal conduct.  Do you understand
18  that?
19  A.      Correct.
20  Q.      Okay.  But I'm asking you to distinguish
21  between the two in this case.  And previously you
22  told me he was not resisting arrest because he
23  wasn't under arrest for anything because he wasn't
24  a suspect of doing anything wrong.  Is that still



Page 105

1  correct?
2  A.      Yes, he was not under arrest for
3  anything.
4  Q.      Right.  And, so, he wasn't resisting
5  arrest in any way as a result of that, correct?
6  A.      Correct.
7          MR. BRADFORD:  For crimes code
8  purposes.
9          MR. ZEIGER:  For crimes code
10  purposes, that's what I'm asking, exactly.
11  BY MR. ZEIGER:
12  Q.      Is that right, Corporal?
13  A.      Yes, he was not resisting arrest.
14  Q.      He was resisting your commands,
15  though?
16  A.      Correct.
17  Q.      Okay.  And you had no information that
18  this individual, whomever he was, was violent or
19  dangerous; did you?
20  A.      No, it was unknown.
21  Q.      Okay.  And the duration of time it took
22  from once you entered the building until he left
23  the kitchen, how much time passed?
24  A.      There was seconds --

Page 106

1  Q.      I didn't hear you.
2  A.      It was sudden.
3  Q.      Less than five seconds?
4  A.      Yes.
5  Q.      Then when you were in the living room
6  next to the kitchen, how long was it from the time
7  you entered that room until your shield touched a
8  part of his body?
9  A.      I can't give a time frame.  It was
10  quick.
11  Q.      Less than ten seconds?
12  A.      Yes.
13  Q.      So, from the time you entered the room
14  on wall four until the time he was on the ground
15  with your shield on top of him, was it -- it would
16  have to have been less than 15 seconds; is that
17  fair to say?
18  A.      Yes.
19  Q.      Okay.  And when you took the shield and
20  you -- you put the shield on his person, that was
21  not part of you arresting him, correct?
22  A.      That was to gain control of the subject.
23  Q.      So, the answer to my question is, no, it
24  was not part of you arresting him?

Page 107

1  A.      No, I did not arrest him.
2  Q.      And other than that gentleman, was there
3  anyone else in the kitchen when you entered?
4  A.      Not that I seen or witnessed.
5  Q.      And when you went into the living room
6  with him next to the kitchen, were there any other
7  people in the living room?
8  A.      There was another -- another male that
9  appeared later.
10  Q.      Was this before or after your shield was
11  on the man we're talking about?
12  A.      I -- I can't recall.
13  Q.      So, it could have been before, during or
14  after, you're not sure?
15  A.      My focus was on the party I was dealing
16  with.  And then they had another person on the
17  ground.  It would have probably been after.
18  Q.      And can we -- let's break that down.
19  You used a lot of pronouns there.
20  A.      Okay.  I apologize.  I cut you off
21  there.  I'm sorry.
22  Q.      No.  You explain.
23  A.      I went in.  I was there with this
24  individual.  As I was dealing with him, he come to

Page 108

1  the ground, and then the other -- the other male
2  appeared.
3  Q.      So, at the time that your shield made
4  contact with this person's body, there was no one
5  else in that living room, correct?
6  A.      Not that I witnessed.
7  Q.      Okay.  And when you entered the kitchen,
8  were you able to see the man's hands before he
9  started to walk away from you?
10  A.      I can't recall.
11  Q.      Did you notice a weapon in his hands,
12  any type of weapon?
13  A.      No.
14  Q.      And when he went in the living room, did
15  you notice any type of weapon on his person?
16  A.      No, there was no weapon on -- in his
17  hands.
18  Q.      And you never saw him go for a weapon
19  anywhere, correct?
20  A.      No.  His attention was towards us.
21  Q.      And when you finally got your shield on
22  him and he was zip tied, no weapon was recovered
23  from him, correct?
24  A.      Not that I know of.



