```
                                                  Page 1
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3   ADA ANGLEMEYER, et al)
 4                        )
 5     - vs -             ) No. 19-3714
 6                        )
 7   NORTHAMPTON COUNTY,  )
 8   et al                )
 9
10
11           Videotaped Video Teleconference
12   Deposition of JASON PELOTTE, held on August 27,
13   2020, at 2:34 p.m., before Dolores M. Horne,
14   Professional Reporter and Notary Public, in and
15   for the Commonwealth of Pennsylvania.
16
17
18           ESQUIRE DEPOSITION SOLUTIONS
19           1835 Market Street, Suite 555
20           Philadelphia, Pennsylvania  19103
21               215-988-9191
22
23
24
```

```
                                                  Page 2
 1   APPEARANCES:
 2
 3           THE ZEIGER FIRM
 4           BY:  BRIAN ZEIGER, ESQUIRE
 5           1500 John F. Kennedy Boulevard
 6           Suite 620A
 7           Philadelphia, Pennsylvania  19103
 8           (215) 546-0340
 9           Attorneys for the Plaintiffs
10
11
12
13           PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
14           BY:  KEVIN BRADFORD, ESQUIRE
15           1600 Arch Street
16           Suite 300
17           Philadelphia, Pennsylvania  19103
18           (215) 560-1031
19           kbradford@attorneygeneral.gov
20           Attorneys for the Defendants
21
22
23
24
```

```
                                                  Page 3
 1                    I N D E X
 2   WITNESS      EXAMINATION        PAGE
 3   JASON PELOTTE
 4
 5           By:  Mr. Zeiger          5
 6           By:  Mr. Bradford        32
 7
 8              E X H I B I T S
 9   NO.            DESCRIPTION           PAGE
10   Pelotte 1      Callout Report        18
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                  Page 4
 1           DEPOSITION SUPPORT INDEX
 2
 3   Direction to Witness Not to Answer
 4   Page    Line    Page    Line    Page    Line
 5
 6
 7
 8   Request for Production of Documents
 9   Page    Line    Page    Line    Page    Line
10
11
12
13   Stipulations
14   Page    Line    Page    Line    Page    Line
15
16
17
18
19   Question Marked
20   Page    Line    Page    Line    Page    Line
21
22
23
24
```



SUMMARY JUDGMENT EXHIBIT 10

Page 5

1   THE VIDEO TECHNICIAN: We are now
2 on the record. The time is now 2:34 on August 27,
3 2020. This begins the video conference deposition
4 of Jason Pelotte taken in the matter of Ada
5 Anglemeyer, et al, versus Northampton County, et
6 al, filed in the US District Court, Eastern
7 District of Pennsylvania, case number is or Civil
8 Action No. 19-3714. My name is George Ellis. I'm
9 your remote videographer today. The court
10 reporter is Dolores Horne. We are representing
11 Esquire Deposition Solutions.
12        Counsel, please state your name
13 and who you represent after which the court
14 reporter will swear in the witness.
15        MR. ZEIGER: Good morning -- good
16 afternoon, Brian Zeiger for the plaintiffs.
17        MR. BRADFORD: Kevin Bradford for
18 the remaining defendants.
19        JASON PELOTTE, after having been
20 first duly sworn, was examined and testified as
21 follows:
22             * * *
23        EXAMINATION
24             * * *

Page 6

1 BY MR. ZEIGER:
2 Q.    Good afternoon, Trooper. It's corporal?
3 A.    Correct.
4 Q.    Do you remember being on duty on
5 February 23rd of 2018 working as a Pennsylvania
6 State trooper?
7 A.    I do.
8 Q.    And do you recall being briefed about an
9 assignment for the SERT team at 04:00 hours?
10 A.   Yes, sir.
11 Q.   And as a result of whatever that
12 briefing was, did you have an opportunity to go to
13 a house to execute a warrant located at 340 Old
14 Allentown Road in Bushkill Township Northampton
15 County, Pennsylvania?
16 A.   Yes, sir.
17 Q.   Okay. And as a result of that were you
18 working on the SERT team?
19 A.   Yes, sir.
20 Q.   And did you enter the -- the home, the
21 living home where people were living as -- as part
22 of your job at 6:00 a.m. in the morning?
23 A.   Yes, sir. Probably like 6:05.
24 Q.   Understood. And were you one of the

