### Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                          - - -
     ADA ENGLEMEYER, et al.     :
 4                              :
          v.                    :
 5                              :
     NORTHAMPTON COUNTY         :  NO. 19-3714
 6
 7                          - - -
 8                    October 1, 2020
 9                          - - -
10           Videotape deposition of CORPORAL
11   BRIAN L. KING, taken pursuant to notice, was
12   held remotely, commencing at 1:15 p.m., on the
13   above date, before Torre Lynn Adams, a Court
14   Reporter and Notary Public in the Commonwealth
15   of Pennsylvania.
16                          - - -
17
18
19
             ESQUIRE DEPOSITION SOLUTIONS
20                    Suite 2600
                1835 Market Street
21         Philadelphia, Pennsylvania 19103
                  (215) 988-9191
22
23
24
```

### Page 2

```
 1   APPEARANCES:
 2
 3       LEVIN & ZEIGER
         BY:  BRIAN ZEIGER, ESQUIRE
 4       1500 John F. Kennedy Boulevard
         Philadelphia, Pennsylvania 19102
 5       (267)225-1776
         zeiger@levinzeiger.com
 6       Representing the Plaintiffs
 7
 8       OFFICE OF ATTORNEY GENERAL
         BY:  KEVIN R. BRADFORD, ESQUIRE
 9       21 South 12th Street
         Philadelphia, Pennsylvania 19107
10       (215) 560-2262
         Representing the Defendants
11
12                      - - -
13   ALSO PRESENT:
14       SUMMER MENKEE, Videographer
15                      - - -
16
17
18
19
20
21
22
23
24
```

### Page 3

```
 1                      - - -
 2                    I N D E X
 3                      - - -
 4   Testimony of:  CORPORAL BRIAN L. KING
 5        By Mr. Zeiger                     6, 29
 6        By Mr. Bradford                      27
 7                      - - -
 8                  E X H I B I T S
 9                      - - -
10   NO.        DESCRIPTION                  PAGE
11        (None)
12
```

### Page 4

```
 1                      - - -
 2            DEPOSITION SUPPORT INDEX
 3                      - - -
 4
 5   Direction to Witness Not to Answer
 6   Page Line   Page Line       Page Line
 7   None
 8
 9
10   Request for Production of Documents
11   Page Line   Page Line       Page Line
12   None
13
14
15   Stipulations
16   Page Line   Page Line       Page Line
17   5    1-6
18
19
20   Question Marked
21   Page Line   Page Line       Page Line
22   None
23
24
```



SUMMARY JUDGMENT EXHIBIT 11

Page 5

1  (It is hereby stipulated and
2  agreed by and between counsel that signing,
3  sealing, filing and certification are waived;
4  and that all objections, except as to the form
5  of questions, be reserved until the time of
6  trial.)
7       - - -
8       VIDEO TECHNICIAN: Good afternoon,
9  everyone. We are now on the record. The time
10 is 1:15 eastern standard time, p.m. that is, on
11 October 1, 2020.
12      This begins the video deposition
13 of Trooper or Corporal King taken in the matter
14 of Ada Anglemeyer, et al. versus Northampton
15 County filed in the U.S. District Court for the
16 Eastern District of Pennsylvania, the case
17 number of which is 1937-14.
18      My name is Summer Menkee. I'm
19 your remote videographer today. Our court
20 reporter is Torre Lynn Adams and we represent
21 Esquire Deposition Solutions.
22      If you get knocked off this
23 conference call, Zoom, at any time, there is
24 some Esquire conferencing support in the chat

Page 6

1  for you to help you out.
2       Other than that, just remember to
3  mute your audio, everyone, when you're not
4  speaking, unmute when you're ready to speak.
5       Counsel, go ahead and state your
6  name and whom you represent after which the
7  court reporter will swear in the witness.
8       MR. ZEIGER: Good afternoon.
9  Brian Zeiger for the plaintiffs.
10      MR. BRADFORD: And Kevin Bradford
11 for all the current defendants.
12      - - -
13      CORPORAL BRIAN L. KING, after
14 having been duly sworn, was examined and
15 testified as follows:
16      - - -
17      EXAMINATION
18      - - -
19 BY MR. ZEIGER:
20     Q.    Corporal King, good afternoon.
21 How are you?
22     A.    I'm doing well, sir. How are you?
23     Q.    Good.
24           So, you remember -- were you on

Page 7

1  duty as a State Trooper on or about
2  February 23rd of 2018?
3      A.    Yes.
4      Q.    And did your tour of duty, at some
5  point in time, take to you a location of 340 Old
6  Allentown Road, Bushkill Township, Northampton
7  County, Pennsylvania?
8      A.    Yes.
9      Q.    Were you there as part of a team
10 called CERT team to execute a warrant?
