IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADA ANGLEMEYER, et al., | : | |
| | : | No. 19-cv-3714-JMY |
| vs. | : | |
| | : | |
| GRAIG AMMONS, et al. | : | |

**MEMORANDUM**

**YOUNGE, J.**                                                                                   September 13, 2022

      Currently before the Court is a Motion for Summary Judgment filed by the Defendants. (Motion for Summary Judgment "MSJ", ECF No. 51.)  The Courts find this matter appropriate for resolution without oral argument.  See Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons set forth below, the Court will grant the Defendants' Motion.

**I.**      **PROCEDURAL AND FACTUAL BACKGROUND:**

      **A.**      **Procedural History:**

      This action arises from a police raid on Plaintiffs' home in Windgap, Pennsylvania. Plaintiffs seek to recover damages for personal injury that occurred or allegedly occurred during the raid.  (Second Amended Complaint ¶¶ 19 ¶ 33, ECF No. 33.)  Plaintiffs proceed on the theory that the Pennsylvania State Police Officers who conducted the raid violated their constitutional rights under 42 U.S.C. § 1983 and used excessive force in violation of the Fourth Amendment of the United States Constitution.  (Second Amended Complaint ¶¶ 22-32 (Counts I & II).)  Plaintiffs' also purport to advance claims of conspiracy to deprive them of their due process right to access to the court.  (Opposition Brief page 23, ECF No. 51; *Second Amended Complaint* ¶¶ 22-26 (Count I).)

      Plaintiffs brought this action against nineteen Pennsylvania State Police Officers who were part of the Special Emergency Response Team (hereinafter "SERT") who raided their

home.  The nineteen Defendants are; Peter Del Gaizo, Matthew Wysocky, Nathan Aukamp, Terrance W. Merante, Daniel Wilk, David Brodeur, Craig Ammons, Michael D. Lang, Brian Atkinson, Vincente Lopez, Kevin Ward, Clinton C. Painter, Mark A. Benson, Robert W. McGarvey, Lance Schimp, Brian L. King, Jason Pelotte, John P. Chulock, and Matthew J. Pierotti.  (Second Amended Complaint ¶ 4.)  However, the Plaintiffs only oppose the Defendants' motion for summary judgment as pertains to Mark Benson, Vincinte Lopez, Clinton Painter, Robert McGarvey, Lance Schimp, and Matthew Wysocky.  (Opp. Brief page 1; Plaintiffs' Proposed Order, ECF No. 51 page1.)  Plaintiffs agree that all other Defendants should be dismissed from this matter.  (*Id.*)

Based on the representation made in Plaintiffs' response to Defendants' motion for summary judgment, the Court will summarily dismiss all Defendants from this action with the exception of Officers Mark Benson, Vincinte Lopez, Clinton Painter, Robert McGarvey, Lance Schimp, and Matthew Wysocky.  The Court will proceed to substantively address Plaintiffs' claims against the remaining Defendants accordingly.

**B.     Factual Background:**

This action arises from a search warrant executed at 340 Allentown Road, Bangor Township, Pennsylvania ("the Property) on February 23, 2018.  (Defendants' Statement of Material Facts "SMF" ¶ 4; ECF No. 51-2.[1])  At the time, the Property was owned by Ada and Richard Anglemeyer and was an approximately 60-acre parcel of land with a large residence, garage and numerous other structures.  (SMF ¶¶ 2-3.)  The search warrant was obtained on February 22, 2018 by police officers working for the Northampton County Drug Task Force

---

[1] Plaintiffs accept and agree with almost all the facts asserted by Defendants in their Statement of Material Facts.  (Plaintiffs' Statement of Material Facts, Resp. in Opposition, ECF No. 51 page 31.)

based on information that multiple controlled buys of crystal methamphetamine had been made at the Property from one of the residents, Mark Anglemeyer. (SMF ¶¶ 8, 12.) The search warrant provided for the search of the residence, garage and trailer, and "All persons located on the premises described herein." (SMF ¶ 12.) The search warrant encompassed the entire Property and was not limited to simply the garage or outbuildings. (Search Warrant, Motion for Summary Judgment, Ex. 12, ECF No. 49-5.)