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
109–112

Page 109

1  Q.      Other than Mark Anglemeyer, you had no
2  information that anyone else in the property was
3  violent or dangerous, correct?
4          MR. BRADFORD: Objection to form.
5          THE WITNESS: It was unknown.
6  BY MR. ZEIGER:
7  Q.      Okay. So, the answer to my question is,
8  no, you didn't have any affirmative information
9  that anyone was violent or dangerous before --
10         MR. BRADFORD: Objection to the
11 form.
12         THE WITNESS: It was unknown at
13 that point.
14 BY MR. ZEIGER:
15 Q.      I mean, unknown means you didn't know or
16 you didn't have any information --
17 A.      I mean, it was unknown.
18 Q.      Okay. If the person who was hit with
19 this shield -- I'm going to use the word hit. If
20 the person who -- who made contact with this
21 shield that you had on your person claims they
22 were injured as a -- as a result of this incident,
23 what is your response to that statement?
24 A.      I did not know of any injuries of that

Page 110

1  day.
2  Q.      If they were injured as a -- as a result
3  of that, are you sorry for causing that injury?
4          MR. BRADFORD: Object to form.
5  Don't answer that. That's a silly question.
6  BY MR. ZEIGER:
7  Q.      All right. Now, this other Corporal
8  King that we talked about, is he -- is he the --
9  the only African American trooper that was on --
10 in that group?
11 A.      Yes, I believe -- there may have been
12 two on the team. I can't recall if there's -- if
13 Brian was the only -- Corporal King was the only
14 African American at that point or not.
15 Q.      And if there was another African
16 American on the team, would they have been the
17 same size as him or is he like one of the biggest
18 guys around?
19 A.      He's the bigger of the two black guys.
20 Q.      And -- and is Corporal King also bigger
21 than everyone else there regardless of their race
22 or nationality?
23 A.      He's -- he's a bigger individual, yes.
24 Q.      Did you hear Corporal King say anything

Page 111

1  to anyone during this take down of this house?
2  A.      I did not.
3  Q.      Did you see Corporal King at all in this
4  -- in this house at all?
5  A.      Not that I can recall.
6  Q.      And as far as the gentleman that your
7  shield touched, you never saw him placed in a
8  chair anywhere?
9  A.      I did not.
10         MR. ZEIGER: Thank you very much.
11 I have no further questions. Please be safe.
12 BY MR. BRADFORD:
13 Q.      Corporal, I have a couple of things to
14 clear up here. Corporal, how many SERT jobs are
15 you involved in, we'll say annually?
16 A.      With last year or this year, we're --
17 we're going to be well over 100 --
18 Q.      So --
19 A.      -- each year.
20 Q.      Each year about 100?
21 A.      Well over 100.
22 Q.      When we talked about that -- that the --
23 it was actually dark out when you entered the
24 house?

Page 112

1  A.      Yes, I believe so.
2  Q.      What were the conditions inside of the
3  house, in the kitchen or the living room
4  specifically where -- where you saw the male that
5  you made contact with?
6  A.      I know I was using the light on my
7  shield and then the light on my weapon as well.
8  And I was using them to illuminate -- illuminate
9  the room. I apologize. I just messed up my
10 screen here.
11         MR. BRADFORD: Off the record for
12 a second.
13         (Discussion off the record.)
14 BY MR. BRADFORD:
15 Q.      Corporal, did you know if the gentleman
16 that you had contact with had a firearm on his --
17 on his person anywhere when you encountered him?
18 A.      I did not.
19 Q.      Do you know whether when you encountered
20 him and when you made contact with him with the
21 shield, that -- whether or not there was a firearm
22 within -- within arm's reach of him?
23 A.      I did not.
24 Q.      Could you see the entire room when you



Page 113

1  had -- when you made contact with him with the
2  shield, had you looked at the entire room for
3  firearms?
4  A.    I did not.  A quick scan for people.
5  Q.    Did you know if -- did you know if
6  anyone else was in that living room when you were
7  making contact with the gentleman you -- the
8  male?
9  A.    I did not witness anyone.
10  Q.    Mr. Zeiger asked you about how someone
11  would be able to identify you.  Is it fair to say
12  your report described in great detail what you did
13  once you entered that house and -- and who you
14  encountered?
15  A.    Yes.
16  Q.    And you described that again today in
17  great detail?
18  A.    Yes.
19  Q.    Did -- so, did -- did any other male
20  residents in the house have a shield made contact
21  with them in the living room on the lower level
22  that you recall?
23  A.    I don't believe so.
24  Q.    So, if one person had his shield made