Page 7

1 people that entered the home?
2 A.    Yes, sir.
3 Q.    And when you entered the home, did you
4 use any force?
5 A.    No, sir.
6 Q.    You didn't use any force against
7 anyone?
8 A.    No, sir.
9 Q.    Did you observe any other troopers use
10 any force against anyone?
11 A.   No, sir.
12 Q.   Pardon me, Trooper.
13        MR. ZEIGER: Could we go off the
14 record for a second.
15        THE VIDEO TECHNICIAN: Off the
16 record. The time is 2:37.
17        (Whereupon a break wa taken.)
18        THE VIDEO TECHNICIAN: We're back
19 on the record. The time is 2:39.
20 BY MR. ZEIGER:
21 Q.   Trooper, I apologize for that. We're
22 back on record. Okay. Did you have any physical
23 contact with any human beings that were not state
24 troopers at the time the SERT team entered?

Page 8

1 A.    As I went through the -- I went in
2 through the ground level, sir. And as I moved
3 past, there's -- there was a closet off to my left
4 towards the front of the house. There's a closed
5 door. I opened it. It looked like a walk-in
6 closet fashioned into a bedroom. There's a
7 mattress on the floor and there was like a tiny
8 little man in there, older. I mean, he was
9 getting up out of bed. I asked him to get up. I
10 felt bad for him. I moved him into the living
11 room area where other people were being proned
12 out, and I laid him down on the ground.
13 Q.   What does proned out mean?
14 A.   Proned out is laying down in a position
15 of disadvantage, your chest to the ground, you
16 know, hands behind, up on your head.
17 Q.   And this man, was he a senior citizen?
18 A.   I would guess but I do not know.
19 Q.   Do you know his name?
20 A.   I don't.
21 Q.   If I said his name was Richard
22 Anglemeyer, would that refresh your
23 recollection?
24 A.   I don't -- I don't recall his name.



Page 9

1  Q.    Okay. Did he seem disoriented or
2  confused?
3  A.    Yeah.
4  Q.    Did he seem like someone who might have
5  dementia or Alzheimer's?
6  A.    I don't -- I can't speak to that. I'm
7  not a doctor. Like he seemed like an old guy, you
8  know. I kind of treated him with kid gloves
9  because of it.
10 Q.    I see. Did you have any physical
11 contact with anyone else?
12 A.    No, sir.
13 Q.    And that older gentleman, you put him on
14 the ground?
15 A.    I didn't really have to touch him.
16 Like -- I was like come on out of here. I was
17 talking to him, like you talk to somebody. He
18 wasn't quite understanding. Come out here, you
19 know and then lay down on the ground. And he did.
20 He was -- he complied. So then I passed him off
21 and moved on.
22 Q.    Did you put handcuffs on him?
23 A.    I did not.
24 Q.    Did you put zip ties on him?

Page 10

1  A.    I did not.
2  Q.    Did you see anyone handcuff him or zip
3  tie him?
4  A.    No. I was the team leader, so I kind of
5  moved on to the next area.
6  Q.    How many team leaders were there?
7  A.    One for the ground floor and one for the
8  upper floor.
9  Q.    How many people entered that residence?
10 A.    I couldn't tell you without looking.
11 Q.    More than 20 or less than 20?
12 A.    Probably around 20, actually.
13 Q.    Okay. So, you were responsible for
14 about half of those? You were the team leader for
15 about half of those?
16 A.    Correct.
17 Q.    And when you put the old man on the
18 ground, did he complain of any pain or anything
19 like that?
20 A.    No, sir.
21 Q.    Did he say anything about his knee?
22 A.    No, sir.
23 Q.    And you never put him in a chair?
24 A.    I did not put him in a chair. We put --