11     A.    Yes.
12     Q.    Okay. Now, your deposition today,
13 there's some unusual questions I have to ask you
14 that I normally don't ask most people who I
15 depose, so bear with me. Okay?
16     A.    Understood.
17     Q.    How tall are you?
18     A.    Six-two.
19     Q.    And how much do you weigh?
20     A.    About 230.
21     Q.    Are you in very good shape,
22 athletic shape?
23     A.    In my opinion, yes.
24     Q.    Okay. Were you of the same

Page 8

1  height, weight and physical condition at the
2  date and time I indicated earlier, February 23,
3  2018?
4      A.    Yes.
5      Q.    And I notice today that you're
6  African-American; is that right?
7      A.    Yes.
8      Q.    Okay. And so, on that day in
9  time, about how many troopers were out there
10 executing the warrant?
11     A.    So, there were -- it was both East
12 and West Teams. At full compliment, both teams
13 have 24 apiece. I don't believe everyone was
14 there. So, I could -- I -- I would have to go
15 back and actually look at the base report to
16 count how many guys were there, but it was -- it
17 was both teams of the guys that were available.
18     Q.    Okay. And can you estimate, don't
19 guess, but estimate on the team that went inside
20 the residence? Were you on the team that went
21 inside the residence?
22     A.    Yes, sir.
23     Q.    Can you estimate how many
24 troopers, approximately, went into the

Page 9

1  residence?
2     A.   There were -- it was a double
3  entry. So, I believe there was like a main part
4  to that house and a rear part, but not to
5  belabor, to answer the question, I think it --
6  to estimate, between 12 and 16.
7     Q.   And of those 12 to 16 people, is
8  there anyone else that is even remotely close to
9  the description of a six-two, 235-pound
10 athletically built African-American male that
11 was any -- anyone else remotely close to that
12 description in the 12 to 16 people that entered
13 the house on that day?
14    A.   No.
15    Q.   So, you remember the incident,
16 right?
17    A.   Yes.
18    Q.   And so, if someone described
19 someone who was tall, very athletic built,
20 African-American, you're the only person that
21 was on that job that fits that description on
22 that day, right?
23    A.   I'm the only African --
24 African-American on the West Team, so yes.

Page 10

1     Q.   So, you're the only
2  African-American as well? I didn't --
3     A.   On the West Team, yes.
4     Q.   On the West Team.
5          So, at the time that the entry
6  occurred, you were the only African-American
7  person regardless of your height, weight and
8  built, correct?
9     A.   Yes.
10         MR. BRADFORD: On the West --
11         THE WITNESS: On the West Team.
12 BY MR. ZEIGER:
13    Q.   The West Team's the one who
14 entered the house, correct?
15    A.   There were members West and East
16 Team that entered the house.
17    Q.   Was there anyone else that entered
18 the house that was African-American?
19    A.   No, sir, I don't think so. I
20 don't -- I'm pretty -- no. No. That was me.
21    Q.   Okay. I'm going to mark a
22 document now and I am going to try to share my
23 screen, bear with me.
24         Do you see this document at the

Page 11

1  bottom, it says King-2?
2     A.   Yes.
3     Q.   I don't know why it says King-2.
4  It should say King-1. I think there is no
5  King-1. I only have one exhibit for your
6  deposition today. Okay?
7          I'm going to go --
8     A.   Oh, okay.
9     Q.   -- up.
10         Do you know what this is, this
11 document?
12    A.   It looks like my callout report.
13    Q.   What's a callout report?
14    A.   Callout report is basically the
15 report that lists what you did on that
16 particular warrant service.
17    Q.   Okay. And it says Date of
18 Activation, 2-23-18. Is that the date that you
19 went in to execute the warrant?
20    A.   Yes.
21    Q.   It says Date of Report 3-5-18.
22 Does that mean that you authored the report
23 eight days later?
24    A.   Yes.

Page 12

1     Q.   And name, it says Trooper Brian L.
2  King. That's you?
3     A.   Yes, sir.
4     Q.   And the next part says Warrant
5  Service. That means you went there to execute a
6  warrant?