The Defendants were members of the Pennsylvania State Police Department's SERT which is trained to deal with high-risk, volatile situations. (SMF ¶ 6.) They were not involved with the underlying investigation that was conducted by the Northampton County Drug Task Force, and they were not involved in the process of applying for or obtaining the search warrant. (SMF ¶ 12-13.) On February 8, 2018, Detective Michael Enstrom from the Northampton County Drug Task Force contacted the Pennsylvania State Police's SERT to request assistance in executing a search warrant. (SMF ¶ 5-7.) Defendants were brought in simply to help execute the search warrant. (SMF ¶ 13.)

On or about February 21, 2018, SERT members were notified that they were to report to the Pennsylvania State Police Department's Belfast Barracks at 4:00 a.m. the following morning for a briefing on the operation. (SMF ¶ 14.) Approximately 50 SERT members were activated for the operation, including the 19 original defendants. (SMF ¶ 15.) At the briefing, the SERT members were given a verbal presentation which was video recorded and included a recital of the entire Intelligence Brief and photographs. (SMF ¶¶ 16-17.)

During the pre-raid briefing, SERT Members learned that they were to execute a high-risk search warrant for the Northampton County Drug Task Force based on allegations that Mark Anglemeyer had purportedly conducted multiple methamphetamine sales in a detached garage

located on the Property. (SMF ¶ 8.) They also learned that eight individuals lived in the residence located on the Property. (*Id.*) They were identified as: Ada Anglemeyer (age 76); Richard Anglemeyer (age 77); Mark Anglemeyer (age 52, Ada and Richard's son); Jeffrey Anglemeyer (age 55, Ada and Richard's son); Renae Kluska (age 45, Ada and Richard's daughter); Joseph Kluska (age 44, Renae's husband); Kierra Kluska (age 17, Renae and Joseph Kluska's daughter); and Tyeler Trinkley (age 20, Renae Kluska's son). (*Id.*)

SERT members also learned that state firearms records indicated that several of the residents had legally purchased guns and that guns – including an AR-15 – were believed to be located within the residence. Residents were known to openly carry and shoot guns while they were on the Property. SERT members further learned that several of the residents had criminal records and had exhibited hostility towards law enforcement officers. (*Id.*)

Mark Anglemeyer had a criminal record which included charges of drug sales, assault, and resisting arrest. On one occasion Mark Anglemeyer was involved in an incident in which he led police on a motor vehicle pursuit. (*Id.*) Mark's brother, Jeffrey Anglemeyer, also had a criminal record which included drug sales, firearms violations, assault, resisting arrest and strangulation. (*Id.*) Mark's sister Renae had previously been charged with simple assault, and Joseph Kluska, Renae's husband, had a prior simple assault charge. (*Id.*)

The SERT members knew very little about the interior design of the residence other than it was a split-level house with numerous additions which included an indoor pool and game room. (*Id.*) A confidential informant had reported that the property had "an extensive surveillance System." (*Id.*) The SERT members were then divided into groups and assigned tasks of clearing either the residence, garage or outbuildings. (*Id.*) Nineteen of the SERT

members were assigned the task of entering split-level residence at various entry points and securing the same. (*Id.*)

After the verbal briefing, the SERT members put on their uniforms and equipment and, in the parking lot, conducted at least three rehearsals and proceeded to the Property in several marked vehicles. (SMF ¶¶ 22-24.) They arrived that the Property just before daybreak in full SWAT gear.

Clinton Painter was part of the team that entered the lower level of the split-level residence. (SMF ¶ 37.) Painter was carrying a handgun in one hand and a shield on his opposite arm. The shield had a viewing port and headlights on the front. (SFM ¶ 38.) Painter, along with other troopers, were giving commands to the residents to show their hands and get to the ground. (SMF ¶ 39.) Painter was holding the shield over his face, looking through the shield port and using the headlights; the lighting was dim inside. (SMF ¶ 40.) Upon entry, Officer Painter observed an adult male who retreated to a doorway further in the residence. (SMF ¶ 41.) As Officer Painter approached that area, he encountered a second adult male, who was not wearing a shirt. (SMF ¶ 43.) The second adult male surprised Officer Painter, who he then pushed to the ground applying his shield to the man's backside. (SMF ¶ 44.) Officer Painter then proceeded into the room where the first adult male was now located. (SMF ¶ 46.) That person was yelling and did not respond to commands to get to the ground. (SMF ¶ 47.) Another trooper carrying a shield pinned that person to the wall. (SMF ¶ 48.)