Page 114

1  contact with them in the house, in the living room
2  on the lower level, that person would know who you
3  were?
4  A.    Yes.
5  Q.    Mr. Zeiger asked you questions about
6  that briefing and asked you -- tested your memory
7  on that.  That -- that briefing was videotaped,
8  correct?
9  A.    It was.
10  Q.    And there was several videos, there was
11  eight videos of the briefing and then four videos
12  of the -- of rehearsal.  Do you recall that?
13  A.    I know there was -- there was a lot.
14  Q.    And those were all provided to
15  plaintiffs' counsel in the course of discovery to
16  this point.  Were you present for the -- that
17  entire briefing, at least the parts that were
18  captured on videotape?
19  A.    Yes, I was.
20  Q.    So, is it fair to say the information
21  that was relayed to you that is caught on --
22  captured by that video, you were -- you were
23  present, you had that information at your disposal
24  at the -- the morning you actually conducted the

Page 115

1  search warrant?
2  A.    Yes.
3  Q.    And now are you sure that none of the
4  other -- let's put it this way.  There was --
5  there was a number of residents that were -- a
6  number of individuals that were supposed to be
7  inside that residence, correct?
8  A.    Correct.
9  Q.    Now, did you know whether those would be
10  the only people in the residence or that there
11  could be other people in the residence?
12  A.    There's always the chance that there are
13  additional people in the residence.
14  Q.    And we talked about how Mark Anglemeyer
15  had a record and was not allowed to possess
16  firearms.  Do you know if any of the other
17  residents actually had a criminal record that
18  were -- at least the residents that were presented
19  to you during that briefing?
20  A.    I believe there was multiple individuals
21  with criminal histories.
22  Q.    And these individual, the people with
23  criminal histories and the people without criminal
24  histories were all located somewhere in this

Page 116

1  house, right?
2  A.    Correct, I believe so.
3  Q.    And you had information that there was a
4  number of firearms in this house?
5  A.    Yes.
6  Q.    And someone who is not allowed to use a
7  firearm could easily get a firearm if it's in the
8  house with him, right?
9         MR. ZEIGER:  Objection.  Calls
10  for speculation.  You can answer.
11         MR. BRADFORD:  You've been
12  speculating all day.
13  BY MR. BRADFORD:
14  Q.    The -- and if someone -- if someone has
15  a -- lawfully possess a firearm, they certainly
16  can use it for an unlawful purpose; is that fair
17  to say?
18  A.    Yes.
19  Q.    Is it -- is it a concern to you that --
20  whether or not there's guns in the house when
21  you -- when you participate in a search warrant as
22  part of SERT?
23  A.    Yes.
24  Q.    I guess if you don't have information



ROBERT MCGARVEY
ANGLEMEYER vs NORTHAMPTON COUNTY

August 27, 2020
117–120

Page 117

1  that there's -- there's firearms in the house, you
2  still assume there could be, correct?
3  A.      Yes.
4  Q.      Do you know how many guns were actually
5  recovered from this house?
6  A.      I do not.
7  Q.      Did you know much about the layout of
8  the house before you went into it?
9  A.      No.
10 Q.      And presumably the residents were pretty
11 familiar with that?
12 A.      Correct.
13 Q.      And just to be clear, did you know one
14 way or another whether -- with the information
15 that was shared to you during the briefing, did
16 the information provided indicate one way or
17 another whether -- whether the other individuals
18 besides Mark Anglemeyer were actually part of the
19 meth operation?
20 A.      It was unknown.
21 Q.      So, they could have or they couldn't
22 that, you just didn't -- that was the -- that was
23 the information that was presented?
24 A.      Yes.