Page 11

1  we put them immediately -- we prone everybody on
2  the ground immediately for -- for two reasons.
3  You know, first it's for safety in case there's
4  any gunfire or anything that would happen up
5  around, you know, the guest or higher level and,
6  second, it's a position of disadvantage because
7  anybody can -- so we don't want them to be able to
8  get at anything quickly.
9  Q.    Is there another trooper there named
10 Brian King?
11 A.    Yes, sir.
12 Q.    Was he standing with you when you put
13 the older gentleman in the prone position on the
14 ground?
15 A.    He was in that living room. I'm not
16 sure if he was dealing with -- there's another
17 male there, older male. But I believe he's the
18 one that, you know, said I got him. Like he's
19 good.
20 Q.    Can you explain what -- I'm not good
21 with pronouns. It really confuses me.
22 A.    Okay.
23 Q.    Maybe I'm getting old. But then I'm
24 like -- my brain doesn't function right. Can you

Page 12

1  just give the same answer again but say the names
2  of the people?
3  A.    Okay. What was the older man's name?
4  Q.    Well, I believe his name is Richard
5  Anglemeyer.
6  A.    Okay. Well, the little old guy that --
7  when I escorted him out of the closet and put down
8  on the floor, proned him out, he was in -- he was
9  brought -- the old guy was brought in to the
10 proximity of Corporal King, Brian King. In his
11 proximity, and the fact that he was, you know, a
12 feeble elder gentleman, Brian said I have him,
13 meaning I've got eyes on him. You can move on.
14 Q.    I see. And the other gentleman that was
15 in the room, was he in handcuffs or zipped ties?
16 A.    I can't recall.
17 Q.    If I said his name was Jeffrey
18 Anglemeyer, would that refresh your recollection?
19 A.    No. I think he was the paternal figure
20 there. I think he was the father from the
21 briefing, I'm pretty sure. I don't remember his
22 name but he was --
23 Q.    I'm sorry.
24 A.    He was in our briefing, the father. He



Page 13
1  was the one that had the anti police sentiment.
2  He was the one we had initially encountered as we
3  went through the door.
4  Q.      Richard Anglemeyer?
5  A.      The father. I don't --
6  Q.      The old feeble guy could be -- could be
7  anybody then?
8  A.      He was not the father. He was -- he was
9  not -- I don't recall this older little guy from
10 the briefing at all.
11 Q.      Okay. He could just be like -- you
12 don't know his identity, I guess, then?
13 A.      The little old guy, no. The first guy,
14 he was the father.
15 Q.      I see.
16         MR. BRADFORD: That would be --
17 that's Richard, right, Brian?
18         MR. ZEIGER: The father is
19 Richard, yes.
20 BY MR. ZEIGER:
21 Q.      So I guess all of your previous answers
22 where I called him Richard, that was incorrect.
23 A.      It was a little old guy.
24         MR. BRADFORD: I don't want to

Page 14
1  jump in there. But were either of the old guys
2  older than the others?
3          THE WITNESS: The little guy in
4  the closet, I'm not trying to be, you know,
5  condescending but I just -- it was a little poor
6  old guy in the closet like. He was not the
7  father. He was not the suspects from our
8  briefing.
9  BY MR. ZEIGER:
10 Q.      That's not Richard. Richard is the
11 father --
12 A.      You said that. I didn't say his name.
13 I don't know his name.
14 Q.      Understood. I got it. So, at that
15 time, though, when you entered with the feeble old
16 guy, did you see the father in the room?
17 A.      When I brought the feeble old man out of
18 the closet and into the living room, the father
19 was in the living room being addressed by Corporal
20 King.
21 Q.      Was the father cuffed or zip tied?
22 A.      I don't recall. Not initially and
23 probably not at that point because, you know, this
24 was within ten seconds of entry we were in this

Page 15
1  room. You know, we usually get everybody down
2  first, have a look around, you know, and then flex
3  cuff them after, you know, that -- that area is
4  secured. We don't want to do that -- we don't
5  want to be stuck flex cuffing while other things
6  are going on.
7  Q.      Understood. And did you hear Corporal
8  King tell -- instruct anyone, give anyone any
9  instructions, any other troopers?
10 A.      No, sir.
11 Q.      Did you -- did you hear the father
12 figure complain about any pain in his knee?
13 A.      It was a -- nondescript. He was
14 complaining. I don't know if it was about his
15 knee, but he was -- he was giving us pretty good
16 lip service.
17 Q.      And do you recall any of those words
18 contained in the lip service?
19 A.      Just some swear words. But -- and,
20 again, I mean, five seconds in that room, ten tops
21 and then I moved back to the master bedroom and
22 the pool.
23 Q.      Did the father seem disoriented like he
24 had dementia or Alzheimer's in your --