7     A.   Correct.
8     Q.   And the next line says Address.
9  And that's the address where the warrant was
10 being executed?
11    A.   Yes.
12    Q.   And the next line says Date and
13 Time of Notification, 2-21-18, 1945 hours. And
14 that means that's when you were told there was
15 going to be a CERT operation?
16    A.   Yes.
17    Q.   And then the next line -- to the
18 right of that, says "2-23-18, 18 -- 300 hours."
19         That means you got to the barracks
20 for the briefing at 3:00 a.m. in the morning?
21    A.   Correct.
22    Q.   And then below, it says Straight
23 Time Hours, used eight. It means part of your
24 regular job, you spent eight hours of regular



Page 13

1  time on this?
2  A.   Yes.
3  Q.   And to the -- to the right of
4  that, it said Overtime Hours Used, eight hours.
5  It means you spent eight hours more than your
6  normal shift would be in order to work on this
7  job, correct?
8  A.   Correct.
9  Q.   So, you spent a total of 16 hours,
10 approximately, on this case?
11 A.   Yes.
12 Q.   Okay.  Scrolling down, it says "I
13 deployed from the East TAC van and was assigned
14 as less lethal for the first level."
15      What does that mean, deployed from
16 the East TAC van?
17 A.   "Deployed from the East TAC van,"
18 so both teams have two vans.  One is called TAC.
19 One is called Utility.  That's just a
20 designation for that particular van; TAC,
21 meaning it probably had breaching equipment,
22 tactical type things.  And Utility usually
23 carries gas and our explosive breaching.
24      So, when it says "Deployed from

Page 14

1  the East TAC van," that just designates the --
2  the exact van that I came out of, and that would
3  have been the East TAC van.
4  Q.   Okay.  And "was assigned as less
5  lethal."
6      What does that mean, "assigned as
7  less lethal"?
8  A.   Assigned as less lethal would be
9  with a -- either a beanbag or Taser or both in
10 the event that we came across someone who was
11 resisting and a level of force did not rise to
12 lethal.  I was assigned as less lethal.
13 Q.   Did you use any -- any weapons
14 that day?
15 A.   No.
16 Q.   Did you use any of the less
17 lethal?
18 A.   No.
19 Q.   Did you use any force at all?
20 A.   No.
21 Q.   And first level, this case,
22 there's been some confusion on my part about
23 what first level means.  So, how many levels of
24 the house are there?

Page 15

1  A.   So, there were two levels.  And --
2  and if -- if I'm talking -- that I'm assuming
3  that you know, if not, please back me up.
4      So, the main -- there was like a
5  main part of the house where it was like a split
6  entry; obviously, a split entry, you come in the
7  door, you go down into like a basic and then to
8  an upper level.  The level I went in was around
9  the back.
10      We considered that to be part of
11 the first level.  It ran from maybe like a
12 garage, a carport, all the way back to the main
13 house.
14      Does that make sense to you?
15 Q.   Yes.
16      So, the first level was the upper
17 level; is that correct?
18      MR. BRADFORD:  Can we use the term
19 upper and lower level and that might -- that
20 might --
21      MR. ZEIGER:  No.  I -- I can do
22 that, but he wrote first level on this report.
23 So, that's why we have to use first level.
24      I -- let me ask another question,

Page 16

1  lay some foundation.  Okay?
2      MR. BRADFORD:  Sure.
3  BY MR. ZEIGER:
4  Q.   So, when you walked in, wherever
5  you walked in, were you on the upper level or
6  lower level?
7  A.   I would consider that to be the
8  lower level.
9  Q.   Okay.  So, you walked in on the
10 lower level and you consider that to be the
11 first level; is that right?
12 A.   Yes.
13 Q.   And that's why you wrote that in
14 your report, right?
15 A.   Correct, sir.  I put it like that
16 because I never went up steps.
17 Q.   I --
18 A.   I'm sorry.  Go ahead.
19 Q.   No, I want you to finish.  It's
20 rude of me to interrupt you while you're
21 speaking.  I'm sorry.
22 A.   No, no, no.  I was just saying
23 I -- usually if I don't go up or down --
24      (Cell phone ringing.)



Page 17

 1         Sorry.  If I don't go up or down,
 2  it's usually I just put it as first level.
 3         So, does that help you at all?
 4     Q.   Yes.  And --
 5     A.   Okay.
 6     Q.   "I assisted in clearing and
 7  detaining a W/N/M in the leaving area."