Officer Painter then proceeded further into the residence, where he encountered a female at or near a doorway who he later learned was Ada Anglemeyer. (SMF ¶¶ 49-50.) As Officer Painter approached Ada Anglemeyer, he instructed her to show her hands and get on the ground. (SMF ¶ 51.) Officer Painter saw a doorway to a room behind Ada Anglemeyer and was

uncertain as to whom or what was in it. (SMF ¶ 52.) Ada Anglemeyer had just awoken by a noise and was standing outside her bedroom. (SMF ¶ 53.) Ada Anglemeyer was unaware that police were in the house and did not hear any commands. (SMF ¶ 54.) As Officer Painter continued to approach, Ada Anglemeyer, who did not see him, did not react. (SMF ¶ 55.) Officer Painter then pushed her with his shield; Ada Anglemeyer was facing the shield and the contact caused her to fall backwards. (SMF ¶ 56.) Officer Painter then continued into the room that was behind Ada Anglemeyer. (SMF ¶ 57.) Officer Painter thereafter participated in clearing the rest of the residence, including four additional rooms and an indoor pool area. (SMF ¶ 59.)

Ada Angelmeyer, who was seventy-six years old, alleges that as a result of being pushed to the ground by Officer Painter she suffered two fractured teeth—the upper frontal incisor, a compression fracture to her L1 vertebra, aggravation of degenerative disc and joint disease of the lumbosacral spine, a left gluteal hematoma; and post-traumatic right cubital tunnel syndrome that required post cubital tunnel decompression surgery. (Dr. Robert Sing's Report regarding Ada Anglemeyer, Resp. in Opposition Ex. B; ECF No. 51-2.)

Officer Mark Benson was part of the team that entered the lower level. (SMF ¶ 60.) Officer Benson was armed with a rifle and a handgun. (SMF ¶ 61.) Upon entry, Officer Benson encountered a white male who did not comply with commands to get to the ground, so Officer Benson assisted with securing the male. (SMF ¶ 62.) Officer Benson remained with the male and did not have physical contact with any of the other residents. (SMF ¶ 63.) Officer Lance Schimp was part of the team that entered the lower level. (SMF ¶ 74.) Officer Schimp was armed with a rifle and a handgun. (SMF ¶ 75.) Officer Schimp alleges that he had no physical contact with any of the residents. (SMF ¶ 76.) Officer Vincente Lopez was part of the team that

entered the lower level. (SMF ¶ 31.) After entering, Officer Lopez had physical contact with one person – a white male in the living room whom he placed in flex cuffs. (SMF ¶ 33.)

Officer Robert McGarvey was part of the team that entered the lower level. (SMF ¶ 64.) Officer McGarvey was carrying a handgun in one hand and a shield on his opposite arm. (SMF ¶ 65.) Officer McGarvey, along with other Troopers, was giving commands to the residents to show their hands and get to the ground. (SMF ¶ 66.) Upon entry, Officer McGarvey observed an adult male who retreated to a doorway further in the residence. (SMF ¶ 67.) Officer McGarvey did not know who the adult male was and could not estimate his age. (SMF ¶ 68.) Officer McGarvey followed the adult male, who continued to disregard commands. (SMF ¶69.) Officer McGarvey eventually got close enough to the adult male that he was able to use his shield to force him to the ground. (SMF ¶ 70.) Another SERT member then secured the white male with flex cuffs. (SMF ¶ 71.) Officer McGarvey thereafter participated in clearing the rest of the residence, including a room with a pool. Officer McGarvey does not recall seeing the adult male again and does not know if he suffered any injuries when Officer McGarvey forced him to the ground. (SMF ¶ 73.)

Officer Matthew Wysocky was part of the team that entered the upper level of the residence. (SMF ¶ 92.) Upon entering through the door, Officer Wysocky entered a bedroom and encountered an adult male and an adult female. (SMF ¶ 93.) The male was in a bed asleep or just waking up; Officer Wysocky did not know who he was at that time. (SMF ¶ 94.) Based on other deposition testimony, the male is believed to be Joseph Kluska and the woman, Renae Kluska. (SMF ¶ 95.) On the headboard of the bed was a loaded handgun. (SMF ¶ 96.) Officer Wysocky went towards Kluska and pulled his arms behind his back and handcuffed him using flex cuffs; Joseph Kluska was face down on the bed. (SMF ¶ 97.) Officer Wysocky then moved