Page 118

1  Q.      So, it's fair to say that the -- the
2  information that is presented on the video is the
3  information that is presented to you?
4  A.      Yes, correct.
5  Q.      And before that briefing at 04:00 hours
6  that morning, did you have any information at all
7  about these people?
8  A.      I did not.
9  Q.      Did you participate in the local county
10 investigation that led to SERT --
11 A.      I did not.
12 Q.      After you left the scene, did you
13 participate in any fashion in any criminal charges
14 that resulted from this search warrant?
15 A.      I did not.
16 Q.      When you -- when there's a use of force
17 by yourself, Mr. Zeiger said, you know, you report
18 that as self reporting, so you report that to your
19 supervisor; it that the process?
20 A.      Yes.  And that would have been done via
21 my callout report.
22 Q.      And then your supervisor who reviews the
23 callout report then decides this is something that
24 warrants a blue team action; is that fair to

Page 119

1  say?
2  A.      Yes, I believe so.
3  Q.      You don't decide, the supervisor
4  decides?
5  A.      Yes.
6  Q.      Do you know if -- so, did I ask this?
7  Do you know if there were any arrests that day
8  as -- of any of the residents at the house?
9  A.      I do not.
10        MR. BRADFORD:  I'm done.  Thank
11 you.
12 BY MR. ZEIGER:
13 Q.      Were you aware that there was -- the
14 allegation in this case from the locals who called
15 you all was that the methamphetamine operation was
16 in the garage?  Are you aware of that?
17 A.      I believe that was mentioned in the
18 briefing, yes.
19 Q.      Okay.  And are you aware that there was
20 no allegation from the locals that there was any
21 criminal conduct occurring in the house?
22 A.      I can't recall.
23 Q.      Do you know -- let me -- let me make a
24 statement and then I'm going to ask you a

Page 120

1  question.  I'm going to tell you that the
2  allegation was that there was a methamphetamine
3  operation in the garage, and that there was no
4  allegation of any criminal conduct in the house.
5  I am going to state those facts.  Okay.  If that's
6  true, do you know why there would have been a SERT
7  team that entered the house?
8  A.      Because there was a search warrant for
9  the house.
10 Q.      Based on your experience would it have
11 been safe for you to just enter the garage without
12 entering the house?
13        MR. BRADFORD:  Objection to form.
14        THE WITNESS:  I don't comment on
15 other people's investigations.  This was their
16 investigation and I know there was paperwork that
17 three structures were to be searched and secured
18 and we were requested to the help out with that.
19 BY MR. ZEIGER:
20 Q.      So, you were never told in any kind of
21 briefing, hey, we think the meth lab is in the
22 garage but there's all of these people in this
23 other house so we better take down both structures
24 simultaneously?



Page 121

1          MR. BRADFORD:  Objection to form.
2  You can answer.
3          THE WITNESS:  We were told we had
4  three structures on the search warrant.  And
5  during our briefing we briefed the three
6  structures that we would -- we would secure.
7          MR. ZEIGER:  I have nothing
8  further.  Thank you.
9          THE VIDEO TECHNICIAN:  We ask
10  that all participants to stay connected briefly to
11  provide your transcript and video orders.  Mr.
12  Zeiger, would you like a copy of the transcript
13  and/or video?
14          MR. ZEIGER:  I would like a mini
15  script and video, and I would like both via email
16  if possible.  No hard copies if possible.
17          MR. BRADFORD:  You can do the
18  same for me.
19          THE VIDEO TECHNICIAN:  We are now
20  going off the record on August 27th at 12:13 p.m.
21          (Witness excused.)
22          (Deposition concluded at 12:13
23  p.m.)
24

Page 122

1          C E R T I F I C A T E
2
3          I hereby certify that the witness
4  was duly sworn by me and that the deposition is a
5  true record of the testimony given by the witness.
6
7
8
9          _____
10          Dolores M. Horne
11          Dated:  September 2, 2020
12
13
14
15  (The foregoing certification of this transcript
16  does not apply to any reproduction of the same by
17  any means, unless under the direct control and/or
18  supervision of the certifying shorthand reporter.)
19
20
21
22
23
24