Page 16
1  A.      No.
2  Q.      The father seemed totally with it?
3  A.      Yeah.
4  Q.      All right. Understood. I'm going to
5  share a document with you. Can you see that,
6  Corporal?
7  A.      Yes, sir.
8  Q.      Can you tell me what this document is,
9  if you know?
10 A.      This is my callout report from the
11 incident in question.
12 Q.      Okay. And it says activation date in
13 the top right. And that's the day of the
14 incident, correct?
15 A.      Correct.
16 Q.      And below that it says 2-26-18 date of
17 report. That means that's the day that this
18 report was typed?
19 A.      Correct.
20 Q.      It has your name, Corporal Jason
21 Pelotte, correct?
22 A.      Yes, sir.
23 Q.      And it says incident title, warrant
24 service and it has the address of the house,



Page 17

1  correct?
2  A.    Yes, sir.
3  Q.    And it says the amount of time that was
4  used, straight time was one hour and overtime was
5  five hours; is that right?
6  A.    Correct.
7  Q.    Okay.  Were you the typist of this
8  document or did someone else type it for you?
9  A.    I typed it.
10 Q.    Did you have a supervisor review it when
11 you submitted it?
12 A.    No, not when I submitted it.  He reviews
13 them at his -- at his will once they're submitted.
14 Q.    Are there any corrections or changes
15 made to this document?
16 A.    No, sir.
17 Q.    Did you have an opportunity to review
18 the document before today's deposition?
19 A.    Yes, sir.
20 Q.    And I don't want to hear an answer where
21 you communicated with your lawyer.  But other than
22 that, did you complain or tell anyone that there's
23 any mistakes or omissions contained in this
24 document?

Page 18

1  A.    No, sir.
2  Q.    Okay.
3         MR. BRADFORD:  Can we get this
4  marked as Pelotte 1 just for the record?
5         MR. ZEIGER:  Yes, I agree.  Sorry
6  about that, Kevin.
7         MR. BRADFORD:  No problem.
8  BY MR. ZEIGER:
9  Q.    Okay.  I'm scrolling down here.  Going
10 to the second paragraph it says that you -- you
11 got a briefing at the Belfast Barracks.  And
12 that's what happened at 4:00 a.m. in the morning;
13 is that right?
14 A.    Yes, sir.
15 Q.    And the briefing was given by Corporals
16 Chulock -- Chulock and Alaimo?
17 A.    Alaimo, yes.
18 Q.    Alaimo.  And you were assigned as the
19 team leader for the ground level entry team?
20 A.    Yes, sir.
21 Q.    Okay.  And the next line says, upon
22 initiation of the warrant compromise was called
23 and I opened the knee high gate for my team and
24 then covered as entry was made.  There's a couple

Page 19

1  of things there.  So what does the word compromise
2  mean?
3  A.    When we move up for a search warrant,
4  there's a knock and announce protocol.  If we're
5  discovered prior to that, a compromise could be
6  cameras, lighting, dogs barking, a subject
7  moving -- et cetera.  So a compromise was called
8  because the older white male, the father, was
9  looking out at us.
10 Q.    Where?
11 A.    From where?
12 Q.    From where?  Where was he when he was
13 looking out at you?
14 A.    He was on the ground level in the front
15 of the house.  And if you're looking at it from
16 the French doors when we were making entry, he
17 was -- stood up and was -- you know, it was well
18 lit, like on the ground level, about the middle of
19 the house looking out at us.
20 Q.    He was inside the house?
21 A.    Yes, sir.
22 Q.    And when he -- when he was looking at
23 you, did you see him run or go anywhere or try to
24 escape or anything?