 8         What does clearing and detaining
 9  mean?
10     A.   So, I assisted with clearing on
11  that first level up to that living room area and
12  W/N/M, white non-Hispanic male was placed in
13  custody.  So, I was right there behind him once
14  we were done clearing.
15     Q.   Who placed him in custody?
16     A.   If I was that close to him, and I
17  don't remember, but I'm going -- I'm -- I'm
18  pretty sure that was probably me that placed him
19  in custody, because when we were clearing, there
20  were people on the ground.
21         So, once the clearing was done,
22  everyone's placed in the custody.  And then
23  we'll do a secondary clear.  So, I'm going to
24  say that was me.

Page 18

 1     Q.   Do you know that male's name?
 2     A.   I don't remember who -- which male
 3  it was, no, sir.
 4     Q.   Was he like a kid, an old man or
 5  middle-aged or -- can you give me --
 6     A.   I would say not a kid or old man,
 7  but I would go with -- with middle-aged.
 8     Q.   How did you detain him?  What did
 9  you use to detain them?
10     A.   Flex cuffs.
11     Q.   Behind his back?
12     A.   Yes, sir.
13     Q.   Did he complain of any kind of
14  like shoulder pain or anything like that?
15     A.   Not that I remember.
16     Q.   Did he say I've had a previous
17  injury, anything like that?
18     A.   I don't remember him complaining
19  about an injury.
20     Q.   Next sentence, Once all primary
21  and secondary clearing was complete and all
22  occupants were secured, residents were held
23  until investigators arrived.
24         And so, does that mean that the

Page 19

 1  investigators are the Northampton County police?
 2     A.   Yes, sir, whoever applied for the
 3  search warrant.
 4     Q.   So, you all went in there,
 5  controlled the area there and got everyone
 6  detained.  And then as soon as the local police
 7  arrived, y'all left?
 8     A.   Yes.  Once it was turned over to
 9  the investigators, we departed, yes, sir.
10     Q.   All right.  Next sentence, "I was
11  released from the scene by Command Post/TOPCOM.
12  Postactivation inventory completed.  Weapon and
13  equipment maintenance completed."
14         All that's true?
15     A.   Yes.
16     Q.   And then on 2-21-18, at
17  1945 hours, Corporal Powell activated me for an
18  East warrant service.  My scheduled shift was
19  changed from 0700 -- 1500 hours to 0000 to
20  0800 hours to accommodate the warrant."  Is that
21  true?
22     A.   Yes, sir.
23     Q.   So, when did you get the overtime?
24     A.   The drive time.

Page 20

 1     Q.   I see.  You're not from that area?
 2     A.   No, sir.  I'm from the west part
 3  -- west side of the State.
 4     Q.   Oh, I see.  Okay.
 5         Is there anything missing from
 6  this report?
 7         MR. BRADFORD:  Objection to form.
 8         You can answer.
 9         THE WITNESS:  Is there anything
10  missing?
11  BY MR. ZEIGER:
12     Q.   Like do you want to add in more
13  facts, something you didn't type in here?
14         MR. BRADFORD:  Objection to form.
15         You can answer.
16         THE WITNESS:  Did I just hear
17  objection?
18         MR. BRADFORD:  I might
19  periodically object just for the record.
20         THE WITNESS:  Okay.
21         MR. BRADFORD:  So, yes, I objected
22  to form.  You can answer the question to the
23  best of your ability.
24         THE WITNESS:  No, there's nothing

Page 21
 1   I wish to add.
 2   BY MR. ZEIGER:
 3        Q.    Are there any mistakes?
 4        A.    Not to my knowledge.
 5        Q.    Okay.  Very good.
 6              I'm going to unshare this now.
 7        A.    Okay.
 8        Q.    Okay.  So, Trooper --
 9              MR. BRADFORD:  Corporal.
10   BY MR. ZEIGER:
11        Q.    I'm sorry.  Corporal, I beg your
12   pardon.
13              So, Corporal, I'm going to use a
14   term called information and belief.  It's a
15   lawyer term based on -- it means -- it means
16   what I think will come up in evidence in the
17   case in the future.  Okay?  Do you follow me on
18   that?
19        A.    Yes.
20        Q.    That way I can make a statement
21   today even though I don't -- I don't -- it's not
22   yet on the record, but it will be on the record
23   in the future.