Joseph Kluska from the bed to the floor so that he could pat him down for weapons. (SMF ¶ 98.) Officer Wysocky testified that he moved Joseph Kluska by grabbing him in the upper arm area. (SMF ¶ 99.) Kluska testified that Officer Wysocky moved him by grabbing his wrist area and/or the flex cuffs, picking him up and dropping him to the floor. (SMF ¶ 100.) No weapons were found on Kluska's person. (SMF ¶ 101.) Officer Wysocky then moved Joseph Kluska from the floor to a nearby chair. (SMF ¶ 102.) Officer Wysocky testified that he moved him by assisting him to his feet and leading him to the chair. (SMF ¶ 103.) Kluska testified that Wysocky moved him by grabbing the flex cuffs attached to Kluska's wrists and lifting him up. (SMF ¶ 104.) Kluska immediately had pain in his shoulders, which he attributes to Officer Wysocky moving him from the bed to the floor and then the floor to the chair. (SMF ¶ 105.) Joseph Kluska and Renae Kluska remained in the room for approximately 15 minutes until they were escorted to a living room downstairs where the other residents of the house were located. (SMF ¶ 106.)

Joseph Kluska, who was forty-four-years-old, alleges that he suffered tears in both shoulders and later had left rotator cuff surgery. (Kluska Deposition at 73, Resp. in Opposition Ex. H, ECF No. 51-8.) He specifically alleges suffering an acute complete right subscapularis tendon rupture (rotator cuff tear) that required an arthroscopic rotator cuff repair, a left shoulder rotator cuff tear with associated labral tears, and aggravation of degenerative joint disease, in both shoulders, with right greater than left. (Dr. Robert Sing's Report regarding Joseph Klusha, Resp. in Opposition to MSJ, Ex. C, ECF No. 51-3.)

Jeffery Anglemeyer, who was fifty-five-years-old, alleges that Officers Robert McGarvey, Mark Benson, and Vincente Lopez threw him to the ground, stepped on his neck, set him in a chair and repeatedly slapped him in the face while cuffing his hands behind his back. (Jeffery Anglemeyer Deposition at 85, Resp. in Opposition to MSJ, Ex J, ECF No. 51-10.) He

alleges to have suffered aggravation of degenerative disc and joint disease of the cervical spine, posttraumatic bilateral vertical radiculopathy, status post caudal epidural steroid injection, cervicogenic headaches, cervical myofascial pain syndrome, bilateral should sprains, posttraumatic left should impingement syndrome, and post-traumatic stress disorder.  (Dr. Robert Sing's Report regarding Jeffery Anglemeyer, Resp. in Opposition, Ex. E, ECF No. 51-4.)

Richard Anglemeyer, who was seventy-seven-years-old, alleges that Officer Mark Benson grabbed him by the neck and struck him with something that caused him to lose consciousness.  He purportedly suffered complete tears of both the medial and a lateral menisci of the right knee, a contusion of the right knee, facial abrasions, contusions and hematomas of the neck, and Post-Traumatic Stress Disorder.  (Richard Anglemeyer Deposition at 55-56, Resp. in Opposition to MSJ, Ex I, ECF No. 51-9; Dr. Robert Sing's Report regarding Richard Anglemeyer, Response in Opposition to MSJ, Ex D, ECF No. 51-4.)

## II.     LEGAL STANDARD:

Summary Judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012).  To defeat a motion for summary judgment, there must be a factual dispute that is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

**III.   DISCUSSION:**

The Court finds that Defendant Officers – SERT team members – are entitled to the protections afforded by the application of the doctrine of qualified immunity. As will be explained in more detail below, the Court applies the doctrine of qualified immunity after an evaluation of the facts and circumstances surrounding the raid in conjunction with the relevant

law in this jurisdiction. Specifically, the Court evaluated this lawsuit considering the factors used to assess whether a use of force is excessive and, therefore, unconstitutional under the Fourth Amendment. With regard to Plaintiffs' claim for conspiracy to violate their due process right of access to the court – for reasons that will be explained more fully below – the Court finds that Plaintiffs' conspiracy claim fails.