Page 20

1  A.    He started to move back away from the
2  door.
3  Q.    You saw that with your own eyes?
4  A.    Yes.  I moved up.  I was like -- I moved
5  up ahead of everybody because I'm in the front
6  seat, opened that knee gate and that put me front
7  row center to look into the house.
8  Q.    What -- what is a knee gate?
9  A.    It's like a 3 foot gate around the
10 property.  Did you see pictures of the property?
11 Q.    Yes, I know the answers, Corporal.  My
12 job is just to make a record of what it is.  I'm
13 not allowed to testify.  So I just ask you
14 questions and you give the answers.
15 A.    A white vinyl 3 foot gate with a latch
16 on it, probably to keep they're, you know, the
17 Chihuahuas in.
18 Q.    And so -- so, who called the compromise?
19 Were you the person who called it?
20 A.    No, sir.
21 Q.    So this is what I'm a little confused
22 about.  So you tell me you're the person who made
23 the observation of the compromise but you're not
24 the person who called it, so you had told someone



Page 21

1  there was a compromise?
2  A.     I -- I relayed it to the team via radio.
3  Everybody is carrying like equipment -- when
4  you -- one of the -- there's the old guy and I put
5  out on the radio compromise. I mean, if you're --
6  getting into specifics, I keyed up my radio and
7  called compromise to the team, if that makes more
8  sense. I didn't initially spot him. It drew my
9  attention to him and then I called it. Does that
10 make sense?
11 Q.     Yes. And then when you opened the knee
12 high gate for your team, next it says then covered
13 as entry was made. What does that mean, then
14 covered as entry mean?
15 A.     Then I rifle up and I'm looking at
16 windows up above, any openings that -- that aren't
17 covered by a weapon.
18 Q.     So, when -- when you guys went near the
19 house and you opened this -- this three foot gate,
20 is that by foot or in a vehicle?
21 A.     That was by foot.
22 Q.     I see. How far away was the vehicle
23 from the fence?
24 A.     Probably -- I'm trying to recall

Page 22

1  exactly. But I'd say about 20 yards, 25 yards.
2  Q.     So, you all are on foot. And then
3  you -- you open the gate so the team can go in?
4  A.     Correct.
5  Q.     That's why you're number eight or
6  nine?
7  A.     Our team kind of over look at
8  everything. So, you're looking over top but I'm
9  also seated up in front of the vehicle so I can
10 get up there, hit that knee gate and open it --
11 Q.     Was everyone able to get inside the gate
12 area?
13 A.     Yes, sir.
14 Q.     And then did you go inside the gate
15 area?
16 A.     Yes, sir.
17 Q.     And did the gate close behind you?
18 A.     I don't recall, sir. I don't know if it
19 was on a spring or not.
20 Q.     The next line says, at the doorway I
21 observed an older WNM looking at us from the
22 center of the house. Do you see that?
23 A.     Yes.
24 Q.     And that's the same story you told me

Page 23

1  about five or six questions ago?
2  A.     If that's what I told you, yes, sir.
3  Q.     I beg your pardon. I didn't mean it
4  that way. I apologize. I didn't mean it that
5  way. That was the answer you gave me to the
6  question I asked you about five or six questions
7  ago?
8  A.     Yes, sir.
9  Q.     Okay. And it's the same white male?
10 A.     Yes, sir.
11 Q.     The one you identified today as the
12 father?
13 A.     Yes, sir.
14 Q.     As you moved inside, he disobeyed
15 commands to show his hands and lie down. That's
16 the -- that's still the father, right?
17 A.     Yes.
18 Q.     The subject moved deeper into the house.
19 I followed the team into the center of the house
20 and we had an encounter with three subjects. But
21 this subject moved deeper into the house is still
22 the father, correct?
23 A.     Yes, sir.
24 Q.     And then I followed the team into the

Page 24

1  center of the house and we had encountered three
2  subjects at this point, a younger WNM, an older
3  WNM and an older WNF. Okay?
4  A.     Yes, sir.
5  Q.     Do you know the identities of those
6  three people as we sit here today?
7  A.     I don't, sir.
8  Q.     Okay. The younger WNM, did that person
9  have any contact with any troopers that you
10 know?
11 A.     I mean, troopers detained all three of
12 these people.
13 Q.     Okay. Do you know which trooper
14 interacted with the younger WNM?
15 A.     I don't, sir.
16 Q.     And the older WNM, is that the father?
17 A.     Yes, sir.
18 Q.     And the older WNF, did you later learn
19 that was the mother?
20 A.     Yes, sir.
21 Q.     And is the WNF the one that had an
22 encounter with Trooper Painter?
23 A.     Yes, sir.
24 Q.     And the younger WNM, you have no idea