24              Do you understand what I'm saying?

Page 22
 1        A.    Yes.
 2        Q.    So, based on information and
 3   belief, my understanding is, is that you
 4   reprimanded some other troopers in the middle of
 5   this job, and you were correcting some of the
 6   behavior of some of the other troopers during
 7   this -- this job; is that true or false?
 8              MR. BRADFORD:  I'm going to object
 9   to the question.
10              But go ahead.
11              THE WITNESS:  True.
12   BY MR. ZEIGER:
13        Q.    Okay.  And can you say who you
14   reprimanded, what for and what was the reprimand
15   about?  What happened?
16        A.    So, once everyone was being placed
17   in cuffs, being detained, to be honest with you,
18   sir, I reprimanded everyone in the room because
19   who -- I don't remember who was in front of me,
20   the white male, was constantly making things
21   worse.
22              I remember several times telling
23   him just cool out, this is going to be all
24   right, just keep your mouth shut, relax.

Page 23
 1              There were other people in the
 2   room, a lot of jaw jacking going back and forth
 3   between our guys and theirs.  The thing that
 4   sticks out the most in my mind is the white male
 5   in front of me making reference to that's why
 6   your buddy Trooper got shot the other day,
 7   which, of course, got everybody's attention in
 8   the room, including my own.
 9              Everyone got loud again and
10   basically I said, hey, this is over, everybody
11   relax, everybody relax, and get back to work.
12        Q.    And you were the one saying that?
13        A.    Yes.
14        Q.    And when you say "get back to
15   work," that was directed at the other troopers?
16        A.    Correct.
17        Q.    Okay.  Did you -- did -- was there
18   any other thing that you said or something like
19   a reprimand that you gave to any other troopers?
20        A.    No.
21        Q.    Did you see any other troopers use
22   any force?
23        A.    I did not.
24        Q.    So, based on information and

Page 24
 1   belief, there will be future testimony in this
 2   case where someone is going to say that you told
 3   another trooper something like enough's enough,
 4   like -- like stop doing that.
 5              Do you -- do you recall having any
 6   interaction with any trooper regarding any kind
 7   of statement like that?
 8        A.    I recall having interaction with
 9   everyone in the room and it was basically for
10   everybody going back and forth mouthing off --
11        Q.    And then --
12        A.    -- but that was it.
13        Q.    Okay.  Based on information and
14   belief, the statement, my understanding was it
15   was when one of the officers was using force and
16   that you told one of the officers to stop using
17   force against an elderly gentleman?
18        A.    No.
19        Q.    That's not true?
20        A.    No.
21        Q.    Okay.  There also was a gentleman
22   in his 40s who apparently had some previous
23   injury who was zip tied and seated somewhere and
24   apparently, you made some comments to someone



Page 25

1  about you're using too much force with him; is
2  that true?
3      A.   That is not true.
4      Q.   Okay.  The family is saying if you
5  weren't there, they thought things would be
6  worse, they actually felt like you were the only
7  trooper there that treated them in a fair and
8  honest way on that day.
9           Do you have any comment to make
10 back to that?
11          MR. BRADFORD:  Objection to form.
12          You can -- I don't know if that's
13 a question.  That's not a question.
14          MR. ZEIGER:  I asked if you have
15 any comment on that.
16          THE WITNESS:  I can comment?
17          MR. ZEIGER:  Yes.
18          THE WITNESS:  No, that's --
19 that's -- that's not the case.  No one -- when I
20 said what I said, it was strictly from people
21 talking.  There was no one using, you know,
22 force.  I didn't come to anyone's rescue.  It
23 was just hey, knock it off of the statement hey,
24 that's why your buddy got shot.  And then it --

Page 26

1  there wasn't nothing -- there wasn't anything
2  like -- it wasn't anything like that at all.
3  BY MR. ZEIGER:
4      Q.   Well, the plaintiffs do feel like
5  you came to the rescue.  They asked me to call
6  you as my witness in this case.
7           Do you have a comment in regard to
8  that statement?
9           MR. BRADFORD:  That's not a
10 question.
11          MR. ZEIGER:  Okay.
12          MR. BRADFORD:  That's information
13 that's not even part of this case and you're
14 asking him to comment on it.
15          MR. ZEIGER:  The Trooper is under
16 oath and I appreciate it's very difficult to
17 testify against fellow -- fellow troopers.  So,
18 I want to make sure he gets a full and fair
19 opportunity to say what really happened that
20 day, because my clients have indicated that he
21 stopped someone from hurting them even worse --
22          MR. BRADFORD:  Ask a specific
23 question.