A.  **Defense of Qualified Immunity to Excessive Force Claim:**

The doctrine of qualified immunity shields government officials from monetary damages when their conduct does not violate clearly established statutory or constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This doctrine balances the need to hold public officials accountable and the need to protect them from liability for reasonable performance of their duties. *Id.* Qualified immunity will not shield a public official from liability when a plaintiff shows that: (1) "the official violated a statutory or constitutional right"; and (2) "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A public official may prevail if he or she did not commit a constitutional violation, or if he or she is subject to qualified immunity because the constitutional right that was violated was not clearly established, and courts may address either prong of the qualified immunity analysis first. *Pearson*, 555 U.S. at 236.

In this instance, the Plaintiffs allege that their constitutional right to be free from the use of excessive force was violated. The right to be free from the use of excessive force in the non-custodial setting has been recognized under the Fourth Amendment, which guarantees the right of citizens "to be secure in their persons . . . against unreasonable . . . seizures." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Therefore, the Court will evaluate whether the Defendants

violated Plaintiffs' clearly established right to be free from the use of excessive force when they raided the residence.

**B.     Constitutional Violation – Excessive Use of Force:**

The Court must first consider whether the Defendant Officers' conduct amounted to excessive force. Excessive force claims are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U.S. at 388. The operative question in excessive force cases is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Tennessee v. Garner*, 471 U. S. 1, 8 (1985). The Court analyzes this question "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. In assessing reasonableness, the court should balance the individual's interests against the government's interests and pay careful attention to the facts and circumstances of the case, including the severity of the crime at issue, whether the suspect poses an immediate threat to safety, and whether the suspect is resisting arrest or a flight risk. *Id.* at 396-97; *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017); *Garner*, 471 U.S. at 8 (1985).

Fourth Amendment reasonableness evades a clear-cut test; instead, it calls for an assessment of the officer's behavior under the "totality of the circumstances," in light of the "facts and circumstances confronting them." *Estate of Smith v. Morasco*, 318 F.3d 497, 515 (3d Cir. 2003) (*citing Graham*, 490 U.S. at 397)). Proper application of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The test also takes into account the possibility that the individuals subjected to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. *Id.; Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). Finally, the test for excessive force takes into account whether "the physical force applied was of such an extent as to lead to injury." *Sharrar*, 128 F.3d at 822.

These factors reflect the need for careful balancing of the nature and quality of the intrusion on the person's Fourth Amendment rights against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396. Thus, not all inflictions of force are considered excessive under the Fourth Amendment: "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*

**B.1.   Ada Anglemeyer's Claim for Excessive Use of Force Fails Under the Facts and Circumstances Presented:**

Ada Anglemeyer attributes her injuries to being pushed with a shield by Officer Clinton Painter which caused her to fall backwards on to the floor after emerging from her bedroom in the lower level of the home. (Ada Anglemeyer Deposition at 63.) Officer Painter admits that, while on the lower level, he pushed an individual to the floor whom he later learned was Ada Anglemeyer. (Painter Deposition at 29, MSJ EX. 6, ECF No. 49-9.) The Parties agree that Officer Painter was the only Officer to make contact with Ada Anglemeyer, and she is not

pursuing claims for excessive force against Officers Mark Benson, Vincinte Lopez, Robert McGarvey, Lance Schimp or Matthew Wysocky.[2]

Officer Painter is entitled to the application of qualified immunity for the force he used when he pushed Ada Anglemeyer to the floor during the raid. The application of qualified immunity hinges on whether a reasonable officer could have believed his actions were lawful, in light of clearly established law and the information the officer possessed. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Thompson v. Howard*, 679 F. App'x 177, 184 (3d Cir. Feb 17, 2017). In other words, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007) (*quoting Saucier*, 533 U.S. at 202). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* "[Q]ualified immunity operates 'to protect officers from the sometimes hazy border between excessive and acceptable force.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*quoting Saucier*, 533 U.S. at 206).

In short, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Williams v. City of York*, 967 F.3d 252, 259 (3d Cir. 2020) (*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The purpose of the step two inquiry [of qualified immunity] is to acknowledge the reality that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" *Santini v. Fuentes*, 795 F.3d 410, 418 (3d Cir. 2015) (*quoting Curley*, 499 F.3d at 207).

---

[2] To survive summary judgment, Plaintiffs are required to present evidence to establish the personal involvement of the Defendant in the alleged excessive force. *Jutrowski v. Twp. Of Rivierdale*, 904 F.3d 280 (3d Cir. 2018). Ada Anglemeyer's focus is solely on the contact she had with Officer Painter.