Page 25

1  what trooper that person interacted with?
2  A.    No, sir.
3  Q.    And the older WNM, the father, did that
4  person have an interaction with Trooper
5  McGarvey?
6  A.    I can't speak to that.  All I know --
7  all I recall is Corporal King addressing him.
8  Like we encountered them, but I was eighth or
9  ninth back.  So there was a lot of guys, so I kind
10 of bypassed and looked at an open or closed door
11 that might have another --
12 Q.    Okay.  Then as they were being detained
13 by others, I opened a door to a closet that had
14 been fashioned into a bedroom and observed an
15 older white non Hispanic male.  You wrote that?
16 A.    Yes, sir.
17 Q.    That's the older feeble gentleman?
18 A.    Yes, sir.
19 Q.    I brought him into the main living room
20 area with the others and proned him out on the
21 floor.  That means you -- you laid him out stomach
22 touching the floor, hands and feet spread?
23 A.    Yes.  And, again, I didn't lay him out
24 like -- again, I didn't really ever touch him.  I

Page 26

1  was worried about him.  He was so old.  But, yes,
2  he -- he laid down on the floor, got to the
3  ground.
4  Q.    He was cooperative?
5  A.    Yes, sir.
6  Q.    I then joined additional members pushing
7  through a bedroom on the two side to the indoor
8  pool area on the two, three corner.  We cleared
9  the pool area with no contact.  What does two side
10 mean and what does two, three corner mean?
11 A.    We label houses -- we label them by
12 their sides.  The one side was the side -- any
13 side of the house that faces the main roadway.
14 The two side would be clockwise, kind of around --
15 anything that -- and you're facing the house to
16 the left, you know, picture a square.  So the two
17 side would be that side.  I wish I had a compass
18 direction to give you.  But it would be the one
19 side facing the road, two side would be the left
20 side, the four side would be the right side and
21 the three side would be the backside.  So the two
22 side it was like a master bedroom, went through
23 the hallway to the master bedroom and then that
24 master bedroom was clear and then if I looked

Page 27

1  toward the back of the house, there was a pool
2  area, like a swimming pool.
3  Q.    Indoor pool?
4  A.    Yes, sir.
5  Q.    And it says, we cleared the pool area
6  with no contact.  That means there was no human
7  being in the pool area?
8  A.    Correct.
9  Q.    Corporal Chulock advised me that his
10 team cleared the game room area next.  Okay.  Next
11 it says, I then advised CP of my head count for
12 the ground floor and completed secondary searches
13 on my level.  CP, is that Corporal Chulock?
14 A.    CP is the command post, a vehicle --
15 they're usually, you know, still on the roadway.
16 That's got the boss in it.  We let him know how
17 many people we came into contact with and mine was
18 for the ground floor.
19       MR. BRADFORD:  Ground floor means
20 the lower level, right?
21       THE WITNESS:  Yeah.  We always
22 have problems with these split level type houses.
23 We call it ground level, first level --
24       MR. BRADFORD:  I'm trying to keep

Page 28

1  this lower level and upper level just to avoid
2  that confusion.
3        THE WITNESS:  Okay.  Lower level
4  would be my ground floor.
5        MR. BRADFORD:  I'm sorry.  Go
6  ahead, Brian.
7  BY MR. ZEIGER:
8  Q.    And what was the head count you gave
9  him?
10 A.    I don't recall that specifically.  But I
11 think in this case four total, three males one
12 female.
13 Q.    Then it says completed secondary
14 searches on my level.  What is a secondary
15 search?
16 A.    Secondary search, you know, we initially
17 go through, you know, people either present
18 themselves or in their places that they would
19 normally be, you know, upright, laying in a bed,
20 sitting in a chair.  Secondary search are, you
21 know, behind things where people can hide or, you
22 know, in cabinets, behind furnaces, places people
23 would hide is a secondary search.
24 Q.    Did you find anything?