24          MR. ZEIGER:  I --

Page 27

1           MR. BRADFORD:  Don't say a
2  statement that your clients told you in
3  confidence and then ask him to comment on it.
4           MR. ZEIGER:  No -- no problem.
5  BY MR. ZEIGER:
6      Q.   Do you remember there being a
7  trooper there named Painter?
8      A.   Yes.
9      Q.   Do you -- do you recall seeing
10 Painter take his shield and jamming an old lady
11 up against the wall and lifting her feet off the
12 ground with the shield into the wall?
13     A.   No.
14     Q.   Do you remember saying anything to
15 Painter about this is too much, calm down?
16     A.   No.
17          MR. ZEIGER:  I don't have anything
18 further.
19          MR. BRADFORD:  I have no question.
20 Oh, wait.  I do have a question.
21              - - -
22          EXAMINATION
23              - - -
24 BY MR. BRADFORD:

Page 28

1      Q.   The white male who was in front of
2  you who's talking about the other trooper who
3  got shot, that was -- that was one of the people
4  in the house, right, that wasn't obviously a
5  trooper, right?
6      A.   I'm sorry, say your -- the male
7  that made the statement that's why your buddy
8  got shot?
9      Q.   Yes.  The one that was mouthing
10 off --
11     A.   This was no one in the house.
12 This was a trooper had this just been injured
13 days before --
14     Q.   Yeah, actually, that's a bad
15 question.
16          When -- when you started talking
17 about you said there was a white male in front
18 of you who was talking a lot and then he -- then
19 that person said something about that's why your
20 buddy got shot?
21     A.   Yes.
22     Q.   That person who was making those
23 statements, that was one of the residents,
24 right?



Page 29
1  A.  Yes, it was the male in front of
2  me.
3  Q.  Okay. And was that the male that
4  you that you interacted with, that you secured
5  or do you have --
6  A.  Yes, yes. That was him.
7      MR. BRADFORD: Okay. That's it.
8           - - -
9         EXAMINATION
10          - - -
11  BY MR. ZEIGER:
12  Q.  Do you know that guy's name?
13  A.  I do not.
14  Q.  Is there anything else that
15  happened that day that I didn't ask you about
16  that you want to tell us about?
17      MR. BRADFORD: Objection to form.
18      THE WITNESS: No.
19      MR. ZEIGER: Okay. I have nothing
20  further.
21      MR. BRADFORD: Okay. Thank you,
22  Corporal.
23      VIDEO TECHNICIAN: Are we ready to
24  conclude his deposition?

Page 30
1      MR. BRADFORD: Oh, yeah, yeah.
2  So, she just has to make a statement to
3  conclude, I --
4      VIDEO TECHNICIAN: Yeah, she's
5  making a statement.
6      MR. BRADFORD: I should know this
7  by now.
8      VIDEO TECHNICIAN: I know. Third
9  one, right. Wait. Yeah, just stay on until
10  we're done with the cert.
11      This concludes the videoconference
12  deposition of Trooper or Corporal King. And I
13  believe, gentleman, just for the record, if you
14  could say your transcript and video orders for
15  the court reporter and myself.
16      MR. ZEIGER: Yes. I would like
17  the PDF of the minuscript e-mailed to me and the
18  video in the cheapest format available.
19      MR. BRADFORD: I'll take the same.
20      VIDEO TECHNICIAN: Same. Great.
21      Then, everyone, we are going off
22  the video record on October 1, 2020 at 1:39 p.m.
23  eastern standard time.
24      (Witness excused.)

Page 31
1      (Deposition concluded at 1:39
2  p.m.)

Page 32
1                CERTIFICATE
2
3          I HEREBY CERTIFY that the witness
4  was duly sworn by me and that the deposition is
5  a true record of the testimony given by the
6  witness.
7
8          _Torre Lynn Adams_
9
10  Torre Lynn Adams,
    Court Reporter and Notary Public
    Dated:  October 15, 2020
11
12
13
14
15
16          (The foregoing certification of
17  this transcript does not apply to any
18  reproduction of the same by any means, unless
19  under the direct control and/or supervision of
20  the certifying reporter.)
21
22
23
24



Page 33

```
 1                  LAWYER'S NOTES
 2   PAGE   LINE
 3   ____   ____   _____
 4   ____   ____   _____
 5   ____   ____   _____
 6   ____   ____   _____
 7   ____   ____   _____
 8   ____   ____   _____
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
```