It is the opinion of the Court that Officer Painter's conduct during this incident was not objectively unreasonable under the circumstances. Officer Painter was assigned the task of serving a high-risk warrant at a residence in which he had been advised could contain numerous firearms as well as multiple residents, some of whom had criminal records for violent offenses. He knew very little about the layout of the home other than that it was a split-level home with a pool room and game room. Lighting conditions were poor and his visibility was limited while he looked through a port window of a tactical shield at an unknown female. (Painter Deposition at 29.) He testified that he could not tell if this was one of the expected female residents or someone else. (Painter Deposition at 29-30.) At the time, he did not know if Ada Anglemeyer was in possession or had ready access to a firearm, and she did not comply with his demand get on the ground. He did not know if someone else was in the room behind her because he could not see inside.

Officer Painter testified that he ordered the woman to get to the ground; when she did not comply, he pushed her with his shield. Based on his testimony, the Court could conclude that Officer Painter had few other options because he was holding a tactical shield in one hand and a firearm in the other. Unfortunately, Ada Anglemeyer was injured in the incident; however, this alone does not establish an unconstitutional use of objectively unreasonable excessive force. *Keller v. Crawford*, 465 F. Supp. 3d 472, 483 (E.D. Pa. 2020) (*interpreting Abdullahi v. City of Madison*, 423 F.3d 763, 770-71 (7th Cir. 2005) and stating a "showing that a plaintiff was injured is not itself sufficient to hold excessive force was used."); *Bornstad v. Honey Brook Twp.*, 211 F. App'x 118, 123-24 (3d Cir. 2007)).

**B.2.   Joseph Kluska's Claim for Excessive Use of Force Fails Under the Facts and Circumstances Presented:**

Joseph Kluska alleges that he was injured in the raid by Officer Matthew Wysocky. He does not assert claims for excessive force against Officers Mark Benson, Vincinte Lopez, Robert McGarvey, Lance Schimp, or Clint Painter. As described in the fact section above, Mr. Kluska alleges that he was zip tied from behind and vertically lifted out of bed by his wrists or the zip tie. (Joseph Kluska Deposition at 48-49, 52-54.) He alleges that after being lifted from bed, he was dropped to the floor and again lifted by his wrists or the zip tie and thrown into a chair. (*Id.*)

Officer Wysocky is entitled to the application of qualified immunity for all of the same reasons as Officer Painter – as described above. At the briefing conference, prior to executing the search warrant, Officer Wysocky was provided with the same information as Officer Painter. Under the circumstances, the Court is of the opinion that the force used by Officer Wysocky does not give rise to a constitutional violation. Officer Wysocky was assigned the task of serving a high-risk warrant at a residence which he was told contained numerous firearms along with multiple residents some of whom had criminal records for violent offenses. He knew very little about the internal layout of the home other than that it was a split-level with a pool room and game room.

Officer Wyscocky was entering a dangerous situation in which it was imperative to get all of the residents under control as quickly as possible. During the raid, when Officer Wyscocky entered the bedroom where Mr. Kluska was sleeping, he encountered unknown individuals and saw a handgun laying on the back of the bed. Under these circumstances, the Court finds that Officer Wyscocky's conduct was not objectively unreasonable, and did not violate the Fourth Amendment. The fact that Mr. Kluska was injured in the incident does not establish an objectively unreasonable unconstitutional use of excessive force. *See Keller v.*

16

*Crawford*, 465 F. Supp. 3d 472, 483 (E.D. Pa. 2020) (*interpreting Abdullahi v. City of Madison*, 423 F.3d 763, 770-71 (7th Cir. 2005), and stating that a "showing that a plaintiff was injured is not itself sufficient to hold excessive force was used."); *Bornstad v. Honey Brook Twp.*, 211 F. App'x 118, 123-24 (3d Cir. 2007)).

**B.3.  Jeffrey Anglemeyer's Claim for Excessive Use of Force Fails Under the Facts and Circumstances Presented:**

Jeffrey Anglemeyer pursues excessive force claims against Officers Robert McGarvey, Lance Schimp, and Vincinte Lopez.  He does not attempt to implicate any of the other Officers in his excessive force claim.  Jeffery Anglemeyer alleges he was tackled or thrown to the floor, that one of the Officers placed a foot on the back of his neck, that he was forcibly moved to a chair where he was repeatedly slapped in the face and had his hands cuffed behind his back. (Jeffery Anglemeyer Deposition page 85-86.)  However, Jeffrey Anglemeyer cannot clearly identify which Officers applied the force allegedly used against him during the raid.  (Jeffrey Anglemeyer Deposition page 57-58, 63.)