Page 29

1  A.    No, sir.
2  Q.    All subjects were gathered in the living
3  room area and a medic was requested to respond for
4  the female. Why was the medic requested for the
5  female?
6  A.    When everybody is gathered -- when I
7  came back, the female was complaining about her
8  back. And we have Tac medics that can come into a
9  house and assess the injury and let us know, okay,
10 we need to -- we need ALS or we need anything
11 more. So, based on her complaints, we brought a
12 medic.
13 Q.    What happened?
14 A.    They came in, assessed her and
15 eventually she required an ambulance. I think it
16 was something with her back.
17 Q.    Did you see how she injured her back?
18 A.    I did not.
19 Q.    Did you see Trooper Painter have any
20 contact with her?
21 A.    I did not. I know he was headed that
22 way. He headed that -- I believe she was in the
23 hallway. I know he was headed that way. They
24 were headed that way.

Page 30

1  Q.    Did you see any weapons on her?
2  A.    No, sir.
3  Q.    Did you later learn that she had any
4  weapons on her?
5  A.    No, sir.
6  Q.    On the father, the guy that you have
7  been referring to the whole time, did you see any
8  weapons on him?
9  A.    No, sir.
10 Q.    Did you later learn he had any weapons
11 on him?
12 A.    No, sir.
13 Q.    Next it says, I advised Corporal Chulock
14 that we were ready for investigators soon after
15 the scene and detainees were relinquished to
16 investigators and we exited the premises. We then
17 returned to PSP Belfast and debriefed. And after
18 that, is that the end?
19 A.    Yes, sir.
20 Q.    One second, please. Did you have a body
21 cam on?
22 A.    No, sir.
23 Q.    Did you ever have a body cam on working
24 for the Pennsylvania State Police?

Page 31

1  A.    No, sir.
2  Q.    Have you ever requested in writing or
3  oral, email, text, anything to anyone that you be
4  given a body cam?
5  A.    No, sir.
6  Q.    Why not?
7  A.    That's not -- that's above my pay grade,
8  sir.
9  Q.    I know that, Corporal. I meant it more
10 on the lines of have you ever just asked someone,
11 hey, why -- why don't I have one, I'd like one?
12        MR. BRADFORD: Objection; asked
13 and answered. Can you answer again.
14        THE WITNESS: No, sir.
15 BY MR. ZEIGER:
16 Q.    Do you know what a body cam is?
17 A.    Yes, sir.
18 Q.    Do you believe on the day of this job
19 that you did anything wrong?
20 A.    No, sir.
21 Q.    If the father figure in this case claims
22 he was injured as a result of his interaction with
23 Pennsylvania State Police, do you have any
24 knowledge of that?

Page 32

1  A.    No, sir.
2        MR. ZEIGER: I have nothing
3  further.
4  BY MR. BRADFORD:
5  Q.    Just one question, Corporal. Did you
6  attend the briefing that took place before the --
7  before this search warrant was executed?
8  A.    Yes, sir.
9  Q.    And are you aware that there's videos of
10 that, video recordings of that -- the briefing?
11 A.    Yes, sir.
12 Q.    Did you attend that entire briefing?
13 A.    I did, sir.
14        MR. BRADFORD: That's -- that's
15 all I have.
16        MR. ZEIGER: Be safe, Corporal.
17 Nice day, thank you for your time.
18        THE VIDEO TECHNICIAN: This is
19 George. One moment. Same orders, Counsel?
20        MR. ZEIGER: Yes.
21        MR. BRADFORD: Yes.
22        THE VIDEO TECHNICIAN: We are now
23 going off the record, 3:07 p.m. on August 27,
24 2020.



Page 33

1      (Witness excused.)
2      (Deposition concluded at 3:07
3  p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 34

1         C E R T I F I C A T E
2
3         I hereby certify that the witness
4  was duly sworn by me and that the deposition is a
5  true record of the testimony given by the witness.
6
7
8
9  _____
10         Dolores M. Horne
11         Dated:  September 4, 2020
12
13
14
15  (The foregoing certification of this transcript
16  does not apply to any reproduction of the same by
17  any means, unless under the direct control and/or
18  supervision of the certifying shorthand reporter.)
19
20
21
22
23
24