For all of the reasons that Officers Painter and Wysocky are entitled to the application of qualified immunity, Officers McGarvey, Schimp and Lopez are also entitled to qualified immunity in relationship to any force allegedly applied to Jeffery Anglemeyer.  As previously discussed, the SERT members were all provided with the same information during the pre-raid briefing conference.  The Officers were executing a dangerous high-risk warrant.  The Court is of the opinion that the force used to subdue Jeffery Anglemeyer was not so objectively unreasonable as to establish a claim for unconstitutional use of excessive force in violation of the Fourth Amendment.

Jeffery Anglemeyer's claim for excessive force also fails because he cannot identify with, any particularity, the Officer or Officers who allegedly injured him during the raid.  (Jeffery

Anglemeyer Deposition at 57-58, 60, 63.) He simply points to three Officers who were members of the SERT team as potential culprits. Discovery has failed to reveal the identities of the Officers who applied the various levels of force when interacting with Jeffery Anglemeyer; therefore, his claim fails. Under Third Circuit precedent, in order to survive summary judgement, the plaintiffs are required to present evidence establishing the personal involvement of each defendant in the alleged excessive force. *Jutrowski*, 904 F.3d at 291.

**B.4.  Richard Anglemeyer's Claim for Excessive Use of Force Fails Under the Facts and Circumstances Presented:**

Richard Anglemeyer pursues excessive force claims against Officer Mark Benson. He does not directly implicate any of the other Officers in his excessive force claim. With reference to his claim, he testified that he was injured about 10 to 12 minutes after SERT members initially entered and after at least one of the Northampton County Drug Task Force investigators had entered. He testified that at that point, two SERT members, one of whom was holding a flashlight, suddenly approached him. Without saying a word, one of these two SERT members then grabbed him by the neck, hit him with something hard, which caused him to briefly lose consciousness. (Richard Anglemeyer Deposition at 30-31, 32, 34-36.) Presumably, he was struck with a flashlight.

Richard Anglemeyer looks to the record and materials produced during discovery and argues through a process of deduction that it must have been Officer Benson who struck him. However, the record does not support his contention because there were at least 19 SERT members moving around the residence in various locations at that point in time. Richard Anglemeyer's claim fails because he cannot identify with, any particularity, the Officers who allegedly struck or injured him during the raid. Under Third Circuit precedent, in order to survive summary judgement, the plaintiffs are required to present evidence establishing the

personal involvement of the defendant in the alleged excessive force. *Jutrowski*, 904 F.3d at 291.

**C.      Plaintiffs' Claim for Conspiracy to Violate their Due Process Right of Access to the Court Fails:**

In their response to Defendants' motion for summary judgment, both Jeffery and Richard Anglemeyer pursue an independent claim for conspiracy to violate their due process rights by depriving them of access to the Courts. (Opposition Brief at 23.) They pursue this claim against Officers McGarvey, Schimp, Benson and Lopez. (*Id.*) They argue that Defendants intentionally concealed their identities by covering their faces and not wearing a uniform with their name and badge number on the outside. (*Id.*) They further allege that the Officers should have been required to wear a body camera. (*Id.*)

The Claim asserted by Jeffery and Richard Anglemeyer fails because it was not pled in the Second Amended Complaint. Although Plaintiffs pled a claim for violation of 42 U.S.C. § 1983, the Second Amended Complaint is devoid of any specific allegations to establish that they were advancing a claim for conspiracy to violate their due process right of access to the court. (*See Generally* Second Amended Complaint.) Putting aside the Plaintiffs' pleading deficiency, it is the opinion of this Court that the facts cited by Plaintiffs do not support their claim for conspiracy to violate their due process right of access to the court.

The Officers who were members of the SERT team wore their standard issue SERT uniforms when they conducted the raid. The uniform includes body armor, a helmet and face coverings. The fact that the Officers wore standard protective gear when conducting the raid, does not give rise to a conspiracy claim such as asserted by the Plaintiffs; therefore, their claim fails.

## IV.     CONCLUSION:

For these reason, the Defendants' motion for summary judgment will be granted and this lawsuit will be dismissed.  An appropriate order will be entered.

                                                       BY THE COURT:

                                                       /s/ John Milton Younge
                                                  Judge John Milton Younge